**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| SUSAN FOX, individually, and on behalf of all others similarly situated, | Case No. 12-CV-14390 |
| Plaintiff, | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| TIME, INC., a Delaware Corporation, | |
| Defendant. | |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Susan Fox brings this Class Action Complaint against Defendant Time, Inc.

("Time") to obtain redress for all persons injured by Time's intentional and unlawful disclosure

of Plaintiff's and its other subscribers' highly personal and sensitive information. For her Class

Action Complaint ("Complaint"), Plaintiff alleges as follows upon personal knowledge as to

herself and her own acts and experiences, and, as to all other matters, upon information and

belief, including investigation conducted by her attorneys:

**NATURE OF THE CASE**

1.      Time is "one of the largest branded media companies in the world,"[1] publishing

over 115 magazines, including *TIME*, *Sports Illustrated*, *People*, *Fortune*, *GOLF Magazine*, *All

You*, *Southern Living*, *Real Simple*, *This Old House*, and *Health*.

2.      Unfortunately for its subscribers, Time isn't content with just making money from

magazine sales. Instead, Time double dips by selling its subscribers' personal information—

including, their full names, titles of magazines subscribed to, and home addresses (collectively

---

[1]     Time, Inc. "About Us," http://www.timeinc.com/aboutus/ (last visited Oct. 2, 2012).

"Personal Reading Information"), as well as myriad other personal, lifestyle, and demographic information such as e-mail addresses, gender, age, net worth, home value, political party, religion, and medical conditions, and, when applicable, the number and gender of children living in the household—to data miners and other third parties.

3.      Time's disclosure of such personal, demographic, and lifestyle information is not only unlawful, but also dangerous because it allows for targeting of particularly vulnerable members of society. In fact, anyone can buy a customer list from Time that contains a number of categories of subscriber information. For example, a purchaser could buy a list with the names and addresses of all *TIME* subscribers who are single, recently moved to Ferndale, have a net worth over $500,000, require corrective lenses, and donate to international aid causes. Time would sell such a list for approximately $209 per thousand subscribers listed.

4.      While Time profits handsomely from such practices, its subscribers are completely unaware that their personal information is sold on the open market. In fact, Time never receives its customers' consent prior to selling their Personal Reading Information.

5.      By selling its customers' Personal Reading Information without their consent, Time not only disregards its customers' safety and basic privacy rights, but also violates Michigan's Video Rental Privacy Act, M.C.L. § 445.1712 ("VRPA"), which prohibits companies from disclosing without permission any record or information concerning a customer's purchase of written materials if the record identifies the customer.

6.      Accordingly, Plaintiff brings this Class Action Complaint against Time for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the VRPA, for breach of contract, and in the alternative to breach of contract, for unjust enrichment.

## PARTIES

7.      Plaintiff Susan Fox is a natural person and citizen of the State of Michigan.

8.      Defendant Time, Inc. is a Delaware corporation with its principal place of business at 1271 Avenue of the Americas, in the City of New York, State of New York. Time does business throughout Michigan and the United States.

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over Time because it is registered to do business in Michigan, and regularly conducts business in Michigan, including soliciting business from, and entering into consumer transactions with, Michigan consumers. Further, the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or emanated from, Michigan.

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because at least one Class member is a citizen of a different state than Defendant, the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and none of the exceptions under that subsection apply to this action.

11.      Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to the claim occurred in this District. *See* 28 U.S.C. § 1391(a)(2). Venue is additionally proper because Plaintiff resides within this District in Oakland County, and Defendant transacts significant business in this District, including soliciting consumer business and entering into consumer transactions.

## FACTUAL BACKGROUND

### *Michigan's Video Rental Privacy Act*

12.      In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes,

and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

13.     Recognizing the need to protect its citizens' privacy rights, Michigan's legislature enacted the VRPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378.

14.     Section 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712 (emphasis added).

15.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless.)

16.     Despite the fact that thousands of Michigan residents subscribe to Time publications, Time disregards its legal responsibility by systematically violating the VRPA.

### The Personal Information Market: Consumers' Personal Information Has Real Value

17.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle

remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our life . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

18.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

19.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace, and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. *Data is currency. The larger the data set, the greater potential for analysis—and profit.*[4]

20.     It is now a nearly ubiquitous practice for companies that collect consumer information—such as names, addresses, and product purchase histories—to profit from sharing this data with numerous third parties, without ever disclosing such practices to or obtaining consent from the source consumer.

