## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ROSE COULTER-OWENS, individually, and on behalf of all others similarly situated, | Case No. 2:12-cv-14390-GCS-MKM |
| | Hon. George C. Steeh |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| TIME INC., a Delaware Corporation, | |
| Defendant. | |

## FIRST AMENDED CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff Rose Coulter-Owens brings this class action complaint against Defendant Time Inc. ("Time") to obtain redress for all persons injured by Time's intentional and unlawful disclosure of Plaintiff's and its other subscribers' highly personal and sensitive information. For her First Amended Class Action Complaint ("Complaint"), Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

### NATURE OF THE CASE

1.      Time is "one of the largest branded media companies in the world,"[1]

---

[1]      Time Inc. About Us, http://www.timeinc.com/aboutus/ (last visited Nov. 9, 2013).

1

publishing over 115 magazines, including *TIME*, *Sports Illustrated*, *People*, *Fortune*, *GOLF Magazine*, *All You*, *Southern Living*, *Real Simple*, *This Old House*, and *Health*.

2.     To supplement its sales and advertising revenues, Time also sells its subscribers' personal information—including their full names, titles of magazines subscribed to, and home addresses (collectively "Personal Reading Information"), as well as myriad other personal, lifestyle, and demographic information such as e-mail addresses, gender, age, net worth, home value, political party, religion, and medical conditions, and, when applicable, the number and gender of children living in the household—to data miners and other third parties.

3.     Time's disclosure of such personal, demographic, and lifestyle information is problematic because it allows for highly specific targeting of groups of individuals. For example, anyone could buy from Time a list with the names and addresses of all *TIME* subscribers who are single, recently moved to Ferndale, have a net worth over $1,000,000, require corrective lenses, and donate to international aid causes. Time would sell such a list for approximately $177 per thousand subscribers listed.

4.     While Time profits handsomely from such practices, its subscribers are completely unaware that their personal information is sold on the open market.

In fact, Time never receives its customers' consent prior to selling their Personal Reading Information.

5.      By selling its customers' Personal Reading Information without their consent, Time not only disregards its customers' safety and basic privacy rights, but also violates Michigan's Video Rental Privacy Act, M.C.L. § 445.1712 ("VRPA"), which prohibits companies from disclosing without permission any record or information concerning a customer's purchase of written materials if the record identifies the customer.

6.      Accordingly, Plaintiff brings this Class Action Complaint against Time for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the VRPA, for breach of contract, and in the alternative to breach of contract, for unjust enrichment.

## PARTIES

7.      Plaintiff Rose Coulter-Owens is a natural person and citizen of the State of Michigan.

8.      Defendant Time Inc. is a Delaware corporation with its principal place of business at 1271 Avenue of the Americas, in the City of New York, State of New York. Time does business throughout Michigan and the United States.

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over Time because it is registered

to do, and regularly does, business in Michigan, including soliciting consumer business from, and entering into consumer transactions with, Michigan consumers. Further, the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or emanated from, Michigan.

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because at least one Class member is a citizen of a different state than Defendant, the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and none of the exceptions under that subsection apply to this action.

11.    Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to the claim occurred in this District. 28 U.S.C. § 1391(a)(2). Venue is additionally proper because Plaintiff resides within this District in Oakland County, and Defendant transacts significant business in this District, including soliciting consumer business and entering into consumer transactions.

## FACTUAL BACKGROUND

### *Michigan's Video Rental Privacy Act*

12.    In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes, and dislikes," and that "the trail of information

generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599, at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

13.    Recognizing the need to protect its citizens' privacy rights, Michigan's legislature enacted the VRPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378.

14.    Section 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712 (emphasis added).

15.    Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected

from the disruptive intrusion of a roving eye." S. Rep. No. 100−599, at 6 (statement of Rep. McCandless).

16.    As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

17.    Senator Leahy also explained why choices in movies and reading materials are so private: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

18.    Michigan's passage of the VRPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as Exhibit A.)

6

19.     Despite the fact that thousands of Michigan residents subscribe to Time publications, Time disregards its legal responsibility by systematically violating the VRPA.

