**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| ROSE COULTER-OWENS, individually and on behalf of all others similarly situated, | Case No. 2:12-cv-14390-GCS-MKM |
| Plaintiff, | Hon. George C. Steeh |
| v. | |
| TIME INC., a Delaware Corporation, | |
| Defendant. | |

**TIME'S OPPOSITION TO PLAINTIFF'S MOTION FOR**
**<u>CLASS CERTIFICATION</u>**

Marc Zwillinger
Jacob Sommer
Jeffrey Landis
ZWILLGEN PLLC
1900 M St. NW, Ste. 250
Washington, DC 20036
(202) 706-5205
marc@zwillgen.com
jake@zwillgen.com
jeff@zwillgen.com

Robert M. Jackson (P40723)
Arthur T. O'Reilly  (P70406)
HONIGMAN MILLER SCHWARTZ
AND COHN, LLP
660 Woodward Avenue
2290 First National Building
Detroit, MI  48226
(313) 465-7400
rjackson@honigman.com
aoreilly@honigman.com

## **<u>ISSUE PRESENTED</u>**

Has Plaintiff met her burden of establishing that the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3) are met with respect to her proposed class such that the Court should certify that class?

Defendant's Answer:  No.

## <u>CONTROLLING OR MOST IMPORTANT AUTHORITY</u>

Federal Rule of Civil Procedure 23

*Amchem Prods., Inc. v. Windsor,* 117 S.Ct. 2231 (1997)

*Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)

*In re American Medical Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996)

*Sprague v. Gen. Motors Corp*., 133 F.3d 388 (6th Cir. 1998)

*Stout v. J.D. Byrider,* 228 F.3d 709 (6th Cir. 2000)

*In re OnStar Contract Litig.*, 278 F.R.D. 352 (E.D. Mich. 2011)

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................v

PRELIMINARY STATEMENT ...........................................................1

BACKGROUND ................................................................................3

    A.    Time and the Subscription Process ............................................3

    B.    Time's Use of Third Parties to Conduct Business .....................4

    C.    Traditional "List Rental" .........................................................5

    D.    Variations on Traditional List Rental ......................................6

    E.    Time Inc.'s Notice of its List Rental Practices and Ability to Opt Out .....7

    F.    The Michigan VRPA .................................................................9

    G.    Plaintiff Rose Coulter-Owens ..................................................10

    H.    Plaintiff's Complaint and Class Certification Motion ..............11

ARGUMENT ....................................................................................12

  I.    Plaintiff Fails to Identify an Ascertainable Class.....................13

  II.    Plaintiff Fails to Satisfy the Requirements of Rule 23(a) ........15

    A.    Plaintiff Cannot Satisfy the Commonality Requirement.................15

    B.    Plaintiff is Not Typical of the Class ....................................17

    C.    Plaintiff is not an Adequate Representative of the Class ................18

  III.    Plaintiff Fails to Satisfy the Requirements of Rule 23(b)(3) ..................19

    A.    Individual Issues Predominate Over Common Issues.....................19

    B.    A Class Action is Not Superior .........................................23

iii

IV.      Plaintiff Cannot Certify a Class for Her Unjust Enrichment Claim.........24

CONCLUSION .....................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Abby v. City of Detroit,*
    218 F.R.D. 544 (E.D. Mich. 2003) ........................................ 23-24

*Amchem Prods., Inc. v. Windsor,*
    117 S.Ct. 2231 (1997)....................................................................19

*Cancino v. Yamaha Motor Corp., U.S.A.,*
    No. 3:04CV274, 2010 WL 2607251 (S.D. Ohio June 24, 2010) .................24

*Corwin v. Lawyers Title Ins. Co.,*
    276 F.R.D. 484 (E.D. Mich. 2011) ............................................................25

*Cross v. Nat'l Trust Life Ins. Co.,*
    553 F.2d 1026 (6th Cir. 1977) ....................................................................18

*Davis v. Cintas Corp.,*
    717 F.3d 476 (6th Cir. 2013) ......................................................................18

*Gary Plastic Packaging v. Merrill Lynch,*
    903 F.2d 176 (2d Cir.1990) ........................................................................19

*Givens v. Van Devere, Inc.,*
    No. 1:11-cv-666, 2012 WL 4092803 (N.D. Ohio Apr. 27, 2012)...........15, 22

*In re American Medical Sys., Inc.,*
    75 F.3d 1069 (6th Cir. 1996) ......................................................................13

*In re Google Inc. Gmail Litig.,*
    2014 WL 1102660, Case No. 13-MD-02430-LHK (N.D. Cal. Mar. 18, 2014) ........................................................................................................20

*In re OnStar Contract Litig.,*
    278 F.R.D. 352 (E.D. Mich. 2011) ............................................. 13, 17-18, 20

*In re Skelaxin (Metaxalone) Antitrust Litig.,*
    299 F.R.D. 555 (E.D. Tenn. 2014) ............................................................14

