## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ROSE COULTER-OWENS, individually and on behalf of all others similarly situated, | Case No. 2:12-cv-14390-GCS-MKM |
| | Hon. George C. Steeh |
| Plaintiff, | |
| v. | |
| TIME INC., a Delaware Corporation, | |
| Defendant. | |

## TIME'S MOTION FOR SUMMARY JUDGMENT

Defendant Time Inc. ("Time") hereby moves for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on all counts of Plaintiff's Complaint.  In support of this Motion, Time is contemporaneously filing a Brief, the Declaration of Jeffrey Landis, and the Declaration of Linda Moore, which are incorporated herein.

Time hereby certifies that pursuant to Local Rule 7.1(a), there was a conference between attorneys for Plaintiff and for Time on August 27, 2015 in which Time explained the nature of the motion and its legal basis and requested but did not obtain concurrence in the relief sought.

**WHEREFORE,** Time respectfully requests that this Court enter an Order granting this motion, entering judgment in Time's favor and against Plaintiff on all claims, and granting such other and further relief as this Court deems necessary and proper.

Dated:  August 31, 2015          /s/ Jeffrey Landis
                                 Marc Zwillinger
                                 Jeffrey Landis
                                 Jacob Sommer
                                 ZwillGen PLLC
                                 1900 M St. NW, Ste. 250
                                 Washington, DC 20036
                                 (202) 706-5203

                                 Robert M. Jackson (P40723)
                                 Arthur T. O'Reilly (P70406)
                                 HONIGMAN MILLER SCHWARTZ
                                 AND COHN, LLP
                                 660 Woodward Avenue
                                 2290 First National Building
                                 Detroit, MI  48226
                                 (313) 465-7400
                                 rjackson@honigman.com
                                 aoreilly@honigman.com

                                 *Counsel for Defendant Time, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ROSE COULTER-OWENS,
individually and on behalf of all others
similarly situated,

    Plaintiff,

  v.

TIME INC., a Delaware Corporation,

    Defendant.

Case No. 2:12-cv-14390-GCS-MKM

Hon. George C. Steeh

## TIME'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Marc Zwillinger
Jacob Sommer
Jeffrey Landis
ZwillGen PLLC
1900 M St. NW, Ste. 250
Washington, DC 20036
(202) 706-5205
marc@zwillgen.com
jake@zwillgen.com
jeff@zwillgen.com

Robert M. Jackson (P40723)
Arthur T. O'Reilly  (P70406)
HONIGMAN MILLER SCHWARTZ
AND COHN, LLP
660 Woodward Avenue
2290 First National Building
Detroit, MI  48226
(313) 465-7400
rjackson@honigman.com
aoreilly@honigman.com

## <u>ISSUE PRESENTED</u>

1.      Whether Time is entitled to summary judgment because the disclosure of magazine subscription information to Time's consumer marketing database service provider, Acxiom, falls outside the scope of the VRPA because the statute does not apply to disclosures between a company and its own employees and agents.

**Defendant's Answer:  Yes.**

2.      Whether Time is entitled to summary judgment because the disclosure of magazine subscription information to Wiland was permissible under the VRPA's "direct marketing exception," which allows disclosures for the purpose of marketing goods and services directly to the consumer if the disclosing person informs the consumer by written notice that the consumer may remove his or her name at any time by written notice.

**Defendant's Answer:  Yes.**

3.      Whether Time is entitled to summary judgment because Plaintiff and the class did not purchase their subscriptions directly from Time, and the VRPA only applies to transactions performed  "at retail."

**Defendant's Answer:  Yes.**

4.      Whether Time is entitled to summary judgment on Plaintiff's individual unjust enrichment claim because there is no evidence that Time received a benefit from Plaintiff or that it would be inequitable for Time to retain any benefit that it did receive.

**Defendant's Answer:  Yes.**

5.      Whether the complaint is subject to dismissal pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure because Plaintiff lacks Article III standing and because the Court lacks subject matter jurisdiction.

**Defendant's Answer:  Yes.**

## **CONTROLLING OR MOST IMPORTANT AUTHORITY**

M.C.L. §§ 445.1711-15

M.C.R. 3.501(A)(5)

28 U.S.C. § 1332

*Imhoff Inv., LLC v. SamMichaels, Inc.*, No. 10-10996, 2014 WL 172234 (E.D. Mich. Jan. 15, 2014);

*Karaus v. Bank of New York Mellon*, 831 N.W.2d 897 (Mich. Ct. App. 2012)

*Little v. Howard Johnson Co.,* 455 N.W.2d 390 (Mich. Ct. App. 1990)

*Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381 (6th Cir. 2009)

*Reynolds v. C.I.R.*, 861 F.2d 469 (6th Cir. 1988)

# **TABLE OF CONTENTS**

ISSUE PRESENTED .................................................................................i

CONTROLLING OR MOST IMPORTANT AUTHORITY................................ iii

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF UNDISPUTED FACTS .................................................3

      A. Time and the Subscription Process ....................................3

      B.  "List Rental"................................................................3

      C. Variations on Traditional List Rental..................................5

      D. Time Inc.'s Notice of its List Rental Practices and Ability to
         Opt Out .......................................................................5

      E. Time's Use of Service Providers to Conduct Business......................8

      F. Plaintiff's Information Sharing Practices...........................10

ARGUMENT ...................................................................................10

    I. Time's Use of Acxiom To Host Its Database Does Not Violate the
       VRPA .......................................................................11

