# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ROSE COULTER-OWENS, individually, and on behalf of all others similarly situated, | Case No. 2:12-cv-14390-GCS-MKM |
| | Hon. George C. Steeh |
| Plaintiff, | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| TIME INC., a Delaware Corporation, | |
| Defendant. | |

Henry M. Scharg – P28804
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: 248.596.1111
Fax: 248.671.0335

Ari J. Scharg
ascharg@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff Rose Coulter-Owens and the Class*

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Rose Coulter-Owens respectfully requests that this Court grant summary judgment in her favor as to liability on her claim against Defendant Time Inc. under Michigan's Preservation of Personal Privacy Act, M.C.L. §§ 445.1711-1715. Pursuant to Local Rule 7.1(a), Plaintiff's counsel conferred with counsel for Defendant, during which Plaintiff's counsel explained the nature of the motion and its legal basis. Plaintiff's counsel requested, but did not obtain, concurrence in the relief sought.

For the reasons discussed in the accompanying brief, Plaintiff's motion should be granted.

**BRIEF IN SUPPORT**
**OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**ISSUE PRESENTED**

Is Plaintiff entitled to summary judgment under Rule 56 for her claim under Michigan's Preservation of Personal Privacy Act, M.C.L. §§ 445.1711-15, where (i) Defendant is in the business of selling magazine subscriptions at retail, (ii) Plaintiff purchased a magazine subscription from Defendant, (iii) Defendant disclosed Plaintiff's subscription records to third parties, (iv) the records disclosed included Plaintiff's name, and (v) none of the Act's statutory exceptions apply?

Plaintiff answers yes.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

Federal Rule of Civil Procedure 56

Michigan's Preservation of Personal Privacy Act, M.C.L. §§ 445.1711-15

*U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321 (6th Cir. 2013)

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................ 1

II.   STATEMENT OF UNDISPUTED FACTS ............................. 2

      A.    Time's Disclosure of its Customers' Protected Information. ......... 3

            1.    *Time automatically discloses its customers' protected
                  information to Acxiom.* ............................................ 3

            2.    *Time discloses its customers' protected information to
                  Wiland in order to access valuable information from other
                  publishers.* ...................................................... 4

      B.    It Is Undisputed that Time Did Not Obtain Any of the Class
            Members' Written Permission Before Disclosing their
            Protected Information to Acxiom and Wiland. .................... 6

      C.    Time's Deficient Opt-Out Notices and Practices. .............. 7

III.  ARGUMENT ............................................................ 8

      A.    The Undisputed Facts Establish Each Element of a VRPA
            Claim. ............................................................ 8

            1.    *Time is engaged in the business of selling written materials
                  "at retail."* ...................................................... 9

            2.    *Plaintiff—and all other members of the Class—purchased
                  Time's written materials.* ........................................ 13

            3.    *Time disclosed records and information to third parties
                  concerning the purchases.* ........................................ 13

            4.    *The disclosed records and information indicated the
                  identities of Plaintiff and the other members of the Class.* ...... 14

      B.    The Undisputed Facts Establish that None of the VRPA's
            Statutory Exceptions Apply. .................................... 15

            1.    *The disclosures were not made with the written permission*

*of the customers.* .................................................................... 16

2.   *The disclosures were not for the exclusive purpose of marketing goods and services directly to the consumer and Time's customers were not given the required opportunity to opt out.* .............................................................. 18

   a.   The disclosures to Acxiom were not made for the exclusive purpose of marketing goods and services because the disclosed lists were also used for nonprofit and political fundraising purposes. ............... 19

   b.   The disclosures to Wiland were not for the exclusive purpose of marketing goods and services to Time's customers because in addition to the lists being used for fundraising, Time used Wiland to market to *new* subscribers. ................................................................. 21

   c.   In any event, Time can't take refuge in the "exclusive purpose" exception because it neither honored opt out requests nor provided the notice required by statute. .... 22

**IV.   CONCLUSION** ......................................................................... 25

# TABLE OF AUTHORITIES

## United States Circuit Court of Appeals Cases

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012)............. 11

*Becherer v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 193 F.3d 415 (6th Cir. 1999)...................................................................................................... 1

*U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321 (6th Cir. 2013)............. 8

## United States District Court Cases

*Halaburda v. Bauer Publishing Co., LP*, No. 12-cv-12831, 2013 WL 4012827 (E.D. Mich. Aug. 6, 2013).......................................................................... 10

*High v. Capital Senior Living Props. 2-Heatherwood, Inc.*, 594 F. Supp. 2d 789 (E.D. Mich. 2008)...................................................................................... 24

*Tankersley v. Lynch*, No. 11-12847, 2012 WL 683384 (E.D. Mich. Mar. 2, 2012)............................................................................................... 15, 16

## State Court Cases

*People v. Hughes*, 855 N.W.2d 209 (Mich. Ct. App. 2014)................................. 10