21.     In fact, an entire industry exists where companies known as data miners purchase, trade, and otherwise collect massive databases of information about consumers. According to an article on the *TIME* website, data miners then profit by selling this "extraordinarily intrusive"

---

[2]     The Information Marketplace: Merging and Exchanging Consumer Data (Mar. 13, 2001), http://www.ftc.gov/bcp/workshops/infomktplace/transcript.htm (last visited Oct. 2, 2012).

[3]     *See*, Web's Hot New Commodity: Privacy, WSJ.com (Feb. 27, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Oct. 2, 2012).

[4]     Statement of FTC Commissioner Pamela Jones Harbour, http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited Oct. 2, 2012). (emphasis added).

information in an open and largely unregulated market.[5]

22.     The scope of data miners' knowledge about consumers is truly astounding: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[6]

23.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[7]

24.     In their letter, the co-Chairmen recognized that:

> [t]he business of data brokerage, namely the collecting, assembling, maintaining, and selling to third-parties of consumers' personal information, has grown into a multiple billion dollar industry. *By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer*. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[8]

---

[5]     *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Oct. 2, 2012).

[6]     Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Oct. 2, 2012).

[7]     *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Congressman Ed Markey (July 24, 2012), http://markey.house.gov/press-release/bipartisan-group-lawmakers-query-data-brokers-about-practices-involving-consumers%E2%80%99 (last visited Oct. 2, 2012).

[8]     Letter from Edward J. Markey and Joe Barton, co-Chairmen, Congressional Bi-Partisan Privacy Caucus, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 2, 2012) (available at http://markey.house.gov/sites/markey.house.gov/files/documents/Axciom%20letter.pdf) (emphasis added).

25.     Data mining is especially troublesome when consumer information is sold to direct marketing companies. In addition to causing waste and inconvenience, direct marketers often use consumer information to lure unsuspecting consumers into various scams,[9] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Time share information with data miners and direct marketers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

26.     Information disclosures like Time's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12]

27.     Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like Time's are particularly

---

[9]      *Prize Offers: You Don't Have to Pay to Play!*, Federal Trade Commission, http://www.ftc.gov/bcp/edu/pubs/consumer/telemarketing/tel17.shtm (last visited Oct. 2, 2012).

[10]     Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007 at A1.

[11]     *Id.*

[12]     *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* http://www.ftc.gov/os/2000/08/agingtestimony.htm (last visited Oct. 2, 2012).

troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

28.    Time is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data miners, direct marketers, and other third parties is a widespread practice in the publishing industry.

29.    Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

30.    In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[14]

31.    These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[15]

32.    Thus, in today's economy, individuals and businesses alike place a real,

---

[13]    *Id.*

[14]    *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nyTimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Oct. 2, 2012).

[15]    Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also generally* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Oct. 2, 2012).

quantifiable value on consumer data and corresponding privacy rights.[16] As such, where a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer is denied the full monetary value of that transaction.

### *Time Unlawfully Sells its Subscribers' Personal Reading Information*

33.     Time maintains a vast digital database comprised of its subscribers' Personal Reading Information. Time discloses its subscribers' Personal Reading Information to data mining companies including Acxiom and others, who then supplement that information with additional sensitive personal information about each Time subscriber, including age, income, net worth, home value, marriage status, health ailments, hobbies, political affiliation, travel habits, financial practices, religion, ethnicity, nationality, and, where applicable, number and gender of children in the household. (*See*, *e.g.*, Group Exhibit 1.)

34.     Time then sells its mailing lists—which include subscribers' Personal Reading Information, and can include the sensitive information obtained from data miners—to interested third parties, allowing those companies to identify which individuals purchased which magazines. (*See*, *e.g.*, Group Exhibit 1.)

35.     As a result of Time's data compiling and sharing practices, companies can purchase mailing lists from Time that identify Time subscribers by their most intimate details: income, political affiliation, religion, and even by health ailments such as diabetes or arthritis. Time's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers. For example, Time will sell—to anyone willing to pay for it—a list of elderly, Lutheran *GOLF Magazine*

---

[16]     Hann *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at 2, *available at* http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited Oct. 2, 2012) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

subscribers who are diabetic military veterans, with a net worth above $500,000, and a

susceptibility to mail-order offers.

36.     Time does not seek its subscribers' consent prior to any of these disclosures, and

its subscribers remain unaware that their Personal Reading Information and other sensitive

personal information is being bought and sold on the open market.

37.     Consumers can sign up for Time subscriptions through numerous media outlets,

including the Internet, telephone, or traditional mail. Regardless of how the consumer subscribes,

Time never requires the individual to read or agree to any terms of service, privacy policy, or

information-sharing policy. Consequently, Time uniformly fails to obtain any form of consent

from—or even provide effective notice to—its subscribers before disclosing their Personal

Reading Information.