### The Personal Information Market:
### Consumers' Personal Information Has Real Value

20.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our life . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

21.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

22.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace, and publicly stated that:

---

[2]     The Information Marketplace: Merging and Exchanging Consumer Data, FTC (Mar. 13, 2001), http://www.ftc.gov/bcp/workshops/infomktplace/transcript.htm (last visited Nov. 10, 2013).

[3]     *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, WSJ.com (Feb. 28, 2011, 12:01 AM), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Nov. 10, 2013).

Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. *Data is currency. The larger the data set, the greater potential for analysis—and profit.*[4]

23.    It is now a nearly ubiquitous practice for companies that collect consumer information—such as names, addresses, and product purchase histories—to profit from sharing this data with numerous third parties, without ever disclosing such practices to or obtaining consent from the source consumer.

24.    In fact, an entire industry exists where companies known as data miners purchase, trade, and otherwise collect massive databases of information about consumers. According to an article on the *TIME* website, data miners then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[5]

25.    The scope of data miners' knowledge about consumers is truly astounding: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics,

---

[4]    Statement of FTC Commissioner Pamela Jones Harbour, FTC (Dec. 7, 2009), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited Nov. 10, 2013) (emphasis added).

[5]    *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Nov. 10, 2013).

buying habits, household health worries, vacation dreams—and on and on."[6]

26.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[7]

27.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[8]

28.     In their letter, the co-Chairmen recognized that:

> [t]he business of data brokerage, namely the collecting, assembling, maintaining, and selling to third-parties of consumers' personal information, has grown into a

---

[6]     Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times, June 16, 2012, at BU1, *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Nov. 10, 2013).

[7]     Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom, Oct. 9, 2012, *available at* http://commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c.

[8]     *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Smart Energy Universe, http://smartenergyuniverse.com/industry-roundup/3926-bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited Nov. 10, 2013).

multiple billion dollar industry. *By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer*. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

29.   Data mining is especially troublesome when consumer information is sold to direct marketing companies. In addition to causing waste and inconvenience, direct marketers often use consumer information to lure unsuspecting consumers into various scams,[10] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Time share information with data miners and direct marketers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

---

[9]   Letter from Edward J. Markey and Joe Barton, co-Chairmen, Congressional Bi-Partisan Privacy Caucus, to Scott E. Howe, Chief Executive Officer, Acxiom, Oct. 2, 2012, *available at* http://www.globalregulatoryenforcementlawblog.com/uploads/file/Axciom%20letter1.pdf) (last visited Nov. 10, 2013) (emphasis added).

[10]   *Prize Offers: You Don't Have to Pay to Play!*, FTC, http://www.ftc.gov/bcp/edu/pubs/consumer/telemarketing/tel17.shtm (last visited Nov. 10, 2013).

[11]   Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, at A1, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all (last visited Nov. 13, 2013).

30.    Information disclosures like Time's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[12] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

31.    Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like Time's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

32.    Time is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data miners, direct marketers, and other third parties is a widespread practice in the publishing industry.

---

[12]    *Id.*

[13]    *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging,* FTC (Aug. 10, 2000) (prepared statement of the FTC), *available at* http://www.ftc.gov/os/2000/08/agingtestimony.htm (last visited Nov. 10, 2013).

[14]    *Id.*

33.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### *Consumers Place Monetary Value on their Privacy and Consider Privacy Practices when Making Purchases*

34.     As the data mining industry has grown, so too have consumer concerns regarding the privacy of their personal information.

35.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15] As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

36.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

---

[15]     *See 2013 TRUSTe US Consumer Confidence Index*, TRUSTe, http://www.truste.com/us-consumer-confidence-index-2013/ (last visited Nov. 10, 2013).

[16]     *Id.*

37.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

38.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

39.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19] As such, where a business offers customers a service that includes statutorily

---

[17]     *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nyTimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Nov. 10, 2013).

[18]     Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also generally* European Network and Information Security Agency, *Study on Monetising Privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Nov. 10, 2013).

[19]     Hann et al., *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at 2, *available at* http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited Nov. 10, 2013) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

guaranteed privacy protections, yet fails to honor these guarantees, the customer is denied the full monetary value of that transaction.