*Kinder v. Meredith*,
    No. 14–cv–11284, 2014 WL 4209575 (E.D. Mich. Aug. 26, 2014).............14

*Kunzelmann v. Wells Fargo Bank, N.A.*,
    No. 9:11-CV-81373-DMM, 2013 WL 139913 (S.D. Fla. Jan. 10, 2013).....25

*O'Neil v. Appel*,
    165 F.R.D. 479 (W.D. Mich. 1996)........................................................ 18-19

*Oshana v. Coca-Cola Co.*,
    472 F.3d 506 (7th Cir. 2006) .........................................................................15

*Pilgrim v. Universal Health Card, LLC*,
    660 F.3d 943 (6th Cir. 2011) ........................................................................13

*Rose v. Saginaw County.*,
    232 F.R.D. 267 (E.D. Mich. 2005) ...............................................................13

*Rowden v. Pac. Parking Sys., Inc.*,
    282 F.R.D. 581 (C.D. Cal. 2012)...................................................................24

*Serrano v. Cintas Corp.*,
    No. CIV. 04-40132, 2009 WL 910702 (E.D. Mich. Mar. 31, 2009) ...........18

*Sprague v. Gen. Motors Corp.*,
    133 F.3d 388 (6th Cir. 1998) .................................................................. 17-18

*Stout v. J.D. Byrider*,
    228 F.3d 709 (6th Cir. 2000) ........................................................................18

*Wal–Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)..................................................................12, 15, 24

*Young v. Nationwide Mut. Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) ........................................................................15

**Statutory Provisions and Rules**

Fed. R. Civ. P. 23(a)(3)............................................................................................17

Fed. R. Civ. P. 23(a)(4) ............................................................................... 18

Fed. R. Civ. P. 23(b)(3) .......................................................................... 19, 23

M.C.L. § 445.1712 ................................................................................... 4, 9

M.C.L. § 445.1713 ...................................................................................... 10

M.C.L. § 445.1715 ................................................................................ 21, 23

## **PRELIMINARY STATEMENT**

This case was originally about Time's renting of mailing lists to companies that wanted to market goods or services to Time subscribers, a decades-old practice, albeit one from which Time has excluded Michigan subscribers since March 2013.[1]  After discovery revealed that Time did not disclose subscriber names and magazine titles to those companies (as required for VRPA liability) and did provide subscribers notice and opportunity to opt out of the practice (as allowed under the VRPA), Plaintiff changed course.   Plaintiff now focuses exclusively on Time's disclosures to two vendors that assisted Time in the list rental process—Acxiom, who hosted Time's subscriber database, and Wiland, who administered a list rental "cooperative." On the merits, neither of these alleged disclosures violates the VRPA.  But even before getting there, because Plaintiff has not put forward the evidence required to show that this case can and should be tried on a class basis, her class certification motion ("Motion") should be denied.

Plaintiff's proposed class is not ascertainable in that class membership turns on whether an individual is the *purchaser* of the magazine, not the *subscriber*; but because the class is defined as those who purchased subscriptions from entities *other than Time*, there is no way to identify class members without going to those entities. The fact that the proposed class is defined as people who purchased

---

[1] In this brief, "Time" refers to the entity Time Inc., and "TIME" refers to the magazine with that title.

1

subscriptions from third-parties, and not Time, also means that the entire class is composed of people who have no claim under the VRPA because they did not purchase from Time "at retail."  And even if class membership did turn on an individual being a *subscriber* and not a *purchaser*, the class would still not be ascertainable because Time cannot tell in many instances whether a person subscribing through a third-party did so on a website as opposed to through some other method, such as over the phone or via mail.

Plaintiff's proposed class also does not satisfy the commonality and predominance requirements because the questions that will drive resolution of this case—whether a person had their information disclosed, what notice and opportunity to opt out of such disclosure they received, and what damages (if any) they incurred—are individualized and not subject to class-wide resolution. Plaintiff is also not typical of the proposed class because even if she prevails, it does not mean other class members will. Nor can she adequately represent the class because she had actual knowledge of Time's practices.

A class action is also not the superior method of adjudicating these claims. A person aggrieved by any disclosure has every incentive to bring an individual action because the VRPA contains a statutory penalty of $5,000 (***2,500 times*** the $2 Plaintiff paid for her subscriptions) and allows for recovery of fees and costs. Finally, Plaintiff has not even tried to satisfy Rule 23's requirements for her unjust

2

enrichment claim, nor could she given that both the benefit allegedly conferred on Time (the subscription price paid) and the value subscribers allegedly attributed to the privacy of their subscriptions are inherently individualized.