      A. The VRPA allows disclosures to agents like Acxiom .......................11

      B. Time's use of Acxiom's data appends services is irrelevant .............13

    II. Time's Participation in the Wiland Co-op Does not Violate
       the VRPA....................................................................15

      A. Disclosures to Wiland were permissable ...........................15

      B. Time's written notices are sufficient under the VRPA.....................16

III.  Plaintiff Cannot Establish She Purchased from Time "At Retail" ........20

IV.  The Unjust Enrichment Claim Cannot Survive Summary
     Judgment ...............................................................................................22

 V.  Article III Standing and Subject Matter Jurisdiction Are Lacking .........23

CONCLUSION ...........................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Appleton v. First Nat. Bank of Ohio,*
  62 F.3d 791 (6th Cir. 1995) ...........................................................12

*Giles v. Univ. of Toledo,*
  286 F. App'x 295 (6th Cir. 2008) .................................................11

*Haggar Co. v. Helvering,*
  308 U.S. 389 (1940).......................................................................12

*Hollowell v. Career Decisions, Inc.,*
  298 N.W.2d 915 (Mich. Ct. App. 1980).......................................23

*Huang v. Int'l Total Servs.,*
  No. 94-75368, 1997 WL 33377508 (E.D. Mich. Apr. 17, 1997)..................12

*Imhoff Inv., LLC v. SamMichaels, Inc.*,
  No. 10-10996, 2014 WL 172234 (E.D. Mich. Jan. 15, 2014)......................12

*Karaus v. Bank of New York Mellon*,
  831 N.W.2d 897 (Mich. Ct. App. 2012).................................. 22-23

*Kinder v. Meredith,*
  No. 14–cv–11284, 2014 WL 4209575 (E.D. Mich. Aug. 26, 2014)............21

*Little v. Howard Johnson Co.*,
  455 N.W.2d 390 (Mich. Ct. App. 1990).......................................12

*Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*,
  590 F.3d 381 (6th Cir. 2009) .......................................................22

*Pack v. Damon Corp.,*
  434 F.3d 810 (6th Cir. 2006) ................................................. 10-11

*Reynolds v. C.I.R.,*
  861 F.2d 469 (6th Cir. 1988) .......................................................20

*Shady Grove Orthopedic Associates v. Allstate Ins. Co.*,
   559 U.S. 393 (2010)........................................................................25

*Spokeo, Inc. v. Robins,*
   135 S. Ct. 1892 (April 27, 2015) (No. 13-1339) .................................... 23-24

*Turner v. Grand Trunk W. R. Co.,*
   No. 11–CV–13281, 2013 WL 5372753 (E.D. Mich. Sept. 25, 2013)...........11

*United States v. Redmond*,
   205 F. Supp. 858 (E.D. Mich. 1962) ............................................................22

**Statutory Provisions and Rules**

M.C.L. § 436.1111 ...............................................................................22

M.C.L. § 445.1712 ................................................................11, 14, 20

M.C.L. § 445.1713(d) ...........................................................................15

M.C.L. § 445.2503 ...............................................................................18

M.C.R. § 3.501(A)(5).............................................................................24

15 U.S.C. § 1681d(a) ............................................................................18

15 U.S.C. § 1692g ................................................................................ 18

15 U.S.C. § 6803 ..................................................................................18

15 U.S.C. § 7704(a) .............................................................................18

16 C.F.R. Part 313 ...............................................................................18

18 U.S.C. § 2710(b)(2).........................................................................18

28 U.S.C. § 1332(d) .............................................................................24

Fed. R. Civ. P. 56(a).............................................................................11

**Others**

Brief of Alabama, Colorado, Michigan, Nebraska, Tennessee, West Virginia, Wisconsin and Wyoming as Amicus Curiae in Support of Petitioner, *Spokeo, Inc. v. Robins*, 135 S. Ct. 1892 (2015) (No. 13-1339)....................................................24

*Retail*, Merriam-Webster, http://www.merriam-webster.com/dictionary/retail (last visited Aug. 21, 2015)................................................................................................21

*Retail*, Oxford English Dictionary,
http://www.oxforddictionaries.com/definition/english/retail (last visited Aug. 31, 2015) ...........................................................................................................21

United States Postal Service, Mailing Standards of the Unites States Postal Service, Domestic Manual at 233 (July 13, 2015)...............................................................19

## PRELIMINARY STATEMENT

Despite paying virtually nothing for a one-year subscription to three magazines Time Inc. ("Time") published, and lacking any actual injury, Plaintiff seeks enormous statutory damages from Time.  Plaintiff does so under the VRPA, an obscure 1988 statute that sat untouched for 25 years before an enterprising set of attorneys started brandishing it against the country's magazine publishers.

Plaintiff originally objected to Time's renting of mailing lists to companies that wanted to market goods or services to her. After discovery revealed that Time did not disclose names and magazine titles to those companies (as required for VRPA liability), Plaintiff abandoned that theory. She now seeks her windfall based on Time divulging magazine titles to two service providers—Acxiom, who hosted Time's consumer marketing database, and Wiland, who administered a list rental "cooperative" in which Time participated—neither of whom could (or did) disclose those titles to anyone else.  Neither of these alleged "disclosures" violates the VRPA and entry of summary judgment for Time is appropriate.

***First***, the VRPA permits companies to share information with service agents, which is exactly what Acxiom was to Time. Thus, there is no "disclosure" at all under the VRPA. The fact that Time separately ***received*** certain additional demographic information from Acxiom that Time appended to its own subscriber files, does not save Plaintiff's claim.