*World Book, Inc. v. Dep't of Treasury*, 590 N.W.2d 293 (Mich. 1999)................ 13

## Rules and Statutes

M.C.L. § 205.51(b) .......................................................................................... 10

M.C.L. §§ 445.1711-1715 ........................................................................ *passim*

Michigan Non-Standard Jury Instr. Civil § 32:10 ................................................. 9

## Miscellaneous Authority

Black's Law Dictionary (9th ed. 2009) ................................................................ 9

## I.      INTRODUCTION

The Preservation of Personal Privacy Act[1]—which is popularly referred to as the Video Rental Privacy Act ("VRPA")—provides Michigan consumers with a statutory right to privacy in their reading choices and habits. In this certified class action, Plaintiff Rose Coulter-Owens alleges that Defendant Time, Inc. ("Time") violated the VRPA by disclosing its customers' detailed magazine subscription histories to "multiple third parties for different reasons." (Dkt. 117, Opinion and Order Granting Mot. to Certify Class ["Cert. Order"] at 2-3.)[2] That Time engages in this conduct is undisputed, and Time presents no evidence to establish that its conduct is excused by any of the potentially available statutory exceptions. Given that the undisputed facts establish Time's liability under the VRPA, Plaintiff Coulter-Owens—a subscriber to three of Time's magazines—respectfully requests that this Court enter summary judgment against Time on the VRPA claims.[3]

---

[1]     M.C.L. §§ 445.1711-1715.

[2]     Here, the Class certified under Rule 23(b)(3) is defined as "All Michigan residents who between March 31, 2009 and November 15, 2013 purchased a subscription to *TIME*, *Fortune*, or *Real Simple* magazines through any website other than Time.com, Fortune.com, and RealSimple.com." (Cert. Order at 22.)

[3]     Plaintiff has met and conferred with Defendant with respect to her proposed plan for providing notice of this certified action to the Class, and intends to move the Court for approval of such plan within 7 days. Under the proposed plan, Class members will have 45 days from receipt of the notice to exclude themselves from the Class. As such, Plaintiff respectfully requests that the Court allow a sufficient amount of time for Class members to exercise their opt out rights before ruling upon the instant motion. *See, e.g., Becherer v. Merrill Lynch, Pierce, Fenner, &*

1

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   Time's Disclosure of Its Customers' Protected Information.

Plaintiff is a Michigan resident who purchased subscriptions to three

magazines published by Time—*TIME*, *Fortune*, and *Real Simple*—through one of

its subscription agents.[4] (Def.'s Resp. 1st Interrogs. (Ex. A[5]) at No. 4; Deposition

transcript of Coulter-Owens ["Coulter-Owens Tr."] (Ex. B) 56:4-57:19); (*see also*

Cert. Order at 2, 17.) When Plaintiff and the other Class members purchased a

subscription for "one of [Time's] magazines through a third party agent, certain

information [was] collected for [Time,] such as the subscriber's name, address and

magazine choice." (Cert. Order at 2; Deposition transcript of Time's Rule 30(b)(6)

designee Scott Breininger ["Breininger Dep."] (Ex. C), at 130:6-133:19; Def.'s

Resp. 2nd Interrogs. (Ex. D) at No. 2; *see also* "Time Incorporated – Agency FTP

File Specifications" (Ex. E).) This information automatically goes to Time's

"fulfillment center" and is then "later sent by [Time] to multiple third parties for

different reasons." (Cert. Order at 2-3; Breininger Dep. at 19:5-20:7; 130:6-

---

*Smith, Inc.*, 193 F.3d 415, 429-30 (6th Cir. 1999) (Moore, C.J. concurring) ("In order to curtail one-way intervention, the district court must rule expeditiously on certification and provide an early opt-out date that limits the opportunity of the absent class members to sit on the sidelines without committing to the class.")

[4]   Throughout this brief, "Time" (roman type) refers to Defendant Time, while "*TIME*" (italicized, all caps) refers to the magazine of that name.

[5]   All references to Exhibits (here, "Ex. A") refer to Exhibits attached to the declaration of Ari J. Scharg ("Scharg Decl."), submitted concurrently with, and in support of, this Motion.

133:19.) Two such unrelated third parties—Acxiom Corporation and Wiland Direct—are at issue here.

        1.   *Time automatically discloses its customers' protected information to Acxiom.*

First, "all of [Time's] subscriber information—including people who purchase a subscription from one of defendant's third party agents—is sent by [Time] to Acxiom Corporation ('Acxiom') . . . on a weekly or bi-weekly basis." (Cert. Order at 3; Breininger Dep. 19:24-20:20; 67:1-21; 180:10-21.) Acxiom is a third-party data mining company that has been described as "the quiet giant of a multi-billion dollar industry known as database marketing."[6] It has reportedly amassed the world's largest commercial database on consumers, integrating what it knows about their offline, online, and mobile behavior to create in-depth profiles of 190 million individuals and 126 million households in the United States. *Id*.