38.     As a result, Time disclosed and continues to disclose its customers' Personal

Reading Information—including their reading habits and preferences that can "reveal intimate

facts about our lives, from our political and religious beliefs to our health concerns"[17]—to

anybody willing to pay for it.

39.     By and through these actions, Time has intentionally disclosed to third parties its

Michigan subscribers' Personal Reading Information without consent, in direct violation of the

VRPA and in breach of its contracts with Plaintiff and the other members of the Class.

### FACTS RELATING TO PLAINTIFF SUSAN FOX

40.     Plaintiff Susan Fox is a natural person and citizen of the State of Michigan.

41.     Fox is a current subscriber to *Real Simple* and *TIME*, and is a former subscriber to

---

[17]     *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited Oct. 2, 2012).

*This Old House* and *Health*.

42.     *Real Simple*, *TIME*, *This Old House* and *Health* are magazines published, owned, and operated by Time.

43.     Fox has never agreed to allow Time to sell or disclose her Personal Reading Information to anyone.

44.     Time has never given Fox prior notice of any sale or disclosure of her Personal Reading Information.

45.     However, beginning on the date that Fox subscribed to a Time publication, and continuing to the present, Time has disclosed, and continues to disclose, without consent or prior notice, Fox's Personal Reading Information (*i.e.*, information that identifies Fox as a current or former *Real Simple*, *TIME*, *This Old House*, or *Health* subscriber) to data mining companies including Acxiom and others, who then supplement that information with data from their own files.

46.     Furthermore, during that same time period, Time has sold—and continues to sell and offer for sale—mailing lists containing Fox's Personal Reading Information to third parties seeking to contact Time subscribers, without first obtaining Fox's consent or even giving her prior notice of the sales.

47.     Because Time disclosed and sold her Personal Reading Information, Fox now receives a deluge of junk mail and telephone solicitations offering, among other things, discounted magazine subscriptions. These unwanted offers waste Fox's time, money, and resources, and cause her emotional distress, including irritation, annoyance, and anxiety and fear that her personal information will fall into the hands of thieves and scammers. This increase in harassing junk mail and phone calls received by Fox is attributable to Time's sale of her Personal

Reading Information.

48.     Additionally, because Fox is entitled by law to privacy in her Personal Reading Information, and because she paid money for her subscriptions to *Real Simple*, *TIME*, *This Old House* and *Health*, Time's sale of Fox's Personal Reading Information deprived Fox of the full set of benefits to which she was entitled as part of her *Real Simple*, *TIME*, *This Old House* and *Health* subscriptions, thereby causing her economic harm.

## CLASS ACTION ALLEGATIONS

49.     **Class Definition:** Plaintiff brings this action on behalf of herself and a proposed Class, defined as follows:

> All Michigan residents who had their Personal Reading Information disclosed to third parties by Time without consent.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendant, and (5) the legal representatives, successors, or assigns of any such excluded person.

50.     **Numerosity:** The exact number of Class members is unknown to Plaintiff at this time, but it is clear that individual joinder of each Class member is impracticable. Defendant has deceived, and profited from selling the Personal Reading Information of thousands of consumers who fall into the definition set forth above. Ultimately, members of the Class will be easily identified through Defendant's records.

51.   **Typicality:** Plaintiff's claims are typical of the claims of the other Class members. Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

52.   **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class members, and they have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other Class members.

53.   **Commonality and Predominance:** Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting only individual members. Those questions with respect to the Class include, but are not limited to:

(a)   Whether Time is "engaged in the business of selling at retail" books or other written materials (*i.e.*, magazines);

(b)   Whether Time obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information;

(c)   Whether Time's disclosure of Plaintiff's and the Class's Personal Reading Information violated the Video Rental Privacy Act, M.C.L. § 445.1712;

(d)   Whether Time's sale of Plaintiff's and the Class's Personal Reading Information constitutes a breach of contract; and

(e)   Whether Time's sale and disclosure of Plaintiff's and the Class's Personal

Reading Information constitutes unjust enrichment.

54.     **Superiority:** Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all Class members is impracticable. The damages suffered by the individual Class members will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the Class members to obtain effective relief from Defendant's misconduct on an individual basis. Even if Class members could sustain individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

55.     **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's practices challenged herein apply to and affect the Class members uniformly, and Plaintiff's challenge of those practices hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

56.     Plaintiff reserves the right to revise the definition of the Class as necessary based upon information learned in discovery.