### *Time Unlawfully Sells its Subscribers' Personal Reading Information*

40.    Time maintains a vast digital database comprised of its subscribers' Personal Reading Information. Time discloses its subscribers' Personal Reading Information to data mining companies including Acxiom and others, who then supplement that information with additional sensitive personal information about each Time subscriber, including age, income, net worth, home value, marriage status, health ailments, hobbies, political affiliation, travel habits, financial practices, religion, ethnicity, nationality, and, where applicable, number and gender of children in the household. (*See*, *e.g.*, Exhibits B, C.)

41.    Time then sells its mailing lists—which include subscribers' Personal Reading Information, and can include the sensitive information obtained from data miners—to interested third parties, allowing those companies to identify which individuals purchased which magazines. (*Id.*)

42.    As a result of Time's data compiling and sharing practices, companies can purchase mailing lists from Time that identify Time subscribers by their most intimate details: income, political affiliation, religion, and even by health ailments such as diabetes or arthritis. Time's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at

14

risk of serious harm from scammers. For example, Time will sell—to anyone willing to pay for it—a list of elderly, Lutheran *Entertainment Weekly* subscribers who are diabetic military veterans, with a net worth above $500,000, and a susceptibility to mail-order offers.

43.    Time does not seek its subscribers' consent prior to any of these disclosures, and its subscribers remain unaware that their Personal Reading Information and other sensitive personal information is being bought and sold on the open market.

44.    Consumers can sign up for Time subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail. Regardless of how the consumer subscribes, Time never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy. Consequently, Time uniformly fails to obtain any form of consent from—or even provide effective notice to—its subscribers before disclosing their Personal Reading Information.

45.    As a result, Time disclosed and continues to disclose its customers' Personal Reading Information—including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to

our health concerns"[20]—to anybody willing to pay for it.

46.     By and through these actions, Time has intentionally disclosed to third parties its Michigan subscribers' Personal Reading Information without consent, in direct violation of the VRPA and in breach of its contracts with Plaintiff and the other members of the Class.

## FACTS RELATING TO ROSE COULTER-OWENS

47.     Plaintiff Rose Coulter-Owens is a citizen of the state of Michigan.

48.     Coulter-Owens is a current subscriber to *TIME*.

49.     *TIME* is a magazine published, owned, and operated by Time.

50.     Coulter-Owens has never agreed to allow Time to sell or disclose her Personal Reading Information to anyone.

51.     Time has never given Coulter-Owens prior notice of any sale or disclosure of her Personal Reading Information.

52.     However, beginning on the date that Coulter-Owens subscribed to *TIME*, and continuing to the present, Time has disclosed, and continues to disclose, without consent or prior notice, Coulter-Owens's Personal Reading Information (i.e., information that identifies Coulter-Owens as a *TIME* subscriber) to data

---

[20]     *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited Nov. 10, 2013).

mining companies including Acxiom and others, who then supplement that information with data from their own files.

53.    Furthermore, during that same time period, Time has sold—and continues to sell and offer for sale—mailing lists containing Coulter-Owens's Personal Reading Information to third parties seeking to contact Time subscribers, without first obtaining Coulter-Owens's consent or even giving her prior notice of the sales.

54.    Because Time disclosed and sold her Personal Reading Information, Coulter-Owens now receives a deluge of junk mail and telephone solicitations offering, among other things, discounted magazine subscriptions. These unwanted offers waste Coulter-Owens's time, money, and resources, and cause her emotional distress, including irritation, annoyance, and anxiety and fear that her personal information will fall into the hands of thieves and scammers. Time's sale of Coulter-Owens's Personal Reading Information directly contributed to the increase in harassing junk mail and phone calls Coulter-Owens received.

55.    Additionally, because Coulter-Owens is entitled by law to privacy in her Personal Reading Information, and because she paid money for her *TIME* subscription, Time's sale of Coulter-Owens's Personal Reading Information deprived her of the full set of benefits to which she was entitled as part of her *TIME* subscription, thereby causing her economic harm.

## CLASS ACTION ALLEGATIONS

56.     **Class Definition:** Plaintiff brings this action on behalf of herself and a proposed Class, defined as follows:

> All Michigan residents who had their Personal Reading Information disclosed to third parties by Time without consent.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendant, and (5) the legal representatives, successors, or assigns of any such excluded person.