## BACKGROUND

**A.    Time and the Subscription Process**

Time is a media company that publishes magazines including TIME, Fortune, and Real Simple.  Consumers can subscribe to a magazine published by Time in numerous ways.  They can subscribe directly with Time by mail in response to solicitations from Time, using subscription cards found in editions of magazines, by telephone, or by Internet. (Ex. A, No. 3.) [2]  They also can buy subscriptions from third parties Time authorizes to sell subscriptions. (*Id.*)

For example, a person can purchase a subscription to a Time magazine on www.magazines.com, which sells subscriptions through an agreement with Time. (*See* Ex. B.) ███████████████████████████████████

████████████████████████████████████████

███████████    *Id.* Magazines.com (or a similar third party) then submits the subscriber's name and address to Time to fulfill the order. (Ex. C at 130:20-131:5.)

There are many variations of this arrangement.  A person can subscribe to a Time magazine through a third party as part of a school or church fund-raiser, by

---

[2] All references to Exhibits refer to Exhibits attached to the Declaration of Jeffrey Landis submitted herewith.

redeeming frequent flyer miles, or as a reward for participating in an Internet survey.  Between 2007 and 2013, Time authorized █████████████████ ███████████████████████████████████████████████ (*See* Ex. D-F.)  In some instances, Time can tell the method (*i.e.* over the Internet or phone, through the mail, or using a voucher) a person used to subscribe through one of these third-parties. (*See* Declaration of Karan Simoneau in support of Time's Opposition to Plaintiff's Motion for Class Certification ("Simoneau Decl.") ¶¶ 5-6.) In many instances, however, Time will not be able to tell the particular method a person used to subscribe through a third party.  (*Id.* ¶¶ 7-10.)

**B.    Time's Use of Third Parties to Conduct Business**

Time uses multiple third parties to conduct its business.  This includes printers to put names and addresses on magazines, mailing houses to mail the magazines to subscribers, the United States Postal Service to deliver the magazines, and customer service centers to provide customer support and answer customer complaints.  (Ex. G, No. 4.)[3]

Similarly, Acxiom Corporation ("Acxiom") is a service provider ████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████

---

[3] Any "disclosure" to these service providers is not a VRPA "disclosure" at all because the statute allows companies to provide information to its own employees or agents; and only restricts disclosures by the company or its "employee[s] or agent[s]" to other "person[s]."  M.C.L. § 445.1712.



███ (Ex. C at 19:5-9.) ███████████████████████████

███ (Ex. H at 1004.) ███████████████████████████

████████████████████████████████████████████████

███ (*Id.*) █████████████████████████████ (*Id.*)

Acxiom also provides other services to Time under the same agreement. ███

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ *Id.* at 1013.[4]

## C.  Traditional "List Rental"

Time, like other publishers, makes its mailing lists available to third parties who want to market goods or services to Time's subscribers. (Ex. A, No. 2.) This practice, often referred to as "list rental," has existed for decades. (*See* Ex. J.) Time, however, stopped making Michigan subscribers available for list rental in March of 2013. (*See* Ex. K.)  The list rental process works as follows:

- A third party that wants to market to a Time subscriber ("Third-party Marketer") contacts Time's "list manager," Infogroup, to discuss the criteria the Third-party Marketer wants to use to come up with a target audience, for

---

[4] Plaintiff asserts ██████████████████████████████████████ ██████████████████████████████████████████ *See* Mem. at 7, n.5 (emphasis in original).  These assertions are false and the documents cited say no such thing. ███████████████████████████████████ (*See* Ex. I at 920.) ████████████████████████████████████ ██████████████████ (*See* Ex. H at 1004.)

example, ███████████████████████████████████████████

███████████████████████████████ (*See* Ex. L.)

- Time must approve the Third-party Marketer, the proposed use of the list, and all terms and conditions of the proposed use. (Ex. M at 1764.) This includes reviewing a copy of the mailing piece that will be sent to the subscriber. (*Id.*) Each rental is for a specified date and promotion, and cannot be re-used or used for another purpose. (*Id.* at 1765.)

- If Time approves a rental, a file containing the name and address of the individuals meeting the criteria is ████████████████████████
  ████████████████████████████████████████████████████
  (Ex. N at 1751.)

Each list rental goes through this process. (Ex. C at 105:16-20.)  But within this process, there is variation.  A Third-party Marketer may rent a list of TIME, Real Simple, *or* Fortune subscribers in New York City between certain ages. (*See, e.g.*, Ex. O.)  Magazine title may also not be among the criteria.  For example, the Third-party Marketer may rent names from Time's "Masterfile"—a combined list of subscribers to multiple magazines; or from Time's "New Movers Database"— which contains subscribers who recently contacted Time to change their address. (Ex. P.) ████████████████████████████████████████

███████████████████████████████████████████████████

██████████████ (*See, e.g.,* Ex. Q at 18327.)

## D.   Variations on Traditional List Rental

██████████████████████████████████████████████████

█████████████████████████████ ("Wiland").  █████████████

██████████████████████████████████████████████████



(Ex. C at 21:8-22:2.)

(*Id.*) (*See* Ex. R at 215.)

(Ex. C at 79:5-21.)