**Second**, Time's participation in the Wiland Co-op does not violate the VRPA. The VRPA allows disclosures for the purpose of marketing goods and services directly to the consumer, if the consumer is provided with written notice of the ability to remove his or her name from such disclosures.  Here, Time's disclosure to Wiland was precisely to market goods and services directly to consumers: Wiland's Co-op allowed members to obtain names from the database for the exclusive purpose of sending marketing materials (although members that did so **never** received magazine titles and could not use magazine title as a selection criterion). And Time provided subscribers with written notice of the ability to opt out of this disclosure in the magazines it sent, on its websites, and in bills and renewal notices.  The VRPA expressly allows this conduct.

**Third**, Plaintiff's VRPA claim fails because any information disclosed about Plaintiff or any other class member did not concern the purchase of subscriptions from Time "at retail" as required by the statute.  To the contrary, the class by definition is made up of individuals that bought subscriptions from third parties **other** than Time.  A basic element of a VRPA claim is thus lacking.

**Fourth**, Time is entitled to summary judgment on Plaintiff's individual unjust enrichment claim. Despite indicating that Plaintiff was preparing to dismiss the unjust enrichment claim, Plaintiff's counsel has not done so.   The claim remains on an individual basis.  But there is no evidence that Plaintiff conferred a

benefit on Time, or that it would be inequitable for Time to retain such benefit.

*Fifth*, this case should be dismissed because Plaintiff admits the class has suffered no injury and thus Article III standing is lacking, and the Court lacks subject matter jurisdiction because the VRPA does not allow class actions.

## STATEMENT OF UNDISPUTED FACTS

### A.    Time and the Subscription Process

Time is a media company that publishes magazines including TIME, Fortune, and Real Simple. Consumers can subscribe to these magazines by responding to mail solicitations from Time, using subscription cards found in issues of magazines, by telephone, or through the Internet. (Ex. A, No. 3.)[1] They also can buy subscriptions from third parties.  (*Id.*)

Plaintiff subscribed to TIME, Fortune, and Real Simple in 2009. (Ex. B, Nos. 1-2, 16.) She purchased her subscription from a third-party selling subscriptions to Time magazines. (Ex. C at 175:16-22.) Plaintiff paid $2 for a one-year subscription to each magazine, an offer she "jumped on" because "it was about as cheap as you could get." (*Id.* at 60:21-22; 59:8-14.)

### B.    "List Rental"

Time, like other publishers, rents mailing lists to third parties that want to market goods or services to Time's subscribers. (Ex. A, No. 2.) This "list rental"

---

[1] All references to Exhibits refer to exhibits attached to the Declaration of Jeffrey Landis submitted herewith.

practice has existed for decades. (*See* Ex. D at 4.) Time, however, stopped making names of Michigan subscribers available for list rental in March of 2013. (*See* Ex E.) The list rental process works as follows:

- A third party that wants to market to Time subscribers ("Third-Party Marketer"), contacts Time's "list manager" to discuss the criteria the Third-Party Marketer wants to use to come up with a target audience; for example, female subscribers to any magazine published by Time between the ages of 25 and 54 that have a fashion/apparel interest. (*See* Ex. F.)

- Time must approve the Third-party Marketer, the proposed use of the list, and all terms and conditions of the proposed use. (Ex. G at 001764.) This includes reviewing a copy of the mailing piece that will be sent to the subscriber. (*Id.*) Each rental is for a specified date and mailing, and cannot be re-used or used for another purpose. (*Id.* at 001765.)

- If Time approves the rental, a file containing only the name and address of the individuals meeting the criteria (and not magazine title) is "sent ONLY to the contact at the printer/mail house that the [Third-Party Marketer] is using" for the mailing.  (Ex. H at 001751.)

Every list rental goes through this process. (Ex. I at 105:16-20.)

Time "rented" Plaintiff's name and address once. In 2010, the University of Chicago rented a list of Fortune subscribers in 9 states, including Michigan, to send a brochure for an executive education program. (Ex. A, No. 9.)  Once Time approved the rental, a file containing only subscribers' names and addresses was generated from the database (*see* Ex. J) and transmitted to the mailing house that the University of Chicago had tasked with mailing the brochure. (*See* Ex. K.) Plaintiff does not recall receiving the brochure, explaining that she would not recall "something that trivial" and that it would be just "another one of those little items"

she would "toss." (Ex. C at 155:11-25.)

## C.    Variations on Traditional List Rental

During the relevant time period, Time also rented names to Third-Party Marketers through a cooperative database, or "Co-op," administered by Wiland Direct ("Wiland"). A Co-op is another form of list rental where rather than the publisher renting names to a Third-Party Marketer, the publisher contributes names to a third-party administered database that combines it with information from other entities, such as other publishers and catalog companies. (Ex. I at 21:8-22:2.) Members of the Wiland Co-op could rent names from the database to send marketing materials. (*Id*. at 19:1-4.) Once subscriber information was put in the Wiland database, however, it was anonymized—no participant knew who contributed the names. (*Id*. at 21:23-22:11; 79:5-21.)   A member renting names from the Co-op could not use magazine title—or any criteria unique to Time—as selection criteria. (*Id*.)   And a member ***never*** received information showing that a person subscribed to a specific magazine. (*Id*.) There is no evidence in the record that Plaintiff's name was provided to Wiland.