After Time automatically discloses its customers' names, addresses, and magazine choices to Acxiom, "Acxiom then appends the lists it receives from [Time] with additional demographic information, such as the subscriber's age, income level, ethnicity, marital status and health status, among other information," (Cert. Order at 3; Breininger Dep. 19:17-20, 235:4-236:8). In fact, Time makes

---

6    Natasha Singer, *Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), http://www.nytimes.com /2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited August 31, 2015).

these disclosures to Acxiom weeks *before* its customers even receive the first issue of their magazine subscription. (Breininger Dep. at 132:5-24; 156:7-157:10; 179:12-180:21.) Importantly, Time discloses its customers' personal reading information to Acxiom in order to increase the information's value (through the addition of the appended data) and to facilitate Time's rental of such personal reading information to third parties for profit. (*See* Ex. D at No. 3; *see also* Ex. A at No. 10; Breininger Dep. at 250:18-23.)

From there, Time "rents" its subscriber lists to unrelated companies, political groups, charities, and other organizations that want to target readers of specific Time magazines. (Breininger Dep. at 10:14-11:1; 104:22-105:20; 121:11-123:11.) (*See*, *e.g.*, Cert. Order at 3 ("For example, in 2012, millions of [Time's] subscribers received a 'Mitt Romney For President' mailer, while others received a mailer from 'AARP'") (citing Dkt. 85-6).) But rather than simply "renting" its customer subscription lists, Time offers the much more valuable option of targeting specific subsets of individuals based on the particular needs of the "renter." In this way, one can target subsets of Time's magazine subscription lists based on a variety of "selects" it acquires from Acxiom—including age, religious and ethnic affiliation (including "African-American," "Catholic," "Latino," "Jewish," etc.), income level, political affiliation, ages of all children in the household, home ownership, health issues, charitable donations, and past purchasing behavior, amongst

hundreds of others. (*See* Time Datacards (Ex. F); *see also* Time-Acxiom

Restatement of Work (Ex. G) at 000961-95.) "Time benefited to the tune of

millions of dollars [███████████████,] from its subscriber list revenue

business from 2008 through 2013." (Cert. Order at 4; Ex. A No. 10.)

> 2.   *Time discloses its customers' protected information to Wiland in*
>       *order to access valuable information from other publishers.*

In addition to its weekly disclosures to Acxiom, Time also automatically

discloses its customers' statutorily-protected information—i.e., names, addresses,

and subscription titles—to unrelated third-party Wiland on a quarterly basis, (Cert.

Order at 3; Breininger Dep. at 72:16-18, 76:8-21, 85:22-86:19; Time-Wiland

Contract (Ex H) at 000212.) Wiland is a self-described "marketing intelligence

company," that offers a variety of "big-data" services to magazine publishers to

assist with new subscriber acquisition ("prospecting") and reactivation of former

("expired") subscribers. (Wiland Website Screenshots (Ex. I) at 2-3, 6-17.)

To provide these services, Wiland maintains a "cooperative database" that

contains data on a staggering 235 million consumers, 110 million households, and

160 million magazine subscribers. (Ex. I at 9-17.) Wiland boasts that "[w]ith

transaction data regularly supplied by our 2,500+ clients, this database enables us

to understand the reading, buying, and giving behavior of virtually every adult in

the U.S." *Id*. Relevant to this motion, Time disclosed the subscriber lists for its

*TIME*, *Fortune*, and *Real Simple* magazines to Wiland. (Breininger Dep. at 74:5-

76:21; Amendments to Time-Wiland Contract (Ex. J).)

Importantly, the reason that Time discloses its customers' detailed magazine records to Wiland is because such disclosures are the "price" that Time must pay in order to access the vast dossiers of valuable consumer data contained in the Wiland database (i.e., the contact information for new potential subscribers to Time magazines). (Ex. H at 000212; Breininger Dep. at 87:9-88:24; *see also* Cert. Order at 4 ("[Time] contributes to the Wiland database so that it can take advantage of the information contributed to the database by other companies.").) Put another way, Time discloses its subscribers' names, addresses, and magazine subscription titles as a means to unlock access to the subscriber information supplied by *other* magazine publishers.

**B.    It Is Undisputed That Time Did Not Obtain Any of the Class Members' Written Permission Before Disclosing Their Protected Information to Acxiom and Wiland.**

The Class includes consumers who purchased subscriptions to *TIME*, *Fortune*, and/or *Real Simple* magazines online through Time's subscription "agents." (Cert. Order at 22.) "[I]t is undisputed that at the time [P]laintiff and [members of the Class] subscribed to [Time's] magazines through a third-party agent, [Time] had not yet obtained their permission to disclose their information" to other third parties, including Acxiom and Wiland. (Cert. Order at 15; *see also* Breininger Dep. at 174:17-175:10; Ex. A at No. 14.) Likewise, Time has admitted

6

that it did not *later* obtain Plaintiff's or any Class member's permission for the disclosures to Acxiom or Wiland. (Breininger Dep. at 174:17-175:10.)