**FIRST CAUSE OF ACTION**
**Violation of the Video Rental Privacy Act**
**(M.C.L. § 445.1712)**
**(On Behalf of Plaintiff and the Class)**

57.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

58.     As a magazine publisher that sells subscriptions to consumers, Time is engaged in the business of selling written materials at retail. M.C.L. § 445.1712.

59.     By subscribing to *TIME*, *Real Simple*, *This Old House* and *Health*, Fox purchased written materials from Time. M.C.L. § 445.1712.

60.     Because Fox purchased written materials from Time, she is a "customer" within the meaning of the VRPA. M.C.L. § 445.1711(a).

61.     At all times relevant, and beginning on the dates Fox initiated her first Time subscription, Time disclosed—and continues to disclose—Fox's Personal Reading Information, which identifies her as a *TIME*, *Real Simple*, *This Old House*, or *Health* subscriber, in at least two ways.

62.     First, Time disclosed mailing lists containing Fox's Personal Reading Information to data mining companies including Acxiom and others, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Time.

63.     Second, Time sold its mailing lists containing Fox's Personal Reading Information—enhanced with additional information from data miners—to interested third parties, who could then use the mailing lists to contact Time subscribers. Because the mailing lists included the additional information from the data miners, the lists were more valuable, and Time was able to increase its profits gained from the mailing list sales.

64.     By selling and otherwise disclosing its subscriber lists, Time disclosed to persons

15

other than Plaintiff records or information concerning Fox's purchase of written materials from Time. M.C.L. § 445.1712.

65.     The information disclosed by Time indicates Fox's name and address, as well as the fact that she subscribes or subscribed to *TIME*, *Real Simple*, *This Old House* or *Health*. Accordingly, the records or information disclosed by Time indicate Fox's identity. M.C.L. § 445.1712.

66.     Fox never consented to Time disclosing her Personal Reading Information to anyone.

67.     Worse still, Time did not even give Fox prior notice of its disclosure of her Personal Reading Information to third parties.

68.     By disclosing Fox's Personal Reading Information, Time violated Fox's common law right to privacy.

69.     By disclosing Fox's Personal Reading Information, Time violated Fox's statutorily protected right to privacy in her reading habits. M.C.L. § 445.1712.

70.     Additionally, because Fox paid for her Time subscriptions, and Time was obligated to comply with the VRPA, Time's unlawful disclosure of Fox's Personal Reading Information deprived her of the full value of her paid-for subscriptions. Because Fox ascribes monetary value to the privacy of her Personal Reading Information, Time's unlawful sale and disclosure of her Personal Reading Information deprived her of paid-for value, thereby causing her economic harm.

71.     Also, because Fox and the other Class members priced VRPA compliance into their willingness to subscribe to Time publications, they overpaid for their Time subscriptions.

72.     Time's disclosure of Fox's Personal Reading Information to third parties has also

caused an influx of third-party print advertisements and marketing calls to her cellular phone, causing emotional distress in the form of irritation, aggravation, anxiety, and fear that her information will be obtained and misused by thieves and scammers, as well as damages in the form of decreased available cellular phone minutes.

73.     Further, Fox's and the other Class members' Personal Reading Information has monetary value, and Time's failure to comply with the VRPA deprived Fox and the Class of their statutorily guaranteed right to control the disclosure and use of that data. As such, Time has diminished the value of Fox's and the other Class members' personal property, and deprived them of the opportunity to sell their personal property at market rates for their own financial gain. Accordingly, Fox and the other Class members have sustained, and continue to sustain, monetary injuries as a direct and proximate result of Time's violation of the VRPA.

74.     As a result of Time's unlawful and continued disclosure of their Personal Reading Information, Plaintiff and the other Class members have suffered privacy and economic injuries. On behalf of themselves and the Class, Plaintiff seeks: (1) an injunction requiring Defendant Time to obtain consent from Michigan subscribers prior to the disclosure of their Personal Reading Information as required by the VRPA; (2) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to M.C.L. § 445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

**SECOND CAUSE OF ACTION**
**Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

75.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

76.     Time offered to sell magazine subscriptions to Fox and the other Class members for specific prices.

77.     Fox and the other Class members accepted Time's offers by agreeing to pay the offered prices as consideration for purchasing the magazine subscriptions.

78.     Accordingly, Time, on the one hand, and Fox and the other Class members, on the other, entered into binding contracts for magazine subscriptions.

79.     Because the laws existing at the time and place of the making of a contract are incorporated into it, the contracts between Time and Fox and the other Class members included obligations for the parties to abide by all applicable laws, including the VRPA.