57.     **Numerosity:** The exact number of Class members is unknown to Plaintiff at this time, but it is clear that individual joinder of each Class member is impracticable. Defendant has deceived, and profited from selling the Personal Reading Information of thousands of consumers who fall into the definition set forth above. Ultimately, members of the Class will be easily identified through Defendant's records.

58.     **Typicality:** Plaintiff's claims are typical of the claims of the other

Class members. Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

59. **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class members, and they have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other Class members.

60. **Commonality and Predominance:** Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting only individual members. Those questions with respect to the Class include, but are not limited to:

    (a)    Whether Time is "engaged in the business of selling at retail" books or other written materials (i.e., magazines);

    (b)    Whether Time obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information;

(c)     Whether Time's disclosure of Plaintiff's and the Class's
Personal Reading Information violated the Video Rental
Privacy Act, M.C.L. § 445.1712;

(d)     Whether Time's sale of Plaintiff's and the Class's Personal
Reading Information constitutes a breach of contract; and

(e)     Whether Time's sale and disclosure of Plaintiff's and the
Class's Personal Reading Information constitutes unjust
enrichment.

61.     **Superiority:** Class proceedings are superior to all other available
methods for the fair and efficient adjudication of this controversy, as joinder of all
Class members is impracticable. The damages suffered by the individual Class
members will likely be small relative to the burden and expense of individual
prosecution of the complex litigation necessitated by Defendant's actions. Thus, it
would be virtually impossible for the Class members to obtain effective relief from
Defendant's misconduct on an individual basis. Even if Class members could
sustain individual litigation, it would not be preferable to a class action, because
individual litigation would increase the delay and expense to all parties due to the
complex legal and factual controversies presented in this Complaint. By contrast, a
class action presents far fewer management difficulties and provides the benefits of
single adjudication, economy of scale, and comprehensive supervision by a single

court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

62.    **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's practices challenged herein apply to and affect the Class members uniformly, and Plaintiff's challenge of those practices hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

63.    Plaintiff reserves the right to revise the definition of the Class as necessary based upon information learned in discovery.

**FIRST CAUSE OF ACTION**
**Violation of the Video Rental Privacy Act**
**(M.C.L. § 445.1712)**
**(On Behalf of Plaintiff and the Class)**

64.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

65.    As a magazine publisher that sells subscriptions to consumers, Time is engaged in the business of selling written materials at retail. M.C.L. § 445.1712.

66.    By subscribing to *TIME*, Coulter-Owens purchased written materials

21

from Time. M.C.L. § 445.1712.

67.    Because Coulter-Owens purchased written materials directly from Time, she is a "customer" within the meaning of the VRPA. M.C.L. § 445.1711(a).

68.    At all times relevant, and beginning when Coulter-Owens first subscribed to *TIME*, Time disclosed—and continues to disclose—Coulter-Owens's Personal Reading Information, which identifies her as a *TIME* subscriber, in at least two ways.

69.    First, Time disclosed mailing lists containing Coulter-Owens's Personal Reading Information to data mining companies including Acxiom and others, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Time.

70.    Second, Time sold its mailing lists containing Coulter-Owens's Personal Reading Information—enhanced with additional information from data miners—to interested third parties, who could then use the mailing lists to contact Time subscribers. These third parties included other consumer-facing businesses, educational institutions, and organizations soliciting monetary and other contributions.

71.    Because the mailing lists included the additional information from the data miners, the lists were more valuable, and Time was able to increase its profits

gained from the mailing list sales.

72.     By selling and otherwise disclosing its subscriber lists, Time disclosed to persons other than Plaintiff records or information concerning her purchase of written materials from Time. M.C.L. § 445.1712.

73.     The information disclosed by Time indicates Coulter-Owens's name and address, as well as the fact that she subscribes to *TIME*. Accordingly, the records or information disclosed by Time indicate Coulter-Owens's identity. M.C.L. § 445.1712.

74.     Coulter-Owens never consented to Time disclosing her Personal Reading Information to anyone.

75.     Worse still, Time did not even give Coulter-Owens prior notice of its disclosure of her Personal Reading Information to third parties.

76.     On information and belief, Time's disclosures of Coulter-Owens's Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

77.     On information and belief, Time's disclosures of Coulter-Owens's Personal Reading Information were not made to collect payment for their subscriptions.