(*Id.*)

## E.     Time Inc.'s Notice of its List Rental Practices and Ability to Opt Out

Time notifies subscribers of its list rental practices in numerous places, including the magazines themselves.  Between November 2009 and November 2010 when Plaintiff was a subscriber, the notices in TIME were provided on the table of contents page, and used the following language: "**Mailing list:** We make a portion of our mailing list available to reputable firms.  If you would prefer that we not include your name, please call or write us at P.O. Box 60001, Tampa, Fla. 33630, or send us an email at ***privacy@time.customerservc.com***." (*See, e.g.*, Ex. S.)  Fortune's notice appeared at the magazine's end, following contact instructions for customer service, and used the following language: "**Mailing List**: We make a portion of our mailing list available to reputable firms." (*See, e.g.*, Ex. T.)

Time also notified actual and potential subscribers of Time's practices and

the ability to opt out of those practices on its website.  Time's Privacy Notice disclosed that "[w]e may disclose personally identifiable information to third parties whose practices are not covered by this privacy statement (e.g., other marketers, magazine publishers, retailers, participatory databases and non-profit organizations) that want to market products or services to you." (Ex. U at 4217.) In a "**Privacy Options**" section, the notice explains that "if you prefer not to receive traditional mail or other off-line promotions from this or any other Time Inc. property or any companies not owned by Time Inc., please <u>click here</u>." (*Id.*) The "<u>click here</u>" links to a page where a subscriber can enter their name and address and then "click here if you do not wish to receive offers of products and services from companies outside of Time Inc." (*See, e.g.*, Ex. V.)

Time also provided notice and opportunity to opt out in mailings sent to subscribers.  Bills sent to TIME subscribers included a section called "MAIL PREFERENCE SERVICE" where Time disclosed that "[o]ccasionally, we make a portion of our mailing list available to carefully selected firms whose products might be of interest to you.  If you would prefer not to receive mailings . . . from these companies, please initial in the space provided."  (Ex. W at 46968.)  This was followed by a "check box" and the words "Yes, please do not release my name_____ (initial)".  (*Id.*)   The same language appeared on bills sent to subscribers of Fortune (*see, e.g.*, Ex. X at 46963) and Real Simple (*see, e.g.*, Ex. Y

8

at 46910.)  The notice was also on renewal forms sent to subscribers of all three magazines. (*See, e.g.,* Ex. Z at 46929, Ex. AA at 46901, and Ex. BB at 46959.)

A subscriber opting out of list rental using any of the above methods would be added to Time's "do not promote" list and Time would no longer include their names in future list rentals. (Ex. C at 215:7-21.) ████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ (*Id.* at 216:10-15.) █

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████ (*See* Ex. I at 917 ███████████████████████████████

███████████████████████████████████ .)[5]

## F.    The Michigan VRPA

The VRPA states that a "person, or an employee or agent of the person engaged in the business of selling at retail . . . other written materials . . . shall not disclose to any person other than the customer a record of information concerning the purchase . . . of those materials by a customer that indicates the identity of the

---

[5] ██████████████████████████████████████████████████████
████████ For example, subscribers can opt out of only receiving marketing from companies outside of Time, or they can opt out of receiving marketing from Time and outside entities.  (*See, e.g.,* Ex. V at 46770.) █████████████████
███████████████████████████ (*See* Ex. CC at 47629.)

customer."  M.C.L. § 445.1712.  The VRPA allows disclosures for the purpose of marketing goods and services directly to the customer, if the customer is provided with written notice of the ability to remove his or her name.  M.C.L. §445.1713.

## G.    Plaintiff Rose Coulter-Owens

Plaintiff subscribed to TIME, Fortune, and Real Simple in November 2009. (Ex. DD, Nos. 2, 16.)  She purchased her subscriptions from a company authorized to sell subscriptions to Time magazines. (Ex. EE at 175:16-22.)  Plaintiff paid $2 for a one-year subscription to each magazine, an offer she "jumped on" because "it was about as cheap as you could get for six magazines." (*Id.* at 60:21-22; 59:8-14.) This was $0.04 per issue for the weekly TIME and roughly $0.16 per issue for Fortune and Real Simple. (*Id.* at 183:4-184:14.)

Plaintiff admitted that by at least the end of 2009 (within a few weeks of subscribing) she knew that publishers, including Time, made subscriber lists available to third parties for rental.  (*Id.* at 92:6-14.)   According to Plaintiff, someone told her about the practice, although she could not recall who. (*Id.* at 92:23-93:13.)  Plaintiff took no affirmative steps after learning of this practice. She did not contact Time customer service, visit Time's website to review its policies regarding list rental or opt out from being included in such rentals. (*Id.* at 95:3-21.)

Time "rented" Plaintiff's name and address only once.  ██████████████

█████████████████████████████████████████████████████████████



(Ex. A, No. 9.)

(*see* Ex. FF)

(*See* Ex. GG.) Plaintiff does not recall receiving the brochure, explaining that she would not recall "something that trivial" and that it would likely be just "another one of those little items" she would "toss." (Ex. EE at 155:11-25.)