## D.    Time Inc.'s Notice of its List Rental Practices and Ability to Opt Out

Time notified subscribers of its disclosure practices, and the ability to opt out of those practices, in numerous places. This includes in each magazine issue. For example, between November 2009 and November 2010 when Plaintiff was a

subscriber, the following notice appeared on the table of contents page in each weekly issue of TIME: "**Mailing list:** We make a portion of our mailing list available to reputable firms. If you would prefer that we not include your name, please call or write us at P.O. Box 60001, Tampa, Fla. 33630, or send us an email at ***privacy@time.customersvc.com***." (*See, e.g.*, Ex. L.) Fortune and Real Simple's notices appeared at the magazines' ends, following contact instructions for customer service, and used the following language: "Mailing List: We make a portion of our mailing list available to reputable firms." (*See, e.g.*, Ex. M.)

Time also provided notice of and the ability to opt out of those practices on its website during the class period. This notice specifically disclosed Time's participation in data co-ops stating that "[w]e may disclose personally identifiable information to third parties whose practices are not covered by this privacy statement (e.g., other marketers, magazine publishers, retailers, ***participatory databases*** and non-profit organizations) that want to market products or services to you." (Ex. N at 0004217) (emphasis added). In a "Privacy Options" section, the notice explained that "[i]f you prefer not to receive traditional mail or other off-line promotions from this or any other Time Inc. property or any companies not owned by Time Inc., please click here." (*Id.*) The words "click here" linked to a page where subscribers could enter their names and addresses and opt out of future sharing by clicking where it says "click here if you do not wish to receive offers of

products and services from companies outside of Time Inc." (*See, e.g.*, Ex. O.)

Time also provided customers with notice and opportunity to opt out in mailings sent to subscribers. Bills sent to TIME subscribers included a section called "MAIL PREFERENCE SERVICE" where Time disclosed that "[o]ccasionally, we make a portion of our mailing list available to carefully selected firms whose products might be of interest to you. If you would prefer not to receive mailings . . . from these companies, please initial in the space provided." (Ex. V at 0046968.) This was followed by a "check box" and the words "Yes, please do not release my name_____ (initial)" (*Id.*) The same language appeared on bills sent to subscribers of Fortune (*see, e.g.,* Ex. X at 0046964) and Real Simple (*see, e.g.,* Ex. Y at 0046910.) Time provided the same notice on renewal forms sent to subscribers of all three magazines. (*See, e.g.,* Ex. Z at 0046929; Ex. AA at 0046901; and Ex. BB at 0046959.)

Plaintiff admits that she knew ***within weeks*** of subscribing in 2009 that Time made subscriber lists available to third parties for rental. (Ex. C at 92:6-14.) According to Plaintiff, someone told her about the practice. (*Id.* at 92:23-93:13.) Plaintiff took no affirmative steps after learning of this practice. She did not contact Time customer service, visit Time's website to review its policies, or opt out from having her information disclosed. (*Id.* at 95:3-21.)

Had Plaintiff or any class member opted out, they would have been added to

Time's "do not promote" list and Time would have no longer included their name in future list rentals. (Ex. I at 215:7-21.) They also would have no longer been eligible to have their name contributed to Wiland; and if their name had previously been contributed to Wiland, it would have been purged. (*Id.* at 216:7-15.)

### E.     Time's Use of Service Providers to Conduct Business

Time uses multiple service providers to conduct its business. This includes printers to put names and addresses on magazines, mailing houses to mail magazines to subscribers, the United States Postal Service to deliver the magazines, and customer service centers to provide customer support. (Ex. P, No. 4.) Time also uses Acxiom to host Time's subscriber database used for consumer marketing purposes. (*Id.* at Nos. 3, 4.)

During the class period, Acxiom helped Time fulfill list rental requests from third parties that wanted to market goods or services to Time subscribers. (Ex. I at 19:5-9.) ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████     ██████████████████████ Acxiom also administered opt outs of list rentals on Time's behalf. (Acxiom Decl. ¶ 8.) When a Time

subscriber opted out of a specific type of marketing, Time provided that data to Acxiom, and Acxiom's software added the appropriate "do not promote" tag to the subscriber's name in Time's database. (*Id.*)[2]

Acxiom also provided other services to Time during the class period. As an independent service, Acxiom provided Time with data about the people already in Time's database. (Ex. Q at 001013.) ████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

Regardless of the service Acxiom performed on Time's behalf, several things remained consistent. First, the data Acxiom hosted was Time's property. (Ex. Q at 001004.) Acxiom could not, and did not, use Time subscriber data for any other purpose, such as Acxiom's own commercial purposes or to provide services to Acxiom customers other than Time. (Acxiom Decl. ¶ 16.) Acxiom was also required to prevent disclosure of the data to any third parties. (Ex. Q at 001004.) Upon expiration of the parties' agreement, Acxiom was required to

---

[2] This was necessary for Time to honor opt outs consistent with subscribers' wishes. Time could not simply remove a subscriber name from its consumer marketing database because subscribers could opt out of certain types of marketing without opting out of others. For example, subscribers could opt out of only receiving marketing from companies outside of Time, or from both Time and outside entities. (*See, e.g.,* Ex. O at 0046770.) Different tags get applied depending on the subscriber's preference. (*See* Ex. W at 0047629.) Additionally, subscribers could re-appear in the database because of new subscriptions.

"promptly destroy" Time's data and certify in writing that it had done so. (*Id.*)

Plaintiff has produced no evidence that Time's use of Acxiom to host its database

affected her or the class whatsoever.

## F.    Plaintiff's Information Sharing Practices

Plaintiff made her personal information available to third parties and the

public during the class period. For example, Plaintiff gave her name and address to

Clark's Shoes so it could send her catalogs. (Ex. C at 11:5-11.) She did not do

anything to make sure that only Clark's could use her address and not provide it to

third parties. (*Id.* at 11:21-25.) She provided a pharmacy with her name, e-mail

address, and mailing address to sign up for its rewards program. (*Id.* at 133:11-23.)