### C.   Time's Deficient Opt-Out Notices and Practices.

Time's supposed "opt-out notices" were provided at the bottom of a single page of each *TIME*, *Fortune*, and *Real Simple* magazine in miniscule font. (*See* Scharg Decl. ¶¶ 19-21.) Those supposed "notices"—which were substantially similar across all relevant magazine—stated:

> Mailing List: We make a portion of our mailing list available to reputable firms. If you would prefer that we do not include your name, please call, or write us at P.O. Box 60001, Tampa, Fla. 33630, or send us an email at privacy@time.customersvc.com. . . .[7]

(Scharg Decl. ¶¶ 19-21.) Putting aside the issues relating to their placement and font size, these "notices" were ineffective for two other reasons.

To start, these "notices" conveyed a policy that was disingenuous at best (and outright deceptive at worst) because even when customers did submit "opt out" requests, *Time would disclose their information to Acxiom anyway*. (Cert. Order at 15; Breininger Dep. 215:7-216:6.) In other words, there was no way for Time's customers to opt out of the Acxiom disclosures. And further, because Time

---

[7]   As described *infra*, Section III.B.2.c, and set forth in the Scharg Declaration, the in-magazine notices for *Fortune* and *Real Simple* magazines only stated that Time would "make a portion of our mailing list available to reputable firms," and did not include any notice about customer's supposed ability to "not be included" by calling or writing. (Scharg Decl. ¶¶ 19-21.)

transmitted its customers' protected information to Acxiom so quickly, (*see supra* § II.A.1), Class members didn't even receive these in-magazine "notices" until weeks *after* the disclosures to Acxiom had already been made. (Breininger Dep. 132:5-24; 156:7-157:10; 179:12-180:21.) These facts are undisputed—the Court has already noted that, as Time's Rule 30(b)(6) deponent testified, "[Time's] opt-out notice was not available on any third-party agent website at the time a subscription was purchased, nor is there any evidence to suggest that consumers were notified of the disclosure to Acxiom at the time they purchased their magazine subscriptions." (Cert. Order at 15 (citing Breininger Dep. 156:1-6).)

## III.   ARGUMENT

Under Federal Rule of Civil Procedure 56, "[a] court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013). Here, Plaintiff is entitled to judgment as a matter of law because the undisputed facts establish that every element of a "written materials" VRPA claim is met, and that none of the Act's statutory exceptions apply.

### A.   The Undisputed Facts Establish Each Element of a VRPA Claim.

The VRPA provides that "a person . . . engaged in the business of selling at retail . . . written materials . . . shall not disclose to any person, other than the

customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer." M.C.L. § 445.1712. There are thus four elements of a VRPA claim: (1) the defendant was engaged in the business of selling written materials "at retail," (2) the plaintiff purchased written materials from the defendant, (3) the defendant disclosed a record or information concerning the purchase to a person other than plaintiff, and (4) the disclosed record or information indicated the plaintiff's identity. *See* Michigan Non-Standard Jury Instr. Civil § 32:10. As explained below, the undisputed facts here establish that each of these elements is met.

      1.    *Time is engaged in the business of selling written materials "at retail."*

The VRPA applies to companies "engaged in the business of selling at retail . . . books or other written materials." M.C.L. § 445.1712. Although the VRPA doesn't define the term "retail," that unambiguous term refers to "the sale of goods or commodities to ultimate consumers, as opposed to the sale for further distribution or processing." Black's Law Dictionary (9th ed. 2009). Likewise, Webster's defines "retail" as "to sell (something) to customers for their own use."[8]

---

[8]    "Retail," Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/retail (last accessed August 31, 2015). On the other hand, "wholesale" is defined as "the business of selling things in large amounts to other businesses rather than to individual customers." *See* "Wholesale," Merriam-Webster Online Dictionary, http://www.merriam-

9

Here, there can be no dispute that "at retail" simply means to sell a product to consumers for their own use, as opposed to "at wholesale," which means selling a product in large amounts to other businesses for resale.[9] And because Time sells magazine subscriptions to customers for their own use, it indisputably falls within the statutory meaning of a company engaged in the business of selling magazines "at retail." (Ex. A at No. 17; Breininger Dep. at 124:3-126:7.) *See Halaburda v. Bauer Publishing Co., LP*, No. 12-cv-12831, 2013 WL 4012827 at *7 (E.D. Mich. Aug. 6, 2013) ("As to 'selling at retail,' the court is persuaded by plaintiffs' argument that the defendants to these actions are in the business of publishing magazines, and sell them to the ultimate consumer of the products.").