80.     Fox and the other Class members performed their obligations under the contracts by paying the consideration owed to Time for the purchase of the magazine subscriptions, and by complying with all applicable laws.

81.     The ability to control disclosure of sensitive personal information—such as Personal Reading Information—is material to any consumer transaction because it is likely to affect a consumer's decision to, or conduct regarding, purchase of a product or service.

82.     Time's failure to perform its contractual obligations imposed by the VRPA—*i.e.*, maintaining confidentiality of subscribers' Personal Reading Information—constitutes a material breach by Time of its contracts with Fox and the other Class members.

83.     Plaintiff and the other Class members have suffered actual damages as a result of Time's breach in the form of the value Fox and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information. This amount is tangible and will be calculated at trial.

84.     Further, a portion of the purchase price of each Time subscription sold to Fox and the other Class members was intended to ensure the confidentiality of Fox's and the other Class members' Personal Reading Information, as required by the VRPA. Because Fox and the other

Class members were denied services that they paid for and were entitled to receive—*i.e.*, confidentiality of their Personal Reading Information—they incurred actual monetary damages.

85.     Additionally, because Time profited from its breach, Fox and the other Class members are entitled to disgorgement of all profits obtained by Time from its unlawful disclosure of its subscribers' Personal Reading Information.

86.     Accordingly, Plaintiff and the other Class members seek an order declaring that Time's conduct constitutes a breach of contract, and awarding Plaintiff and the Class disgorgement of Time's unlawfully obtained profits and damages in an amount to be calculated at trial.

### THIRD CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)
### <u>(In the Alternative to Breach of Contract)</u>

87.     Plaintiff incorporates the allegations contained in paragraphs 1 through 74 as if fully set forth herein.

88.     Fox's claim for unjust enrichment is brought in the alternative to her claim for breach of contract.

89.     Fox and the Class members conferred a benefit on Time by providing Time with their Personal Reading Information and paying Time for their magazine subscriptions. Time received and retained the information and money belonging to Fox and the Class when Plaintiff and the Class subscribed to Time publications.

90.     Time appreciates or has knowledge of such benefits.

91.     Under the VRPA, Fox and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

92.     Under principles of equity and good conscience, because Time failed to comply

with the VRPA, Time should not be allowed to retain the full amount of money Fox and the Class paid for their subscriptions or the money it received by selling Fox's and the Class's Personal Reading Information.

93. Fox and the other Class members have suffered actual damages as a result of Time's unlawful conduct in the form the value Fox and the other Class members paid for and ascribed to confidentiality of their Personal Reading Information. This amount is tangible and will be calculated at trial.

94. Further, a portion of the purchase price of each Time subscription sold to Fox and the other Class members was intended to ensure the confidentiality of Fox's and the other Class members' Personal Reading Information, as required by the VRPA. Because Fox and the other Class members were denied services that they paid for and were entitled to receive—*i.e.*, confidentiality of their Personal Reading Information—they incurred actual monetary damages.

95. To prevent inequity, Time should return to Fox and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from Time's sale and disclosure of Fox's and the Class's Personal Reading Information.

96. Accordingly, Plaintiff and the Class members seek an order declaring that Time's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by Time through its sale and disclosure of Plaintiff's and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Susan Fox, on behalf of herself and the Class, prays that the Court enter judgment in her favor and against Time and for the following relief:

    (1) Certify the Class as defined above, appoint Plaintiff as Class Representatives, and designate her counsel as Class Counsel;

(2) Declare that Time's conduct as described herein violates the Video Rental Privacy Act, M.C.L. § 445.1712;

(3) Declare that Time's conduct as described herein constitutes a breach of contract, or, in the alternative, unjust enrichment;

(4) Award actual damages, including disgorgement, or $5,000, whichever is greater, to each Class member, as provided by the Video Rental Privacy Act, M.C.L. § 445.1715(a);

(5) Award injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Time to cease the unlawful disclosures discussed herein;

(6) Award of reasonable attorneys' fees, interest and costs, M.C.L. § 445.1715(b); and

(7) Such other and further relief as the Court deems equitable and just.

## DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: October 3, 2012

**Susan Fox**, individually and on behalf of all others similarly situated,


By:/s/  Ari J. Scharg
         One of her attorneys

Henry M. Scharg
LAW OFFICE OF HENRY M. SCHARG
302 W. Main Street
Northville, Michigan 48167
Tel: (248) 596-1111
Fax: (248) 596-1578
hmsattyatlaw@aol.com

Ari J. Scharg
EDELSON MCGUIRE, LLC
350 N. LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378
ascharg@edelson.com

*Counsel for Plaintiff Susan Fox*