78.     Time's disclosures of Coulter-Owens's Personal Reading information were made to data miners, direct mail advertisers, and organizations soliciting

23

monetary and other contributions, all in order to increase Time's revenue. Accordingly, Time's disclosures were not made for the exclusive purpose of marketing goods and services directly to Coulter-Owens.

79.    By disclosing Coulter-Owens's Personal Reading Information, Time violated Coulter-Owens's common law right to privacy.

80.    By disclosing Coulter-Owens's Personal Reading Information, Time violated Coulter-Owens's statutorily protected right to privacy in her reading habits. M.C.L. § 445.1712.

81.    Additionally, because Coulter-Owens paid for her Time subscription, and Time was obligated to comply with the VRPA, Time's unlawful disclosure of Coulter-Owens's Personal Reading Information deprived her of the full value of her paid-for subscriptions. Because Coulter-Owens ascribes monetary value to the privacy of her Personal Reading Information, Time's unlawful sale and disclosure of her Personal Reading Information caused her to receive less value than she paid for, thereby causing her economic harm.

82.    Likewise, because Coulter-Owens and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine subscription that keeps their Personal Reading Information private is more valuable than one that does not.

83.    Accordingly, had Coulter-Owens been adequately informed of Time's

disclosure practices, she would not have been willing to purchase her *TIME* subscription at the price charged, if at all. Thus, Time's unlawful disclosures caused Coulter-Owens economic harm.

84.     Time's disclosure of Coulter-Owens's Personal Reading Information to third parties has also caused an influx of third-party print advertisements and marketing calls to her cellular phone, causing emotional distress in the form of irritation, aggravation, anxiety, and fear that her information will be obtained and misused by thieves and scammers, as well as damages in the form of decreased available cellular phone minutes.

85.     As a result of Time's unlawful and continued disclosure of their Personal Reading Information, Plaintiff and the other Class members have suffered privacy and economic injuries. On behalf of herself and the Class, Plaintiff seeks: (1) an injunction requiring Defendant Time to obtain consent from Michigan subscribers prior to the disclosure of their Personal Reading Information as required by the VRPA; (2) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to M.C.L. § 445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

## SECOND CAUSE OF ACTION
### Breach of Contract
### (On Behalf of Plaintiff and the Class)[21]

86.     Plaintiff incorporates the foregoing allegations as if fully set forth

herein.

87.     Time offered to sell magazine subscriptions to Coulter-Owens and the

other Class members for specific prices.

88.     Coulter-Owens and the other Class members accepted Time's offers

by agreeing to pay the offered prices as consideration for purchasing the magazine

subscriptions.

89.     Accordingly, Time, on the one hand, and Coulter-Owens and the other

Class members, on the other, entered into binding contracts for magazine

subscriptions.

90.     Because the laws existing at the time and place of the making of a

contract are incorporated into it, the contracts between Time and Coulter-Owens

and the other Class members included obligations for the parties to abide by all

applicable laws, including the VRPA.

91.     Coulter-Owens and the other Class members performed their

---

[21]     Coulter-Owens recognizes that the Court dismissed the previous plaintiff's claim for breach of contract and that her allegations likely fall within the scope of the Court's prior dismissal. Accordingly, Plaintiff asserts the contract claim primarily to preserve it for appeal.

obligations under the contracts by paying the consideration owed to Time for the purchase of the magazine subscriptions, and by complying with all applicable laws.

92.     The ability to control disclosure of sensitive personal information—such as Personal Reading Information—is material to any consumer transaction because it is likely to affect a consumer's decision to, or conduct regarding, purchase of a product or service.

93.     Time's failure to perform its contractual obligations imposed by the VRPA—i.e., maintaining confidentiality of subscribers' Personal Reading Information—constitutes a material breach by Time of its contracts with Coulter-Owens and the other Class members.

94.     Plaintiff and the other Class members have suffered actual damages as a result of Time's breach in the form of the value Coulter-Owens and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information. This amount is tangible and will be calculated at trial.

95.     Further, a portion of the purchase price of each Time subscription sold to Coulter-Owens and the other Class members was intended to ensure the confidentiality of Coulter-Owens's and the other Class members' Personal Reading Information, as required by the VRPA. Because Coulter-Owens and the other Class members were denied services that they paid for and were entitled to receive—i.e.,

confidentiality of their Personal Reading Information—they incurred actual

monetary damages.