## H.   Plaintiff's Complaint and Class Certification Motion

The Amended Complaint alleged that Time violated the VRPA by disclosing mailing lists to "data mining companies" like Acxiom who supplemented those lists with information from Acxiom's own databases, and by selling mailing lists with subscribers' name and magazine titles to third parties who "could then use the mailing lists to contact Time subscribers" (Am. Compl. ¶¶ 69-70.) As a result of this, Plaintiff allegedly received "a deluge of junk mail" and an influx of "marketing calls" and suffered "economic injury" and "emotional distress in the form of irritation, aggravation, anxiety, and fear that her information will be obtained and misused by thieves and scammers." (*Id.* ¶¶ 54, 84-5.) [6]

Plaintiff now seeks to certify a class of "[a]ll Michigan residents who

---

[6] Discovery did not bear these allegations out. Time included Plaintiff in one list rental. And Plaintiff never even gave Time her phone number. (Ex. DD, No. 2.) Plaintiff did, however, post her phone number, and her home and email addresses on a publicly accessible website. (*See* Ex. EE at 216:11-217:21, Ex. HH.)

between March 31, 2009 and November 15, 2013 purchased a subscription to *TIME*, *Fortune*, or *Real Simple* magazines through any website other than Time.com, Fortune.com, and RealSimple.com." Mem. at 2. This definition does not require that purchasers had their information disclosed to any third party, or identify the third parties to whom the information must have been disclosed to qualify for membership in the class. Nonetheless, the Motion references only two entities—Acxiom and Wiland.[7]

## ARGUMENT

Class certification is governed by Federal Rule of Civil Procedure 23. Rule 23 "does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Class certification is proper only if the trial court is satisfied, after a "rigorous analysis," that Rule 23's prerequisites are satisfied. *Id*. "Mere repetition of the language of Rule 23(a) is not sufficient. There must be an adequate

---

[7] *See, e.g.*, Mem. at 12 ("like every member of the proposed class, Plaintiff's name, address and subscription records . . . were disclosed to Acxiom and Wiland); *Id*. at 15 ("the common question on which the claims of all members of the proposed class depend is that Time disclosed each class member's magazine subscription records . . . to Acxiom and Wiland in violation of the VRPA"); *Id*. at 19 ("Time disclosed the subscription records of all proposed class members to Acxiom and Wiland, and the disclosures violated the VRPA.").

12

statement of the basic facts to indicate that each requirement of the rule is fulfilled." *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). The party seeking class certification bears the burden of establishing that all prerequisites are met. *Id*. A claimant must satisfy two sets of requirements: (1) each of the four prerequisites under Rule 23(a), and (2) the prerequisites of one of the types of class actions provided for by Rule 23(b). "A failure on either front dooms the class." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011). Plaintiff fails on both fronts.

## I.    Plaintiff Fails to Identify an Ascertainable Class

The proposed class first fails because it does not meet Rule 23's prerequisite of an ascertainable class of persons to be represented by the class representative. *In re OnStar Contract Litig.*, 278 F.R.D. 352, 373 (E.D. Mich. 2011). A class "must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Rose v. Saginaw County*, 232 F.R.D. 267, 271 (E.D. Mich. 2005). Plaintiff defines the class as "[a]ll Michigan residents" who "purchased a subscription" to one of the three magazines "through any website other than Time.com, Fortune.com, and RealSimple.com." This definition turns on whether a person is the *purchaser* of the magazine, not the *subscriber*. But a purchaser is not always a subscriber. Purchasers may subscribe their spouses or parents, or give a gift subscription. And

because the proposed class is defined as those who purchased subscriptions from entities *other than Time*, there is no way to identify class members without asking those third parties who "purchased" each and every subscription. This type of "individualized fact-finding required to shape the proposed class is inconsistent with class treatment." *In re Skelaxin (Metaxalone) Antitrust Litig.,* 299 F.R.D. 555, 572 (E.D. Tenn. 2014) (noting that "the question of who paid or reimbursed a portion of the purchase price" had "no simple resolution.").

More fundamentally, the entire proposed class is composed of people who have no viable VRPA claim.  In the nearly identical action Plaintiff's attorneys brought in this district against publisher Meredith, Judge Ludington stated that where a person purchases a magazine subscription from a third-party as opposed to the publisher, that purchase would not be considered "at retail" under the VRPA. *See Kinder v. Meredith*, No. 14–cv–11284, 2014 WL 4209575, at *6 (E.D. Mich. Aug. 26, 2014) ("Therefore, if [plaintiff] had purchased her magazine subscription through a third-party, rather than directly from Meredith, she would not have bought them at retail.")  By definition, the entire class here purchased from a third-party and thus did not purchase from Time "at retail" as required by the VRPA.

Even if class membership were based on a person being the subscriber, the class would still not be ascertainable. ████████████████████████ ████████████████████████████████████ (*See* Ex. D-F.)