She frequently provided at least her address when she purchased something

through the Internet, including after she filed her complaint. (*Id.* at 220:2-222:15.)

She did not opt out of direct marketing in connection with any of these purchases.

(*Id.* at 224:5-225:3.) In 2010, Plaintiff posted two of her phone numbers, as well as

her home and email addresses on a publicly accessible website, where they are still

available today. (*See* Ex. C at 216:11-217:21; *see also* Ex. R.)

## ARGUMENT

Summary judgment is proper if the moving party "show[s] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." *Pack v. Damon Corp.*, 434 F.3d 810, 813 (6th Cir. 2006) (quoting

Fed. R. Civ. P. 56(a)).  The nonmoving party may not "rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in [Rule 56]—set out specific facts showing a genuine issue for trial." *Giles v. Univ. of Toledo*, 286 F. App'x 295, 301 (6th Cir. 2008). The "mere existence of a scintilla of evidence" supporting the non-movant cannot defeat summary judgment. *Pack*, 434 F.3d at 814. Rather, "[w]hen the 'record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,' . . . summary judgment is appropriate." *Turner v. Grand Trunk W. R. Co.*, No. 11–CV–13281, 2013 WL 5372753, at *2 (E.D. Mich. Sept. 25, 2013).

## I.     Time's Use of Acxiom to Host its Database Does Not Violate the VRPA

Plaintiff contends that by using Acxiom to host Time's consumer marketing database Time violated the VRPA. She is wrong.

### A.     The VRPA allows disclosures to agents like Acxiom.

Disclosure of data to agents does not violate the VRPA. The VRPA contemplate that agents can receive customer information by providing that "a person, or an *employee* or *agent* of the person" may not disclose the written materials a person purchased at retail. M.C.L. § 445.1712. This makes sense. If using agents violates the VRPA, businesses that sell videos, books, or magazines could not function.  If Time could not use third parties to assist it, Time would violate the VRPA every time it used a printer to put names and addresses on

magazines, a mailing house to mail magazines to subscribers, the USPS to deliver the magazines, or a customer service center to provide customer support. This cannot be what the statute means.[3] *See Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940) ("A literal reading of [a statute] which would lead to absurd results is to be avoided when [it] can be given a reasonable application consistent with [its] words and with the legislative purpose."); *Appleton v. First Nat. Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995) ("Reliance on the literal language of the statute is not justified, however, if it leads to an interpretation which is inconsistent with the legislative intent or to an absurd result.").

The VRPA authorizes transferring data to Acxiom, because Acxiom was Time's agent. The defining element of agency is the principal's right to control the agent's actions. *Imhoff Inv., LLC v. SamMichaels, Inc.*, No. 10-10996, 2014 WL 172234, at *6 (E.D. Mich. Jan. 15, 2014); *Little v. Howard Johnson Co.,* 455 N.W.2d 390, 393 (Mich. Ct. App. 1990) ("[i]n Michigan, the test for a principal-agent relationship is whether the principal has the right to control the agent"); *Huang v. Int'l Total Servs.*, No. 94-75368, 1997 WL 33377508, at *7-8 (E.D. Mich. Apr. 17, 1997) (finding existence of agency relationship based on control).

Time outsourced the hosting of its consumer marketing database to Acxiom.

---

[3]Indeed, under Plaintiff's theory, every entity that possesses "personal reading information," or similar video information and stores that information on a server hosted by a third party (for example a cloud Internet provider like Amazon Web Services) would be violating the VRPA.

But it did so in a way that was the functional equivalent of doing it in-house. (Acxiom Decl. ¶¶ 5-7.)  Acxiom could not, and did not, use Time subscriber data for any other purpose, such as Acxiom's own commercial purposes or to provide services to Acxiom customers other than Time. (*Id.* ¶ 16) At all times, Time controlled Acxiom's operation of that database. Acxiom merely provided the functionality and programs necessary to generate and distribute the lists as directed by Time. (*Id.* ¶ 7.)  Acxiom had no discretion as to the criteria used to select names, the list of names selected, or the sending of the lists of names and addresses. Time (or its list manager) dictated all of this criteria.  Moreover, all customer data belonged to Time even when housed on Acxiom's servers or run through Acxiom's computer programs in connection with the services Acxiom provided to Time. (*Id.* ¶ 16.) Acxiom was only allowed to use Time's subscriber data as required to perform its obligations to Time under the parties' Agreement. (*Id.*)  It is no different than Time sharing information with its own employees— that is not a disclosure the VPRA prohibits, and this should not be either.

### B.    Time's use of Acxiom's data appends services is irrelevant.

Plaintiff suggests that Time violated the VRPA because it also ***obtained*** from Acxiom information regarding subscribers already in Time's consumer marketing database to enable Time itself to more effectively market to those individuals. *See e.g.*, Am. Compl. ¶¶ 40, 69, ECF No. 53. This is also wrong.

Time's ***receipt*** of data from Acxiom is irrelevant because the VRPA is about disclosure.   And it prohibits only the disclosure of "a record or information concerning the purchase … of those materials by a customer that indicates the identity of the customer." M.C.L. § 445.1712. It thus requires the disclosure of a name *and* the magazine the individual purchased from Time. But Time never disclosed which magazines Plaintiff or the class purchased to Acxiom as part of Acxiom's data append service. (Acxiom Decl. ¶ 13.)