That Time sometimes uses agents to sell its magazine subscriptions does not mean that Time is not in the business of selling magazines "at retail." First, and as explained above, not all of Time's magazine sales are conducted using subscription agents. Consumers can purchase magazine subscriptions directly from Time through Time's website, by calling a Time customer service representative, or by

---

webster.com/dictionary/wholesale (last accessed August 31, 2015).
[9]     To the extent that the Court finds that the phrase "at retail" is ambiguous, it may "look to the use by the Legislature of the same or similar terms in other statutes to divine Legislative intent." *People v. Hughes*, 855 N.W.2d 209, 218-19 (Mich. Ct. App. 2014). That analysis compels the exact same result. *See, e.g.*, M.C.L. § 205.51(b) (tax statute defining "[s]ale at retail" and "retail sale" as "a sale, lease, or rental of tangible personal property for any purpose other than for resale, sublease, or subrent").

mailing a postcard to Time, all without the assistance of any subscription agent. (Breininger Dep. at 124:3-126:7.) Consequently, because at least some of Time's magazine subscription sales did not involve subscription agents, Time is indisputably "engaged in the business of selling at retail . . . written materials" and thus subject to the VRPA's prohibition against disclosure of its readers' information.

And in any event, even when it utilizes subscription agents, it is undisputed that Time is still the actual entity that sells magazine subscriptions directly to customers "at retail." Indeed, Time is not selling magazines at wholesale to its subscription agents, who then turn around and resell those magazines to consumers.[10] Rather, Time is simply using its subscription agents to help funnel new or existing customer subscription orders to it. (*See, e.g.,* Breininger Dep. at 153:8-154:2 (when Plaintiff ordered magazines through a subscription agent's website "the order was submitted to [the subscription agent], and then submitted to

---

[10]     To be clear, Plaintiff is not suggesting that Time also profits from magazines *not* sold "at retail." For example, consumers can buy copies of *TIME* and other magazines at grocery stores, bookstores, newsstands, and other establishments that re-sell individual copies of Time's magazines. Those non-subscription magazine purchases—which brick-and-mortar retailers receive in bulk, before offering them "for resale" on a per-issue basis to their own customers (*see* Cert. Order at 11 (quoting *Kinder v. Meredith*, No. 14-cv-11284, 2014 WL 4209575, at *6 (E.D. Mich. Aug. 26, 2014))—are not a part of Plaintiff's or Class members' VRPA claims. *See generally Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 168 (2d Cir. 2012) (distinguishing between "the single-copy magazine industry" and "the subscription-sales industry").

[Time]"); *id.* at 130:20-131:5 (when an order is placed with a subscription agent "they will receive payment for the subscription . . . and the order then will be submitted to Time Inc., to . . . our customer service facility, and they will process the order and put the order on file.").) Indeed, Scott Breininger—Time's Vice President of Marketing—testified that even when a subscription agent is used, Time is still the entity that sells the magazine subscriptions to the customers:



(Breininger Dep. at 138:19-139:16.) Simply put, Time sells its magazine subscriptions directly to customers for their personal use, *i.e.* "at retail." The fact that it uses subscription agents to originate or facilitate some of those subscription sales—including the sales to Plaintiff and other Class members—in no way changes that fact, either generally or with respect to those transactions involving subscription agents.[11] *See World Book, Inc. v. Dep't of Treasury*, 590 N.W.2d 293,

---

[11]      To use the Court's example, those Class members purchasing subscriptions

298 (Mich. 1999) (treating encyclopedia company as having engaged in sales "at retail" under Michigan law, even though "its independent contractors solicited orders from customers and entered into tentative agreements with them").

Consequently, the undisputed facts establish that the first element of Plaintiff's VRPA claim—that Time is engaged in the business of selling written materials at retail—is met.

2.    *Plaintiff—and all other members of Class—purchased Time's written materials.*

It is undisputed that Plaintiff purchased subscriptions to *TIME*, *Fortune*, and *Real Simple* magazines. (Ex. A at No. 4; Rose Tr. (Ex. B) at 56:4-57:19.) And the Class is defined to include only Michigan residents who purchased subscriptions to *TIME*, *Fortune*, or *Real Simple*. (Dkt. 82 at 10.) Thus, the undisputed facts also prove the second element of Plaintiff's VRPA claim—that she and all other members of the Class purchased Time's "written materials."

3.    *Time disclosed records and information to third parties concerning the purchases.*

The third element of Plaintiff's VRPA claim—that Time disclosed records

---

to *Real Simple* magazine through "www.magazines.com" were not, somehow, buying a "www.magazines.com subscription" that caused them to receive copies of *Real Simple* on a monthly basis. (Cert. Order at 1.) Rather, such Class members just used www.magazine.com to facilitate their purchase of a *Real Simple* magazine subscription *from* Time. (*See* Breininger Dep. at 153:8-154:2, 130:20-131:5, 138:19-139:16.)

and information to third parties concerning the purchases—is also established by

the undisputed evidence. As described above, Time routinely and automatically

discloses records and information concerning magazine purchases to third parties

Acxiom and Wiland. As Scott Breininger testified with respect to Acxiom:

> A.    [W]hen someone's order comes on, the information that's sent
> to our fulfillment center about that then is sent to Acxiom….
>
> Q.    So . . . every subscriber's name and information and their
> subscription records are ultimately sent to Acxiom?
>
> A.    They will be at Acxiom, yes.
>
> Q.    … Are they transmitted there by Time?
>
> A.    Yes.