96.     Additionally, because Time profited from its breach, Coulter-Owens

and the other Class members are entitled to disgorgement of all profits obtained by

Time from its unlawful disclosure of its subscribers' Personal Reading

Information.

97.     Accordingly, Plaintiff and the other Class members seek an order

declaring that Time's conduct constitutes breach of contract, and awarding Plaintiff

and the Class disgorgement of Time's unlawfully obtained profits, and damages in

an amount to be calculated at trial.

### THIRD CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)
### (In the Alternative to Breach of Contract)

98.     Plaintiff incorporates the allegations contained in paragraphs 1

through 85 as if fully set forth herein.

99.     Coulter-Owens's claim for unjust enrichment is brought in the

alternative to her claim for breach of contract.

100.    Coulter-Owens and the Class members conferred a benefit on Time by

providing Time with their Personal Reading Information and paying Time for their

magazine subscriptions. Time received and retained the information and money

belonging to Coulter-Owens and the Class when Plaintiff and the Class subscribed to Time publications.

101.   Because Time received and processed Coulter-Owens's and the Class's subscription payments and Personal Reading Information, and because Time has employees handling customer accounts and billing as well as customer data, Time appreciates or has knowledge of such benefits.

102.   Under the VRPA, Coulter-Owens and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

103.   Under principles of equity and good conscience, because Time failed to comply with the VRPA, Time should not be allowed to retain the full amount of money Coulter-Owens and the Class paid for their subscriptions or the money it received by selling Coulter-Owens's and the Class's Personal Reading Information.

104.   Coulter-Owens and the other Class members have suffered actual damages as a result of Time's unlawful conduct in the form the value Coulter-Owens and the other Class members paid for and ascribed to confidentiality of their Personal Reading Information. This amount is tangible and will be calculated at trial.

105.   Further, a portion of the purchase price of each Time subscription sold

to Coulter-Owens and the other Class members was intended to ensure the confidentiality of Coulter-Owens's and the other Class members' Personal Reading Information, as required by the VRPA. Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—they incurred actual monetary damages.

106.   To prevent inequity, Time should return to Coulter-Owens and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from Time's sale and disclosure of Coulter-Owens's and the Class's Personal Reading Information.

107.   Accordingly, Plaintiff and the Class members seek an order declaring that Time's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by Time through its sale and disclosure of Plaintiff's and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Rose Coulter-Owens, on behalf of herself and the Class, prays that the Court enter judgment in her favor and against Time and for the following relief:

> (1)   Certify the Class as defined above, appoint Plaintiff as Class Representative, and designate her counsel as Class Counsel;

(2)   Declare that Time's conduct as described herein violates the Video Rental Privacy Act, M.C.L. § 445.1712;

(3)   Declare that Time's conduct as described herein constitutes a breach of contract, or, in the alternative, unjust enrichment;

(4)   Award actual damages, including disgorgement, or $5,000, whichever is greater, to each Class member, as provided by the Video Rental Privacy Act, M.C.L. § 445.1715(a);

(5)   Award injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Time to cease the unlawful disclosures discussed herein;

(6)   Award of reasonable attorneys' fees, interest and costs, M.C.L. § 445.1715(b); and

(7)   Such other and further relief as the Court deems equitable and just.

## DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury of all claims that can be so tried.

Dated:        November 15, 2013          Respectfully submitted,

                                         **Rose Coulter-Owens**, individually and on behalf of all others similarly situated

                                         By:/s/ J. Dominick Larry
                                              One of her attorneys

Henry M. Scharg
LAW OFFICE OF HENRY M. SCHARG
302 W. Main Street
Northville, Michigan 48167
Tel: (248) 596-1111

Fax: (248) 596-1578
hmsattyatlaw@aol.com

Ari J. Scharg
J. Dominick Larry
EDELSON LLC
350 N. LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378
nlarry@edelson.com
ascharg@edelson.com

*Counsel for Plaintiff Rose Coulter-Owens and the putative Class*

## CERTIFICATE OF SERVICE

I, J. Dominick Larry, an attorney, certify that on November 15, 2013, I served the above and foregoing *Plaintiff's First Amended Class Action Complaint* by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system, on this November 15, 2013.


/s/  J. Dominick Larry