And while Time can tell the particular third-party and promotion through which a person subscribed, in many instances Time cannot tell the *method* by which the person subscribed (*i.e.* over the Internet or phone, through the mail or using a voucher). This is either because the third-party did not provide such information, or because it offered multiple ways to subscribe. *See* Simoneau Decl. ¶¶ 7-10. In these instances, Time cannot identify individuals that subscribed via a website, a prerequisite for class membership under Plaintiff's definition.[8]

## II. Plaintiff Fails to Satisfy the Requirements of Rule 23(a)

### A. Plaintiff Cannot Satisfy the Commonality Requirement

Plaintiff does not satisfy Rule 23(a)'s requirement of a "common contention" that "is capable of class-wide resolution" and "will resolve an issue that is central to the validity of each of the claims in one stroke." *Dukes*, 131 S. Ct. at 2545. Commonality is measured by "the capacity of a class-wide proceeding to

---

[8] In addition, although the Motion only identifies disclosures to Acxiom and Wiland, the proposed class is defined as individuals that purchased a subscription without regard to whether they had their information disclosed at all, let alone to those entities. To the extent the class definition is ***not*** limited to individuals who had their information disclosed to Acxiom and Wiland, it is impermissibly "amorphous." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012). It is also overbroad. *See, e.g.*, *Givens v. Van Devere, Inc.*, No. 1:11-cv-666, 2012 WL 4092803, at *15 (N.D. Ohio Apr. 27, 2012) (finding class definition overbroad where the underlying statutory claim required discrimination but "the proposed class definition does not suggest that discrimination is a factor relevant to class membership"); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (class not ascertainable where deception was an element of the statute allegedly violated and the class was defined without regard to deception).

generate common answers apt to drive the resolution of the litigation." *Id.* at 2551. In assessing this requirement, "[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id*.

Here, there are dissimilarities regarding issues at the heart of the case. For example, the question of whether Time contributed a person's information to Wiland must be resolved on an individual basis. ███████████████████ █████████████████████████████ (*See* Ex. R at 212.) ██████████████ ███████████████████████████████ (Ex. C at 216:7-9.) ███████████████████████████████ ███████████████████████████████ ████████████████████████ █████████████████████████ ██████████████████████ (*See* Ex. II), ████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████

Likewise, resolution of class members' claims involves a highly-

individualized assessment of whether they were given "written notice" of the ability to remove their names from direct marketing.  Plaintiff incorrectly asserts that "Time's purported opt-out notices were the same for each at-issue magazine." Mem. at 18. In fact, Time's in-magazine notices varied across the magazines, with respect to wording and placement.  (*See* Ex. X, T.) And Time provided notices of its practices and the ability to opt out of them elsewhere, including on its website and in bills and renewal notices. (*See* Ex. U-BB.) The notice provided to class members and whether it was sufficient is thus an individualized inquiry that is not common to all proposed class members.  *See, e.g.*, *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998) (finding no commonality where claim depended on "what statements were made to a particular person" and defendants' statements were not uniform).

### B.     Plaintiff is Not Typical of the Class

Plaintiff also fails to satisfy the requirement that her claims or defenses "are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). "The premise of typicality is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *In re OnStar*, 278 F.R.D. at 374 (citing *Sprague,* 133 F.3d at 399).  That is not the case here.  Plaintiff argues that the only notice she received was the notice in the actual magazines and that such notice is insufficient. *See, e.g.*, Mem. at 18.  Putting aside that the Court previously observed that these

17

notices "certainly appear to comply with the terms of the statute" (Dkt. 43 at 15), even if Plaintiff wins her argument that the in-magazine notices were deficient, it will not resolve claims of class members who received notice on Time's website or in its bills and renewal notices.  Typicality is thus lacking.  *See, e.g.*, *OnStar* 278 F.R.D. at 374-75 (no typicality where "[p]roof or disproof of . . . named plaintiff's [claim] will not necessarily prove or disprove the claims of any other class members").[9]

### C.    Plaintiff is not an Adequate Representative of the Class

Rule 23(a)(4) allows certification only if "the representative parties will fairly and adequately protect the interests of the class." One determinant of adequacy is "whether there is any antagonism between the interests of the plaintiffs and other members of the class they seek to represent."  *Cross v. Nat'l Trust Life Ins. Co.*, 553 F.2d 1026, 1031 (6th Cir. 1977).  One source of such antagonism "is the existence of defenses unique to a named plaintiff."  *O'Neil v. Appel*, 165 F.R.D. 479, 493 (W.D. Mich. 1996).

---

[9] *See also Serrano v. Cintas Corp*., No. CIV. 04-40132, 2009 WL 910702, at *8 (E.D. Mich. Mar. 31, 2009) *aff'd sub nom. Davis v. Cintas Corp.,* 717 F.3d 476 (6th Cir. 2013) ("[U]nder those circumstances-it cannot be said that a class member who proves his own claim would necessarily prove the claims of other class members."); *Sprague*, 133 F.3d at 399 (holding no typicality where "[e]ach claim . . . depended on each individual's particular interactions with GM" and thus "a named plaintiff who proved his own claim would not necessarily have proved anybody else's claim"); *Stout v. J.D. Byrider,* 228 F.3d 709, 717 (6th Cir. 2000) (holding no typicality where claims rested on "individual circumstances and transactions surrounding each purchase.").