As part of that separate service, Time provided Acxiom with ***only*** the subscriber's name and address. (*Id.* ¶¶ 13-14.)  The name of a Time magazine was not disclosed to Acxiom in this process, and thus the VRPA does not prohibit this disclosure.  (*Id.*)[4]   ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[4] Even if a specific magazine title was disclosed in connection with this service, Acxiom was likewise acting as Time's agent with respect to this service. Specifically, Acxiom could not, and did not, use any information it obtained from Time as part of this service for Acxiom's own purposes, or to perform services for other Acxiom customers. (*Id.* ¶ 15.) Rather, it could only be used to perform Acxiom's obligations to Time. (*Id.* ¶ 16.)

14

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████  The

VRPA does not prohibit disclosures like this one.

## II.     Time's Participation in the Wiland Co-op Does not Violate the VRPA

Plaintiff's VRPA claim based on Time's participation in the Wiland Co-op also cannot survive summary judgment. The VRPA permits disclosure of information related to the purchase of written materials where (1) the disclosure is for the exclusive purpose of marketing goods and services directly to the customer; and (2) the disclosing person informs the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information. M.C.L. § 445.1713(d).   Both of these elements are satisfied with respect to Wiland.

### A.     Disclosures to Wiland were permissible.

Like Time's disclosures to Acxiom, disclosures to Wiland do not violate the VRPA.  Wiland acted as a pass through entity for Time, holding Time's data until a Third-Party Marketer wanted to rent it.  If anything, as Time's agent and service provider, Wiland enhanced consumer privacy by anonymizing Time's data and combining it with data from other members. █████████████████████████

████████████████████████████████████████████

15

██████████████████████████████████████████████████

█████████████████████████████████████  As a result, even

when a subscriber's name was rented through Wiland, the renting member ***never***

saw or learned the subscriber's magazine titles.  (Ex. I at 79:5-21.)

Even if Wiland is not Time's agent, Time disclosed data to Wiland to market

goods and services directly to consumers.  Wiland aggregated subscriber data from

member publishers and catalog companies to enable members to—like traditional

list rental—rent names from the database to send those individuals marketing

materials. (Ex. I at 21:8-22:2.)  Wiland could not use data for any other purpose.

(Ex. S ¶ 3.)  Here, there is no evidence that Plaintiff's name was ever rented from

Wiland. But sending marketing materials was the only permitted use of

information obtained from the Co-op. (Ex. S ¶ 3) ████████████████████

█████████████████████████████████

**B.    Time's written notices are sufficient under the VRPA.**

Time provided written notice that subscribers could remove their names

from Time's disclosures to Wiland. This notice was provided in multiple locations.

First, each issue of TIME magazine included the following notice: "**Mailing list:**

We make a portion of our mailing list available to reputable firms.  If you would

prefer that we not include your name, please call or write us at P.O. Box 60001,

Tampa, Fla. 33630, or send us an email at ***privacy@time.customerservc.com***."

(*See, e.g.*, Ex. L.)  Fortune and Real Simple also notified readers that they made portions of their mailing list available to third parties. (*See, e.g.,* Ex. M.) There is no dispute that Time provided Plaintiff and the class with these notices.

Time's Internet Privacy Policy further disclosed its practices. Specifically, Time disclosed on its website for anyone to see (regardless of how they subscribed) that "[w]e may disclose personally identifiable information to third parties whose practices are not covered by this privacy statement (*e.g.*, other marketers, magazine publishers, retailers, ***participatory databases*** and non-profit organizations) that want to market products or services to you." (Ex. N at 0004217) (emphasis added). The policy allowed customers to opt out of "receive[ing] traditional mail or other off-line promotions from this or any other Time Inc. property or any companies not owned by Time." (*Id.*) Customers that opted out would not have their information disclosed to Wiland. (Ex. I at 216:10-15.)

Since there is no dispute that Time provided written notices of its disclosure practices, Plaintiff will likely contend that Time's in-magazine notices were not sufficient. This argument ignores the fact that Time provided similar notices on its website and in bills and renewal notices, each of which satisfies the VRPA's notice requirement. But more fundamentally, Time's in-magazine notices were sufficient.

First, the sufficiency of Time's notices is demonstrated by their effectiveness. In 2009, over 780,000 people opted out of direct marketing. (*See* Ex.

17

T.) In 2010 and 2011 that number was over 500,000. (*See* Ex. U.) There is no evidence that any subscribers wanted to opt out of the practice, and did not or could not because they were unaware of how to do so. To the contrary, the record is clear that any subscriber that opted out would no longer be eligible to have their name contributed to Wiland; and if their name had previously been contributed to Wiland, it would have been purged. (Ex. I at 215:7-21; 216:7-15.)

Second, it is telling that although much of the VRPA is modeled after the federal Video Privacy Protection Act, the Michigan legislature chose ***not*** to include the VRPA's language requiring that notice be made in a "clear and conspicuous manner." 18 U.S.C.A. § 2710(b)(2). This is despite the fact that other Michigan statutes have mandated specific forms of consumer notices.[5] For example, M.C.L. § 445.2503 is a statute addressing unsolicited commercial emails. Among its requirements are that each such email include in the e-mail subject line "ADV:" as the first 4 characters; conspicuously state in the e-mail the sender's legal name, correct street address, valid internet domain name, and valid return e-mail

---

[5] Other federal statutes also include specific notice requirements. *See e.g.*, Gramm-Leach-Bliley Act, 15 U.S.C. § 6803 (disclosure is to be "clear and conspicuous" and made at specified times and with specified content) and related regulations, 16 C.F.R. Part 313; the CAN-SPAM Act, 15 U.S.C. § 7704(a) (certain information must be clearly and conspicuously displayed); the Fair Credit Reporting Act, 15 U.S.C. § 1681d(a) (disclosure must be clear and accurate, include certain information, and be mailed or delivered within a certain time); the Fair Debt Collection Practices Act, 15 U.S.C. § 1692(g) (written notice must contain certain information and be made within five days of initial communication).

address;" and "[c]onspicuously provide in the text . . . in print as large as the print used for the majority of the e-mail, a notice that informs the recipient that the recipient may conveniently and at no cost be excluded from future commercial e-mail from the sender." *Id.* The Michigan legislature could have included similar requirements in the VRPA and chose not to.