(Breininger Dep. at 19:17-20:11.)

And with respect to Wiland:

> Q.    Does Time provide Wiland with customer names and magazine
> titles?
>
> A.    Yes.

(Breininger Dep. at 72:16-18, 86:12-19; *see* Ex. H at TIME_RCO_000212.)

The disclosures to Acxiom include the records of "every subscriber[]"

(Breininger Dep. at 19:24-20:4), and the disclosures to Wiland include the records

of subscribers to *TIME*, *Real Simple*, and *Fortune*. (Breininger Dep. at 75:11-

76:21.) Thus, records or information concerning Plaintiff's and the Class's

magazine purchases were disclosed by Time to third parties, establishing the third

14

element of Plaintiff's claim.

    4.    *The disclosed records and information indicated the identities of Plaintiff and the other members of the Class.*

Finally, the last element of Plaintiff's VRPA claim—that the disclosures indicated the identities of Plaintiff and the other members of the Class—is also established by the undisputed evidence. Scott Breininger expressly testified that the records disclosed both to Acxiom and Wiland include "customer names." (Breininger Dep. at 67:1-13 (Acxiom); *id.* at 72:16-18 (Wiland).) (*See* Cert. Order at 2-3 (discussing Time's collection and disclosure of customer names.) It can hardly be disputed that names "indicate[] the identity of the customer." M.C.L. § 445.1712. Consequently, the last element of Plaintiff's VRPA claim is met, and the undisputed evidence thus establishes both all four elements of her claim and that she is entitled to summary judgment.

**B.    The Undisputed Facts Establish that None of the VRPA's Statutory Exceptions Apply.**

The VRPA contains five statutory exceptions excusing the otherwise unlawful disclosure of customer information. M.C.L. § 445.1713. These exceptions are affirmative defenses on which Time bears the ultimate burden of proof. *See Tankersley v. Lynch*, No. 11-12847, 2012 WL 683384, *7 (E.D. Mich. Mar. 2, 2012) ("[A]ppeal to a statutory exclusion is an affirmative defense as to which Defendants carry the burden of proof."). And because Time bears the burden of

proof, Plaintiff is entitled to summary judgment with respect to these affirmative defenses simply by showing "an absence of evidence to support an essential element of [the defense]." *Id.* at *11. Here, the undisputed facts show that Time cannot establish any of the VRPA's five statutory exceptions.

As an initial matter, it is undisputed that the disclosures to Acxiom and Wiland were not pursuant to a court order, pursuant to a search warrant, or for the purpose of debt collection. *See* M.C.L. § 445.1713(b), (c), (e). The remaining statutory exceptions are (1) disclosures with the written permission of the customer, M.C.L. § 445.1713(a), and (2) disclosures for the exclusive purpose of marketing goods and services directly to the consumer, M.C.L. § 445.1713(d). (*See* Cert. Order at 13-14 (discussing Time's applicable affirmative defenses).) As explained below, however, neither of these exceptions apply here.

### 1. The disclosures were not made with the written permission of the customers.

A record or information otherwise protected from disclosure under the VRPA may nevertheless be disclosed "[w]ith the written permission of the customer." M.C.L. § 445.1713(a). Here, however, there is absolutely no evidence that Plaintiff or any other member of the Class provided their written consent to Time's disclosures of their protected information, and indeed, the undisputed evidence establishes the contrary.

First, in response to an interrogatory asking Time to describe how it

16

purportedly obtained its customers' written permission to disclose their protected

information, Time only stated that it  ." (Ex. A at No. 14 (emphasis

added).) But ████████ is not written permission, and in no way establishes

the affirmative defense. Further, while Time's interrogatory response also stated

that "████████████████████

████████████████████

████████████████ [,]" (Ex.

A at No. 14), that statement does not cover members of the Class here—*i.e.* those

who did *not* purchase subscriptions directly through Time's online subscription

process, but rather through the websites of Time's subscription agents. Time's

interrogatory answer conspicuously fails to state (or even suggest) that *those*

subscribers—the only subscribers at issue here—provided written permission.

Moreover, not only does Time *lack* any evidence that members of the

putative class provided written permission to disclose their protected information,

the undisputed evidence *affirmatively establishes* that no such written permission

was provided. (*See* Cert. Order at 15 ("In fact, it is undisputed that at the time

plaintiff and others subscribed to [Time's] magazines through a third party-agent,

[Time] had not yet obtained their permission to disclose their information.").) As

17

Mr. Breininger testified:

> Q.   At the time that the plaintiff subscribed through the agent's
> Web site, did Time obtain the plaintiff's permission to disclose
> her name and magazine titles to third parties?
>
> A.   No.
>
> Q.   Okay. At some point after she subscribed, did Time obtain her
> permission to disclose her name and magazine titles to third
> parties?
>
> [Objection]
>
> A.   No.
>
> Q.   Is that the same case with any other customer that subscribed
> through a third-party—through an agent's Web site to a Time
> magazine?
>
> A.   Yes.