Antagonism exists here.  Plaintiff admitted to having actual notice of Time's practices no later than a few weeks after subscribing (and well before the one time her name was rented).  (*See* Ex. EE at 92:6-14.)  Notwithstanding this notice she did not opt out or otherwise contact Time.  (*See Id.* at 95:3-7.)  This actual notice defense renders her inadequate to represent the interests of absent class members who may have had less knowledge or notice of Time's practices.  *See, e.g.*, *Gary Plastic Packaging v. Merrill Lynch,* 903 F.2d 176, 179 (2d Cir.1990) (explaining that a class representative was inappropriate where his claim was subject to several unique defenses, including that he continued to transaction with defendant despite having notice of the alleged misconduct).

## III.   Plaintiff Fails to Satisfy the Requirements of Rule 23(b)(3)

### A.   Individual Issues Predominate Over Common Issues

Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." The predominance requirement is "far more demanding" than Rule 23(a)'s commonality requirement. *Amchem Prods., Inc. v. Windsor,* 117 S.Ct. 2231, 2250 (1997).  Here, even if Plaintiff satisfies commonality, she does not satisfy the higher threshold of "predominance" because individualized questions overwhelm common questions with respect to whether each class member had

19

their information disclosed to Wiland, whether each class member received notice of Time's marketing practices, and whether each class member was damaged.

*In re OnStar* is instructive. Car buyers sued Onstar under the Michigan Consumer Protection Act, which prohibits omissions that tend to mislead or deceive consumers. *OnStar*, 278 F.R.D. at 374. Onstar argued that the proposed class did not meet the predominance requirement because individual class members "were provided different documents with different forms of disclosures, and in many instances performed their own individual investigations prior to the purchase or lease of the vehicles." *Id.* at 378. The court agreed, finding that no uniform standard could be used "because the putative class members received different disclosures, from different sources, at different times." *Id.* And because class members with "actual knowledge" would not be able to establish an MCPA violation "[y]et, such class members could not be identified without obtaining discovery." *Id.* at 379. The same is true here. Time subscribers received different notices regarding Time's practices from different sources at different times. Plaintiff herself had actual notice and knowledge of those practices. And only individual discovery will determine if other class members also had actual notice.

Similarly, the court in *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, Case No. 13-MD-02430-LHK, (N.D. Cal. Mar. 18, 2014) found predominance lacking in a case involving alleged email interception where a central issue was

"whether the party whose communication was intercepted was on notice that the communication would be intercepted." *Id.* at \*16. The court noted that there was "a panoply of sources from which email users could have learned of Google's interceptions." *Id.* at \*17. And that because "[s]ome class members likely viewed some of these [sources], but others likely did not . . . [a] fact-finder . . . would have to evaluate to which of the various sources each individual user had been exposed and whether each individual 'knew about and consented to the interception' based on the sources to which she was exposed." *Id.*

Damages are another individualized issue. The VRPA authorizes recovery of "[a]ctual damages, including damages for emotional distress, or $5,000.00, whichever is greater." M.C.L. § 445.1715. The Amended Complaint alleges that Plaintiff and the class "suffered privacy and economic injuries." (Am. Compl. ¶ 85.) These alleged injuries include an "influx of third-party print advertisements and marketing calls to her cellular phone, causing emotional distress in the form of irritation, aggravation, anxiety, and fear that her information will be obtained and misused by thieves and scammers, as well as damages in the form of decreased available cellular phone minutes." (*Id.* ¶ 84.) Indeed, the Amended Complaint dedicates pages to the supposed harms caused by the complained-of practices, such as information being used "to lure unsuspecting consumers into various scams"

21

and an alleged "black market . . . where personal information of vulnerable elderly Americans is exchanged." (*Id.* ¶¶ 29, 31.)

The Amended Complaint is thus premised on a theory of actual harm caused to Plaintiff and the class by Time's disclosures. Of course, there is no evidence in the record that this Plaintiff actually suffered any of those harms.[10] But she cannot now switch to a statutory damages theory for class certification purposes. This was the conclusion in *Givens*, where plaintiffs argued that certification of a class of all customers who signed certain documents was appropriate "because the mere use of those documents constituted a technical violation of [the Truth in Lending Act] in every instance and would result in an award of statutory damages to each class member." *Givens*, 2012 WL 4092803, at *13. The court rejected this argument, on the ground that it "ignore[d] much of the language in the amended complaint," which described a "'bait and switch' claim, filled with allegations of deceptive intent," not "a mere 'technical violation'." *Id.*

The same applies here. The language in the Amended Complaint describes actual privacy and economic damages, including emotional distress and risk of