Third, although the VRPA does not mandate any specific formatting requirements for its written notice, as a comparison, to obtain special postage rates for periodicals, the USPS requires companies to include an "Identification Statement" made "in an easily read type" in all copies of a publication.[6] For magazines, the identification must be "shown conspicuously" on one of the first five pages, on the table of contents page, in the masthead of the editorial page if the location of the editorial page is in the table of contents on the front page, or on one of the last three non-advertising pages inside the back cover. *Id.* The compliant USPS identification statements in TIME, Fortune, and Real Simple are located on the same pages and are in the same fonts as Time's notices regarding its disclosure and marketing practices. (*See, e.g.,* Exs. L, M.)[7]

Plaintiff will also likely argue that Time's Internet notification that

---

[6] *See* United States Postal Service, Mailing Standards of the United States Postal Service, Domestic Manual at 233 (July 13, 2015), *available at* http://pe.usps.gov/cpim/ftp/manuals/_dmm300/mailingStandards.pdf (last visited Aug. 21, 2015) (attached as Ex. DD).

[7] There is also no requirement in the VRPA that the publisher provide notice at any specific time, for example prior to the first time information is shared.

subscribers could opt out of disclosures to third parties, including Wiland, is irrelevant because Plaintiff did not subscribe via Time's website. But Plaintiff previously took the position that "the VRPA only requires that written notice be made, and not received." Plaintiff's Reply Mem. in Supp. of Class Cert. at 6, ECF No. 100. She cannot take the opposite position now. *See, e.g.*, *Reynolds v. C.I.R.*, 861 F.2d 469, 472 (6th Cir. 1988) ("The judicial estoppel doctrine protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding.") If the VRPA only requires that notice be made, the written notice Time made on its website (and in its bills and renewal notices) is as effective as Time's notice in the magazines.[8]

## III.    Plaintiff Cannot Establish She Purchased from Time "At Retail"

Time is also entitled to summary judgment because Plaintiff cannot establish a basic element of the VRPA: that she and the class purchased subscriptions from Time "at retail." The VRPA prohibits a person from disclosing records regarding a specific customer's viewing, listening, or reading history of written materials sold "at retail" M.C.L. § 445.1712. Thus, for Time's records about the class to qualify under the statute, they must concern a purchase made directly from Time, and not

---

[8] Time is also entitled to summary judgement if actual notice is determinative because Plaintiff admitted that by at least the end of 2009 (within a few weeks of subscribing) she knew that publishers made subscriber lists available to third parties, but did not opt out of these disclosures. (Ex. C at 92:6-14, 95:3-21.)

from a third party. This makes sense because it is the retailer that interacts with the customer at the time of purchase—not the wholesaler or publisher.

The entire class is defined as individuals that purchased subscriptions "through any website other than Time.com, Fortune.com, and RealSimple.com"— i.e., from entities other than Time.  And Plaintiff testified that she purchased her subscriptions to her Time magazines through a third-party, not directly from Time. (Ex. C at 175:16-22.)  Judge Ludington observed in another VRPA action against a publisher that, "if [plaintiff] had purchased her magazine subscription through a third party, rather than directly from [the publisher], she would not have bought them at retail" under the VRPA and would not have a claim. *See Kinder v. Meredith*, No. 14–cv–11284, 2014 WL 4209575, at *6 (E.D. Mich. Aug. 26, 2014). This is consistent with the ordinary and natural meaning of "retail." Merriam-Webster defines "retail" as "to be sold to the final customer for a specified price," or "to sell in small quantities directly to the ultimate consumer."[9] Oxford English Dictionary defines "retail" as "[t]he action or business of selling goods in relatively small quantities for use or consumption rather than for resale."[10]

Courts considering the meaning of "at retail" in other contexts likewise have

---

[9] *Available at* http://www.merriam-webster.com/dictionary/retail (last visited Aug. 21, 2015).

[10] *Available at* http://www.oxforddictionaries.com/definition/english/retail (last visited Aug. 21, 2015).

concluded that a sale is not "at retail" unless it is made to the ultimate consumer for use. *See, e.g., United States v. Redmond*, 205 F. Supp. 858 (E.D. Mich. 1962) (holding that "[i]f, in fact, a retailer sells articles at wholesale, then such articles are not 'articles sold at retail.'"); M.C.L. § 436.1111; *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 383 (6th Cir. 2009) (defining the retail price of a room as the price charged by a third party seller of hotel rooms, and the wholesale price as the price the third party must pay the hotel to re-let the rooms). These undisputed facts further render Plaintiff's VRPA claim deficient.