(Breininger Dep. at 174:17-175:10.)

Thus, while Plaintiff need only show an absence of evidence to prevail on

her motion for summary judgment with respect to an affirmative defense, here the

undisputed evidence conclusively establishes that neither Plaintiff nor any other

member of the putative class provided written consent to have their information

disclosed. As such, the VRPA's written permission exception does not apply.

>   2.   *The disclosures were not for the exclusive purpose of marketing
>        goods and services directly to the consumer and Time's
>        customers were not given the required opportunity to opt out.*

Finally, a disclosure may be made to a third party if it "is for the exclusive

purpose of marketing goods and services directly to the consumer [and] the person disclosing the information … inform[s] the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information." M.C.L. § 445.1713(d). Here, the undisputed evidence shows that neither Time's disclosures to Acxiom nor its disclosures to Wiland satisfy this exception.

> a.  The disclosures to Acxiom were not made for the exclusive purpose of marketing goods and services because the disclosed lists were also used for nonprofit and political fundraising purposes.

As explained above, the disclosures to Acxiom were for the purpose of facilitating Time's list-rental business. But while some portion of the list-rental business may have eventually resulted in goods and services being marketed to some Time customers, Time's customer disclosures were not made *exclusively* for that purpose as required by the statutory exception. For example, Time rented lists of its subscribers not only to companies interested in selling goods and services, but—as this Court has recognized, (Cert. Order at 3 (describing Time's list rental business))—also to nonprofit and political organizations for fundraising or other non-marketing purposes. (*See*, *e.g.*, Time_RCO_0009276-79 (Ex. K).)

The purpose of renting lists to organizations like these was decidedly *not* for the purpose of marketing goods and services to Time customers, but rather to recruit them to a cause and solicit charitable or political donations from them. █



███████ (Ex. K at 9278.) And indeed, Time's

lists were used by a variety of nonprofit and political fundraising organizations

such as ███████

███████

███████. (*Id.*) In 2011 and 2012,

for instance, ███████

███████ Mitt Romney for President. (Time_RCO_0001661 (Ex. L).) (*See*

Cert. Order at 3.) ███████

███████. (Ex. L.)

Simply put, because Time's disclosures to Acxiom were for the purpose of

facilitating its list-rental business, and because Time's lists were and are not rented

for the exclusive purpose of marketing goods and services, the disclosures to

Acxiom do not fall within this statutory exception.[12]

---

[12]    Further, the disclosures to Acxiom were not even used solely to facilitate
Time's list-rental business. For example, ███████

███████, (Time-Acxiom Contract (Ex. M) at 001013)

(*see id.* at 001001; Ex. G at 000897, 000920-926).

Ex. G at 000910-911.) Thus, even if the list-rental

        b.    The disclosures to Wiland were not for the exclusive purpose of marketing goods and services to Time's customers because in addition to the lists being used for fundraising, Time used Wiland to market to *new* subscribers.

Time's disclosures to Wiland likewise do not fall within the statutory exception. Like its disclosures to Acxiom, Time's disclosures to Wiland are used by other members of the Wiland cooperative for purposes other than directly marketing goods and services to Time customers. For example, other members of the Wiland cooperative that have utilized Time's subscriber lists—and for which Time received payment—include nonprofit and political fundraising organizations such as the ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████. ("Wiland Participants" (Ex. N).)

In addition, the disclosures to Wiland do not fall within the statutory exception for another, independent, reason. The exception permits the disclosure of customer records "[i]f the disclosure is for the exclusive purpose of marketing goods and services *directly to the consumer*." M.C.L. § 445.1713(d) (emphasis

business was used exclusively for the purpose of marketing goods and services to Time customers—which, as explained above, it was not—Time's disclosures to Acxiom were not for the exclusive purpose of marketing goods and services to its customers because the disclosures to Acxiom ████████████████████ ████████████████████.

21

added). As the statutory text makes clear, this means that the marketing of goods and services must be made *directly* to Time's customers—i.e., to the same persons whose magazine subscription records were disclosed. If the statute meant "any" consumer (*i.e.*, not just Time's customers), the entire italicized phrase would be superfluous, as there is no substantive difference between saying "marketing goods and services to *any* consumer" and "marketing goods and services" period.