---

[10] Plaintiff nevertheless maintained these allegations in discovery, testifying at her deposition that she was notified in late 2014 that she was potentially affected by the Target breach and thereafter had thousands of dollars in checks "written from California" on one of her accounts. (Ex. EE at 159:3-20.) Although this was four years after her Time subscriptions expired and she did not articulate how this occurrence had anything to do with Time, she nonetheless took the position that "as far as [she was] concerned, there was a breach on my account, and as far as I can figure I'm going to blame Time." (*Id.* at 194:14-25.)

identity theft, not a mere "technical violation." And Plaintiff expressly requests an "[a]ward of actual damages, including disgorgement, or $5,000, whichever is greater." (Am. Compl. at 31.) Under Plaintiff's theory, however, that determination would require an individualized inquiry into each class member's circumstances, rendering class treatment inappropriate.

### B.    A Class Action is Not Superior

Plaintiff also has not shown that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Courts within this district have observed that 23(b)(3) class actions are "designed primarily to allow the vindication of rights in cases where the monetary amount at stake would not provide adequate incentive for any individual to bring a solo action." *Abby v. City of Detroit,* 218 F.R.D. 544, 549 (E.D. Mich. 2003). The exact opposite holds here. The VRPA allows plaintiffs to recover up to $5,000 in statutory damages per violation. M.C.L. § 445.1715. That amount is ***2,500 times*** more than the $2 Plaintiff paid for each of her subscriptions. And the VRPA allows plaintiffs to recover attorney's fees and costs. *Id.* Put another way, Plaintiff or any other class member that truly believes they are aggrieved has every incentive to bring an individual action, which is the superior means of resolving this claim.

Under similar circumstances, the court in *Cancino v. Yamaha Motor Corp., U.S.A.*, No. 3:04CV274, 2010 WL 2607251, at *17 (S.D. Ohio June 24, 2010),

found that a class action was not superior because "[p]laintiffs seek damages exceeding the purchase price of the [good they purchased] and have asserted three statutory claims which provide for an award of attorney's fees." The *Abby* court likewise found no superiority because it was "not a case where the actual amount of damages due to each class member is small and is thus, a disincentive to bringing suit." *Abby*, 218 F.R.D. at 549. *See also Rowden v. Pac. Parking Sys., Inc.*, 282 F.R.D. 581, 586-87 (C.D. Cal. 2012) (finding individual litigation of FACTA claims "far superior" because the statute provides for statutory damages and attorneys' fees out of "concern that a small statutory award might dissuade potential challenges.")

## IV.    Plaintiff Cannot Certify a Class for Her Unjust Enrichment Claim

Plaintiff has waived certification of her unjust enrichment claim because the Motion does not mention unjust enrichment, let alone explain how Rule 23's requirements are satisfied for that claim.  Even if this were not the case, like her VRPA claim, Plaintiff's unjust enrichment claim is beset by individual issues. Plaintiff characterizes the alleged benefit the class conferred on Time as "paying Time for their magazine subscription."  (Am. Compl. ¶ 100.)  The amount each class member paid, however, is highly individualized.  Plaintiff paid only $2 for each of her subscriptions, while other class members paid different prices or even nothing at all in the case of free promotions.  (*See, e.g.,* Ex. D-F.)

The Amended Complaint also asserts in support of the unjust enrichment claim that Time should return to Plaintiff and the class "the value they ascribe to the confidentiality of their Personal Reading Information." (Am. Compl. ¶ 106.) But class members value the confidentiality of the magazines they subscribe to differently (if at all), requiring an individual inquiry to determine any amount to be returned. A class cannot proceed on this basis. *See, e.g.*, *Corwin v. Lawyers Title Ins. Co.*, 276 F.R.D. 484, 490 (E.D. Mich. 2011) (certification of unjust enrichment claim inappropriate because determination of overcharges required individual assessment of each transaction); *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 9:11-CV-81373-DMM, 2013 WL 139913, at *9 (S.D. Fla. Jan. 10, 2013) ("[B]ecause of the fact-specific nature of the inquiry required, an unjust enrichment claim is almost always-and certainly here-not suitable for class action treatment.").

## <u>CONCLUSION</u>

For the foregoing reasons, Time respectfully requests that the Court deny Plaintiff's Class Certification Motion.

Dated: April 8, 2015           /s/ Jeffrey Landis
                               Marc Zwillinger (pro hac vice)
                               Jeffrey Landis (pro hac vice)
                               Jacob Sommer (pro hac vice)
                               ZwillGen PLLC
                               1900 M St. NW, Ste. 250
                               Washington, DC 20036
                               (202) 706-5203

                               *Counsel for Defendant Time, Inc.*

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 8, 2015, I electronically filed the foregoing Opposition to Plaintiff's Motion for Class Certification and Exhibits with the Clerk of the Court via the ECF system, which shall send a notification of such filing to all counsel of record.

/s/ Jeffrey Landis
Jeffrey Landis (pro hac vice)