## IV.    The Unjust Enrichment Claim Cannot Survive Summary Judgment

Time is also entitled to summary judgment on Plaintiff's individual unjust enrichment claim.[11]  Plaintiff did not confer a benefit directly on Time because she ordered her subscription through another company. (Ex. C at 175:16-22.) *See e.g.*, *Karaus v. Bank of New York Mellon*, 831 N.W.2d 897, 906 (Mich. Ct. App. 2012) ("[P]laintiff has not shown that he conferred a benefit to Mellon, because Mellon acquired its interest in the property through the assignment of the mortgage . . . not through any action of plaintiff.").  Moreover, her alleged detriment is the "portion of the purchase price of each Time subscription sold . . . [that] was intended to

---

[11] During oral argument on Plaintiff's class certification motion, Plaintiff's counsel stated that, subject to confirmation, Plaintiff was preparing to dismiss that claim. Following the hearing, Time contacted Plaintiff and inquired whether Plaintiff intended to dismiss her unjust enrichment claim as indicated at oral argument. Plaintiff responded "we don't intend to press forward with the unjust enrichment claim," but has refused to actually dismiss that claim. (Ex. CC.)

ensure the confidentiality." Am. Compl. ¶ 105. But there is no evidence that *any* portion of her subscription price was to ensure confidentiality. *See Hollowell v. Career Decisions, Inc.*, 298 N.W.2d 915, 920 (Mich. Ct. App. 1980) (summary judgment appropriate where "[p]laintiff failed to offer any proof to indicate that the value of the services she performed exceeded the compensation she received."). Even if Plaintiff conferred a benefit on Time, it would not be inequitable for Time to retain that benefit where Plaintiff paid $0.04 per issue for the weekly TIME and $0.16 per issue for Fortune and Real Simple, and Time never represented that it would keep the titles of Plaintiff's magazines confidential. *See Karaus*, 831 N.W.2d, at 906 (granting summary judgment where there was no evidence to support the contention that defendant "misled to plaintiff to receive any benefit" or "gave any assurances" that it would pay for work completed by Plaintiff).

## V.    Article III Standing and Subject Matter Jurisdiction Are Lacking

Time acknowledges this Court's previous ruling that a statutory violation without actual harm can satisfy Article III's standing requirement. Time respectfully disagrees with this interpretation and requests dismissal for lack of standing. The Supreme Court granted certiorari in a case addressing this very issue.[12] In a recent amicus brief submitted to the Supreme Court, Michigan's Attorney General (along with 7 other Attorneys General) also took the position that

---

[12] *Spokeo, Inc. v. Robins*, 135 S. Ct. 1892 (April 27, 2015) (No. 13-1339).

Article III requires actual harm.[13]  Michigan urged that the Supreme Court preserve the balance between providing injured parties with access to courts and protecting against abusive litigation "simply by reiterating what it has said again and again— standing requires a concrete injury. No new rules or tests are needed." Brief of Attorneys General Amicus Curiae at 20.  And that if the Court interpreted Article III not to require actual harm, "the very problems the States worked so hard to solve-eliminating abusive class actions through robust certification procedures and reduced pressure to settle-are likely to return." *Id.* at 30. Here, Plaintiff confirmed that she and the class are not proceeding under a theory of actual injury. There is thus no standing and the case should be dismissed.

This Court also lacks subject matter jurisdiction over Plaintiff's VRPA claim.  Plaintiff's sole basis for jurisdiction over this action is the Class Action Fairness Act of 2005 (CAFA). 28 U.S.C. 1332(d). But Plaintiff is proceeding on a theory of statutory damages, not actual damages. *See* Op. and Order Granting Pl's. Mot. Certify Class. at 15, ECF No. 117. Michigan law specifically prohibits class actions under statutory damages statutes such as the VRPA unless expressly authorized by the statute itself. *See* M.C.R. 3.501(A)(5). Here, the opposite is the case. The VRPA, which was passed subsequent to Michigan Rule 3.501, incorporates the statute's bar on class actions as a limitation on a substantive right

---

[13] Brief of Attorneys General as Amicus Curiae in Support of Petitioner, *Spokeo, Inc. v. Robins*, 135 S. Ct. 1892 (2015) (No. 13-1339) (attached as Exhibit EE).

by not expressly permitting class actions. Thus, CAFA does not apply and this Court lacks subject matter jurisdiction. *Shady Grove Orthopedic Associates v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (Stevens, J., concurring) does not compel a different result because the New York statute at issue was passed before the New York rule barring class actions, and thus the legislature's intent to bar class actions in that statute as a substantive right was not clear as it is here.

## CONCLUSION

For the foregoing reasons, Time respectfully requests that the Court grant its motion for summary judgment, and dismiss Plaintiff's claims with prejudice.

Dated:  August 31, 2015          /s/ Jeffrey Landis
                                 Marc Zwillinger
                                 Jeffrey Landis
                                 Jacob Sommer
                                 ZwillGen PLLC
                                 1900 M St. NW, Ste. 250
                                 Washington, DC 20036
                                 (202) 706-5203

                                 Robert M. Jackson (P40723)
                                 Arthur T. O'Reilly (P70406)
                                 HONIGMAN MILLER SCHWARTZ
                                 AND COHN, LLP
                                 660 Woodward Avenue
                                 2290 First National Building
                                 Detroit, MI  48226
                                 (313) 465-7400
                                 rjackson@honigman.com
                                 aoreilly@honigman.com

                                 *Counsel for Defendant Time, Inc.*

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2015, I electronically filed the foregoing Motion for Summary Judgment and Exhibits with the Clerk of the Court via the ECF system, which shall send a notification of such filing to all counsel of record.

/s/ Jeffrey Landis         <br>
Jeffrey Landis (pro hac vice)