Here, Time disclosed its subscriber lists to Wiland not only for the purpose of renting those lists to other members of the Wiland cooperative, but because the disclosures were the price for Time to itself gain access to the larger cooperative database. (Breininger Dep. at 87:9-88:24.) (*See* Cert. Order at 4.) And the reason why access to the database was valuable to Time was because it allows Time to prospect for potential *new* subscribers to Time publications. (Wiland promotional materials (Ex. O.) at TIME_RCO_0008100-13; Ex. H at 215 (offering "prospecting services").) But by definition, marketing goods and services (like Time magazines) to potential *new* customers is not marketing goods and services *directly* to those Time customers whose records were disclosed, which is the extent of the statutory exception.

          c.     In any event, Time can't take refuge in the "exclusive purpose" exception because it neither honored opt out requests nor provided the notice required by statute.

As explained, the disclosures to Acxiom and Wiland were not made for the

exclusive purposes of marketing goods and services to Time's customers. But even if they were, the undisputed evidence establishes that Time *still* fails to fall within the statutory exception. If, contrary to the discussion above, Time's disclosures are deemed to be made for the exclusive purpose of marketing goods and services to its customers, the exception also requires that Time "inform the customer by written notice that the customer may remove his or her name at any time by written notice to [Time]." M.C.L. § 445.1713(d). The undisputed evidence establishes that Time has failed this requirement.

To start, the Court has already held that Time's disclosure practices with respect to Acxiom bring it outside the VRPA's "exclusive purpose" exception. Two facts support this conclusion. First, even if Time received a request by a subscriber not to include their name, address, and reading choices on the customer lists disclosed to third parties, *Time would make the disclosures to Acxiom anyway*. (Breininger Dep. 215:7-216:6.) (*See* Cert. Order at 15.) Recognizing this, the Court has held that because the "disclosures to Acxiom occur with or without the return of an opt-out notice," Time cannot avail itself of the "exclusive purpose" statutory exception. (*Id.* ("[T]he potential mitigation of [Time's] liability relates only to the opt-out notices forwarded to Wiland.").) Second—and even assuming there *were* some way to opt out of the Acxiom disclosures (there wasn't)—Time's opt-out notices were still provided to Class members weeks *after* Time had already

disclosed their names to Acxiom and, further, "[Time's] opt-out notice was not available on any third-party agent website at the time a subscription was purchased, nor is there any evidence to suggest that consumers were notified of the disclosure to Acxiom at the time they purchased their magazine subscriptions." (Cert. Order at 15.) (*See also* Breininger Dep. 132:5-24; 156:7-157:10; 179:12-180:21.) Thus, because Time made the Acxiom disclosures before even notifying its customers of a supposed opportunity to opt out, the "exclusive purpose" statutory exception cannot apply.

Next, Time's written "opt out" notices just don't comply with the VRPA's "exclusive purpose" exception. The purported in-magazine "written notice" provided to members of the Class appear at the bottom of a single page of each *Time*, *Fortune*, and *Real Simple* magazine in miniscule font. (*Real Simple* notice (Ex. P) at 47518; *Fortune* notice (Ex. Q) at 47407; *TIME* notice (Ex. R) at 47163.) The size and placement of these notices alone render them deficient. *Cf. High v. Capital Senior Living Props. 2-Heatherwood, Inc.*, 594 F. Supp. 2d 789, 799 (E.D. Mich. 2008) ("Procedural unconscionability is present where the challenged provision is buried in the text of a document, appears in small font, or is not otherwise conspicuous."). Further, the notices in *Fortune* and *Real Simple* do not even inform consumers that they can remove their name from the disclosed lists and, thus, fail to comply with the statutory exception. *See* M.C.L. § 445.1713(d).

24

Instead, they simply state: "Mailing List: We make a portion of our mailing list available to reputable firms." (Ex. P at 47518; Ex. Q at 47407.) Either way, the notices fail to meet the VRPA's minimal requirements for notifying Class members of their ability to "opt out" of Time's disclosures and, thus, Time cannot avail itself of the exception.

Thus, while Time's disclosures to Acxiom and Wiland were not for the exclusive purpose of marketing goods and services directly to its customers, even if they were, Time failed to provide the written notice required by the statutory exception or, with respect to Acxiom, even provide Class members with an opportunity to opt out. Consequently, the undisputed evidence establishes that Time cannot assert that defense.

## IV.    CONCLUSION

Because the undisputed facts establish all elements of Plaintiff's VRPA claim, coupled with the fact that the disclosures at issue here do not fall within any of the statutory exceptions to the act, Plaintiff is entitled to judgment as a matter of law. Accordingly, this Court should enter summary judgment in her favor as to that claim.

Dated: August 31, 2015                    Respectfully submitted,

                                          By: /s/ Ari J. Scharg
                                          Counsel for Plaintiff Rose Coulter-
                                          Owens and the Class

25

## <u>CERTIFICATE OF SERVICE</u>

I, Ari J. Scharg, an attorney, certify that on August 31, 2015, I served the above and foregoing ***Plaintiff's Motion for Summary Judgment*** by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

/s/ Ari J. Scharg