## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ROSE COULTER-OWENS, individually, and on behalf of all others similarly situated, | Case No. 2:12-cv-14390-GCS-MKM |
| Plaintiff, | Hon. George C. Steeh |
| v. | **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| TIME INC., a Delaware Corporation, | |
| Defendant. | |

Henry M. Scharg – P28804
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: 248.596.1111
Fax: 248.671.0335

Ari J. Scharg
ascharg@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
EDELSON PC
350 N. LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378

*Class Counsel*

## ISSUES PRESENTED

Is Defendant entitled to summary judgment under Rule 56 for Plaintiff's claims under Michigan's Preservation of Personal Privacy Act, M.C.L. §§ 445.1711-15, where:

(i)     The Act does not provide a statutory exception for disclosures to agents and, even if it did, Acxiom is not an agent of Time;

(ii)    Time's disclosures to Wiland were made for many purposes other than for the marketing goods and services directly to the consumer and, even if they were made exclusively for that prupose, Time failed to provide Plaintiff and the Class with the requisite opt-out notice; and

(iii)   Time is in the business of selling magazine subscriptions "at retail" and sold magazines subscriptions "at retail" to Plaintiff and the Class?

**Plaintiff's Answer:  No.**

i

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

Federal Rule of Civil Procedure 56

Michigan's Preservation of Personal Privacy Act, M.C.L. §§ 445.1711-15

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................. 1

II.  STATEMENT OF UNDISPUTED FACTS ................................... 4

     A.   Time discloses its customers' protected information to third parties
          Acxiom and Wiland ................................................... 4

     B.   Time did not obtain any of the class members' written permission
          before disclosing their protected information ..................... 6

     C.   Time's Deficient opt-out notices and practices .................... 6

III. ARGUMENT ..................................................................... 6

     A.   There is no exception in the VRPA for disclosures to agents, and in
          any event, Acxiom is not time's agent .............................. 7

          1.   The VRPA does not exempt disclosures to agents ................ 8

          2.   Even if the VRPA exempted disclosures to agents, Acxiom is
               not Time's agent .............................................. 9

     B.   The disclosures to Wiland were not for the exclusive purpose of
          marketing to the consumer ......................................... 13

          1.   Time disclosed class members' protected information to Wiland
               not for the purpose of marketing goods and services to them,
               but to gain access to valuable information about *other*
               consumers .................................................... 13

          2.   Time did not provide sufficient notice to class members of their
               right to opt out of any such disclosures ..................... 16

     C.   Time is engaged in the business of selling written materials at
          retail ............................................................ 18

          1.   Time sells magazines at retail ............................... 18

          2.   Class members' magazine purchases through Time subscription
               agents were at retail ........................................ 20

       D.     Plaintiff has Article III standing, and this Court has subject matter jurisdiction............................................................................ 22

           1.    This Court has already decided that Plaintiff has Article III standing to sue............................................................... 22

           2.    Time's subject matter jurisdiction argument is a confused— and borderline frivolous—attack on this Court's certification ruling........................................................................... 24

IV.   CONCLUSION................................................................................ 25

# TABLE OF AUTHORITIES

## United States Supreme Court Cases

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) ................................................................ 25

## United States Circuit Court of Appeals Cases

*Appoloni v. U.S.*, 450 F.3d 185 (6th Cir. 2006) ...................................... 7

*B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587 (6th Cir. 2001) ................... 7

*Beaudry v. TeleCheck Servs., Inc.*, 579 F.3d 702 (6th Cir. 2009) .................. 23, 24

*In re Kenneth Allen Knight Trust*, 303 F.3d 671 (6th Cir. 2002) .......................... 23

## United States District Court Cases

*Bonner v. Howes*, No. 04-CV-40261-FL, 2005 WL 2562778 (E.D. Mich.
  Oct. 7, 2005) ................................................................... 8

*Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674 (E.D. Mich. 2013) . 12

*Fed. Ins. Co. v. Detroit Med. Ctr.*, No. 08-13322, 2009 WL 136866 (E.D. Mich.
  Jan. 16, 2009) ................................................................ 11

*Friedman v. Freidberg Law Corp.*, 44 F. Supp. 2d 902 (E.D. Mich. 1999).......... 12

*Halaburda v. Bauer Publishing Co., LP*, No. 12-cv-12831, 2013 WL 4012827
  (E.D. Mich. Aug. 6, 2013)..................................................... 20

*Hart v. Comerica Bank*, 957 F. Supp. 958 (E.D. Mich. 1997) .............................. 10

*High v. Capital Senior Living Props. 2-Heatherwood, Inc.*, 594 F. Supp. 2d 789
  (E.D. Mich. 2008).......................................................... 17-18

*In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982 (E.D. Mich. 2014) ........... 3, 4

*In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642 (E.D. Mich. 2011)......... 25

*King v. Pennsylvania Life Ins. Co.*, No. 09-13761, 2013 WL 5944722

(E.D. Mich. Nov. 6, 2013) ................................................................. 7

*Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735 (E.D. Mich. 2014) ................................................................................................ 12

*Roberts v. Bennett Enters., Inc.*, No. 04-73540, 2006 WL 3825067 (E.D. Mich. Dec. 26, 2006) .................................................................. 12

*Rodriguez v. Credit Acceptance Corp.*, No. 07-CV-12578-DT, 2008 WL 344536 (E.D. Mich. Feb. 7, 2008) .......................................................... 10

**State Court Cases**

*Birou v. Thompson-Brown Co.*, 241 N.W. 265 (Mich. Ct. App. 1976) ........... 11, 12

*People v. Hughes*, 855 N.W.2d 209 (Mich. Ct. App. 2014) ........................... 18-19

*Potomic Leasing Co. v. The French Connection Shops, Inc.*, 431 N.W.2d 214 (Mich. Ct. App. 1988) ............................................. 12

*See World Book, Inc. v. Dep't of Treasury*, 590 N.W.2d 293 (Mich. 1999) .......... 22

**Rules and Statutes**

Fed. R. Civ. P. 56 .................................................................................. 7

M.C.L. § 205.51 .................................................................................. 19

M.C.R. §§ 1.101, 1.103 ...................................................................... 25

M.C.R. § 3.501 .............................................................................. 24, 25

Michigan Preservation of Personal Privacy Act, M.C.L. § 445.1711-15 ........ *passim*

**Miscellaneous**

Natasha Singer, *Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), http://www.nytimes.com /2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited October 1, 2015) ................................................................................. 5

Restatement (Third) of Restitution & Unjust Enrichment § 3 ................................. 4

*Retail*, Black's Law Dictionary (9th ed. 2009) ...................................................... 19

*Retail*, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/retail (last accessed October 1, 2015) ................... 19

*Wholesale*, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/wholesale (last accessed October 1, 2015) ............ 19

## I.      INTRODUCTION

Plaintiff Rose Coulter-Owens, on behalf of herself and a class of other magazine purchasers, sued Defendant Time, Inc. for disclosing class members' private and statutorily-protected information to data miner Acxiom and database cooperative Wiland in violation of the VRPA.[1] The parties have filed cross-motions for summary judgment, with Time raising four arguments in an attempt to justify its unlawful disclosures. All of these arguments are without merit, and Time's motion for summary judgment should be denied.

First, Time asserts that its undisputed disclosure of its customers' protected information to Acxiom did not violate the VRPA because Acxiom is its agent. But the plain language of the statute prohibits disclosures "to any person, other than the customer." M.C.L. § 445.1712. Contrary to Time's assertion, there is no exception for disclosure to third parties acting as agents. In any event, even if there were such an exception, Acxiom is not an agent of Time. ███████████████████ ██████████████████████████████████ and Time lacks the ability to control Acxiom's performance of its contractual obligations as required to establish such a relationship.

Second, Time argues that its undisputed disclosure of its customers'

---

[1]  Throughout this brief, "Time" (roman type) refers to Defendant Time, Inc., while "*TIME*" (italicized, all caps) refers to the magazine of that name. Further, all references to Exhibits refer to Exhibits attached to the declaration of Ari J. Scharg ("Scharg Decl."), submitted concurrently with, and in support of, this Motion.

protected information to Wiland falls within an exception to the VRPA allowing disclosures "for the exclusive purpose of marketing goods and services directly to the consumer." M.C.L. § 445.1713(d). But Time's disclosures to Wiland were *not* for the exclusive purpose of marketing goods and services to its customers. The reason Time disclosed its subscribers' information to Wiland was to access Wiland's cooperative database in an attempt to find other—new—customers. This is not marketing "to the consumer," *i.e.*, to the consumer whose information was disclosed. In addition, the information disclosed to Wiland was used by other members of the cooperative for nonprofit and political fundraising, which has nothing to do with the marketing of goods and services. Regardless, even if the disclosures were for the exclusive purpose of marketing goods and services, the exception requires Time to provide its customers with written notice of their right to opt out of such disclosures. M.C.L. § 445. 1713(d). Time points to absolutely no evidence in the record to show that such notice was provided to its customers before their information was disclosed to Wiland, and the in-magazine "notice" that was ultimately provided was both untimely and insufficient.

Third, Time argues that Plaintiff and the class did not purchase their subscriptions "at retail" as required by the VRPA. But what the statute actually requires is simply that the defendant is "engaged in the business of selling at retail … written materials." M.C.L. § 445.1712. Time, which sells magazines directly to

readers, clearly is engaged in the business of selling written materials at retail. But even where, as here, Time utilizes subscription agents to sell magazines to its readers, dictionary definitions, case law, and testimony from Time's own Vice President of Marketing confirm that such sales are "at retail."

Finally, Time argues that Plaintiff lacks Article III standing and that this Court lacks subject matter jurisdiction. But this Court has already decided the Article III standing question, denying Time's motion to dismiss on that basis and refusing to certify the question for interlocutory appeal. Time points to no reason—and certainly not the exceptional conditions required—to revisit that decision. And its subject matter jurisdiction argument, borderline frivolous in its reliance on a Michigan procedural rule, is a poorly disguised attack on this Court's prior ruling on class certification.

For all these reasons, as explained more fully below, Time's motion for summary judgment should be denied.[2]

---

[2] Time is also not entitled to summary judgment on Plaintiff's *individual* unjust enrichment claim. (*See* Cert. Order, Dkt. 117, at 5 ("Plaintiff … seeks class certification only on the VRPA claim.").) First, and consistent with her allegations, it's undisputed that Plaintiff *paid* Time for her subscriptions through a subscription agent, but Time disclosed her information anyway. (*See* Dkt. 43 (Upholding unjust enrichment claim on allegations that Time "engaged in collection and illegal disclosure of [Plaintiff's] personal reading information, and that the monetary and other benefits associated with such disclosure represents unjust enrichment.").) *See also In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1021 (E.D. Mich. 2014) ("Michigan law does not require a benefit to be conferred directly by the plaintiff to a defendant.") (citing collected cases). Second, "Time benefitted to the tune of

## II.    STATEMENT OF UNDISPUTED FACTS

Plaintiff is a Michigan resident who purchased subscriptions to three magazines published by Time—*TIME*, *Fortune*, and *Real Simple*—through one of its subscription agents. (Def.'s Resp. 1st Interrogs. (Ex. B) at No. 4; Coulter-Owens Dep. 56:4-57:19); (*see also* Cert. Order at 2, 17.) When she subscribed, "certain information [was] collected for [Time,] such as [her] name, address and magazine choice." (Cert. Order at 2; Dep. Tr. of Time's Rule 30(b)(6) designee Scott Breininger ["Breininger Dep."] (Ex. C), at 130:6-133:19; Def.'s Resp. 2nd Interrogs. (Ex. D) at No. 2; *see also* File Layout (Ex. E) at 47660-68.) This information was then "sent by [Time] to multiple third parties for different reasons." (Cert. Order at 2-3; Breininger Dep. at 19:5-20:7; 130:6-133:19.)

### A.    Time discloses its customers' protected information to third parties Acxiom and Wiland.

First, "all of [Time's] subscriber information . . . is sent by [Time] to Acxiom Corporation[.]" (Cert. Order at 3; Breininger Dep. 19:24-20:20; 67:1-21;

---

millions of dollars from its subscriber list revenue business from 2008 through 2013." (Cert. Order at 4 (citing Def.'s Resp. to First Set of Interrogs. No. 10).) And because the disclosures underlying Time's business violate the VRPA, Time's list rental revenue is thus subject to disgorgement. (*See* Dkt. 53 ¶ 103 ("[B]ecause Time failed to comply with the VRPA, Time should not be allowed to retain . . . the money it received by selling Coulter-Owen's . . . Information."); Dep. Tr. of Coulter-Owens ["Coulter-Owens Dep."] (Ex. A) at 184:13-186:19 (discussing Time's disclosure of Plaintiff's information via its list rental business).) *See also In re Auto. Parts*, 1014-15 ("An unjust enrichment claim is used to prevent a defendant from 'profit[ing] by his own wrong.'") (quoting Restatement (Third) of Restitution & Unjust Enrichment § 3).

4

180:10-21.) Acxiom is a third-party data mining company with a massive

consumer database.[3] After Time discloses its customers' names, addresses, and

magazine choices to Acxiom, "Acxiom then appends the lists it receives from

[Time] with additional demographic information." (Cert. Order at 3; Breininger

Dep. 19:17-20, 235:4-236:8). Time makes the Acxiom disclosures weeks *before* its

customers receive the first issue of their magazine subscription. (Breininger Dep. at

132:5-24; 156:7-157:10; 179:12-180:21.) Time discloses this information to

increase its value (through the addition of the appended data) and to facilitate

Time's profitable "list rental" business, where Time "rents" its subscriber lists to

unrelated companies for millions of dollars a year. (*See* Ex. D at No. 3; *see also*

Ex. B at No. 10; Breininger Dep. at 250:18-23; 10:14-11:1; 104:22-105:20;

121:11-123:11.) (*See also* Cert. Order at 4.)

Next, Time also discloses its customers' statutorily-protected information to

third-party Wiland. (Cert. Order at 3; Breininger Dep. at 72:16-18, 76:8-21, 85:22-

86:19; Time-Wiland Contract (Ex F) at 000212.) Wiland maintains a "cooperative

database" that contains data on 235 million consumers. (Wiland Screenshots (Ex.

G) at 9-17.) For its part, Time disclosed the subscriber lists for its *TIME*, *Fortune*,

and *Real Simple* magazines to Wiland. (Breininger Dep. at 74:5-76:21;

---

[3]  Natasha Singer, *Mapping, and Sharing, the Consumer Genome*, N.Y. Times
(June 16, 2012), http://www.nytimes.com /2012/06/17/technology/acxiom-the-
quiet-giant-of-consumer-database-marketing.html (last visited October 1, 2015).

Amendments to Time-Wiland Contract (Ex. H).) In exchange for these disclosures, Time received access to the consumer data contained in the larger Wiland database (i.e., the contact information for *new* potential subscribers to Time magazines). (Ex. F at 000212; Breininger Dep. at 87:9-88:24; *see also* Cert. Order at 4 ("[Time] contributes to the Wiland database so that it can take advantage of the information contributed to the database by other companies.").).

### B.   Time did not obtain any of the class members' written permission before disclosing their protected information.

"[I]t is undisputed that at the time [P]laintiff and [members of the Class] subscribed . . . [Time] had not yet obtained their permission to disclose their information" to other third parties, including Acxiom and Wiland. (Cert. Order at 15; *see also* Breininger Dep. at 174:17-175:10; Ex. B at No. 14.)

### C.   Time's deficient opt-out notices and practices.

Time's supposed "opt-out notices" were provided at the bottom of a single page of each *TIME*, *Fortune*, and *Real Simple* magazine in miniscule font. (*See* Scharg Decl. ¶¶ 15-17.) And even when customers submitted "opt out" requests (pursuant to Time's supposed opt-out policy), however, *Time would disclose their information to Acxiom anyway*. (Cert. Order at 15; Breininger Dep. 215:7-216:6.) In other words, Time's customers couldn't opt out of the Acxiom disclosures.

## III.   ARGUMENT

Summary judgment is appropriate if "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also King v. Penn. Life Ins. Co.*, 2013 WL 5944722, at *9 (E.D. Mich. Nov. 6, 2013) ("The party asserting an affirmative defense has the burden to produce evidence to support it."). When deciding cross motions for summary judgment, this Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Appoloni v. U.S.*, 450 F.3d 185, 189 (6th Cir. 2006). In other words, even though the parties have filed cross motions, this Court is free to not resolve the case on summary judgment; it can deny both motions and have the case proceed to trial. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001) ("A trial court may conclude, when reviewing the undisputed material facts agreed upon by the parties and drawing all inferences, in turn, for the non-moving party, that a genuine issue exists as to those material facts, in which case the court is not permitted to resolve the matter, but rather, must allow the case to proceed to trial."). Here, regardless of how this Court decides *Plaintiff's* motion for summary judgment, it should deny *Time's* motion for the following reasons.

### A.   There is no exception in the VRPA for disclosures to agents, and in any event, Acxiom is not time's agent.

Time argues that the VRPA allows a company to disclose protected information to third parties acting as its agent, and that Acxiom is such an agent here. Time is wrong on both fronts.

7

### 1.     The VRPA does not exempt disclosures to agents.

First, the plain language of the statute states that companies shall not disclose protected information "*to any person*, other than the customer." M.C.L. § 445.1712 (emphasis added). It does not say "to any person, other than the customer *or any agent of the person making the disclosure*." Because the statute expressly includes one exception (disclosure to the customer) but not any others (such as disclosure to an agent) no other exceptions to apply. *See Bonner v. Howes*, No. 04-CV-40261-FL, 2005 WL 2562778, at *4 (E.D. Mich. Oct. 7, 2005) (holding that where statute explicitly enumerates exceptions, Michigan legislature presumed not to have authorized other unstated exceptions).

The only reference to agents in the statute is in listing who is prohibited from *disclosing* protected information: "a person … or agent of the person" engaged in the business of selling written materials shall not disclose protected information. M.C.L. § 445.1712. Crucially, however, the statute does not state that publishers may disclose protected information *to* their agents. While one could argue that because the VRPA prohibits agents from disclosing protected information, the statute presumes (and thus permits) that agents will receive such information from their principals, this argument ignores that agents could receive protected information directly from customers. For example, a consumer purchasing a Time magazine subscription through an agent would necessarily

8

disclose their personal information to the agent. That the VRPA prohibits the agent from disclosing that information in no way suggests—contrary to the plain language of the statute—that Time can disclose such protected information to its other agents (or any other third party).

Time essentially concedes that no agency exception can be found in the language of the statute, arguing instead that a literal reading of the statute would lead to absurd results because Time could not operate without disclosing its customers' protected information to third-party agents. (Def. Mem. at 11-12.) But the lack of an agency exception is not absurd, because to the extent Time really does need to disclose protected information to third parties in order to operate (an assertion for which it points to no evidence in support), it can easily obtain its customers' consent to do so. *See* M.C.L. § 445.1713(a) (stating that protected information can be disclosed "[w]ith the written permission of the customer"). The VRPA gives control to the consumer to decide who has access to her reading choices. It is not absurd that the statute would bar a company from disclosing its customer's private information to a data miner like Acxiom without obtaining the customer's consent.

### 2.  Even if the VRPA exempted disclosures to agents, Acxiom is not Time's agent.

In any event, even if there were an agency exception in the statute, Acxiom is not an agent of Time. "[T]he party asserting that the agency exists has the

9

burden of proof on the issue." *Hart v. Comerica Bank*, 957 F. Supp. 958, 978 (E.D. Mich. 1997). Here Time completely fails to meet this burden.

As Time correctly notes, "[t]he defining element of agency is the principal's right to control the agent's actions." (Def. Mem. at 12) (collecting cases). *See also Hart*, 957 F. Supp. at 978 ("In Michigan, consistent with most other States, the test of whether an agency has been created is whether the principal has a right to control the actions of the agent.") (internal quotations omitted). But Time then mistakenly argues that because Acxiom generated customer lists at the direction of and pursuant to criteria selected by Time, that Time had the requisite control over Acxiom to establish an agency relationship. (Def. Mem. at 12-13.)

That is not the case. Under Michigan law, in order to have the control necessary to establish an agency relationship, the principal must have, not just the right to order a certain result, but also the right to control "the methods and means of accomplishing" that result. *Rodriguez v. Credit Acceptance Corp.*, No. 07-CV-12578-DT, 2008 WL 344536, at *3 (E.D. Mich. Feb. 7, 2008). Just because Time could task Acxiom with generating a certain list at a certain time does not mean that Time had the right to control "the methods and means of accomplishing" that task. To the contrary, Acxiom housed and maintained the database from which customer lists ordered by Time were generated, ███████████████████████ ███████████████████████ (Moore Decl. (Dkt. 121) ¶ 5-6.) Simply put,

10

while Time could demand that Acxiom generate a particular list based on particular criteria, it was up to Acxiom to determine *how* to generate that list, *i.e.*, "the method and means of accomplishing" Time's demand.

Evidencing Time's lack of the requisite control over Acxiom's method and means of fulfilling Time's requests 

Perhaps most significant, however, is

(Time-Acxiom Contract (Ex. J) at 001009) (emphasis added). Given this clear contractual language, the Court can determine as a matter of law that Acxiom is not an agent of Time. *See Fed. Ins. Co. v. Detroit Med. Ctr.*, No. 08-13322, 2009 WL 136866, at *9 (E.D. Mich. Jan. 16, 2009) ("Agency is a question of law when based on an unambiguous contract.") (citing *Birou v. Thompson-Brown Co.*, 241

N.W.2d 265, 268 (Mich. Ct. App. 1976)); *Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 684-85 (E.D. Mich. 2013) ("If a written agreement defines the scope of an agent-principal relationship, … a Court must determine the nature of the relationship.") (citing *Birou*)*; see also Potomic Leasing Co. v. The French Connection Shops, Inc.*, 431 N.W.2d 214, 216 (Mich. Ct. App. 1988) (finding no genuine issue of material fact regarding agency where parties' contract specifically disclaimed any agency relationship).

At the very least, given the evidence cited above regarding Time's lack of control over the method and means of Acxiom's performance, the question of whether Acxiom is an agent of Time should be submitted to a jury. *See Roberts v. Bennett Enters., Inc.*, No. 04-73540, 2006 WL 3825067, at *4 (E.D. Mich. Dec. 26, 2006) ("The existence of a principal-agent relationship is for a jury to decide if the record is conflicting."); *Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 752-53 (E.D. Mich. 2014) ("The existence of an agency relationship and the scope of the relationship are questions of fact.") (internal quotations omitted); *Friedman v. Freidberg Law Corp.*, 44 F. Supp. 2d 902, 908 (E.D. Mich. 1999) ("[I]t is well-settled that questions as to the existence and/or scope of an agency relationship are questions of fact appropriate for the jury's consideration."). In either case, Time is not entitled to a summary judgment that Acxiom was its agent.

Consequently, the VRPA does not allow a company to disclose information

12

about its customers' reading choices to another company acting as an agent, and even if it did, this Court cannot hold as a matter of law that Acxiom was Time's agent. Thus, Time's bid for summary judgment on this ground must be denied.

### B. The disclosures to Wiland were not for the exclusive purpose of marketing to the consumer.

Time does not make *any* agency argument with respect to its disclosures to Wiland.[4] Instead, Time argues that its disclosures to Wiland fall within a statutory exception "[i]f the disclosure is for the exclusive purpose of marketing goods and services directly to the consumer." M.C.L. § 445.1713(d). But Time's disclosures of its customers' protected information to Wiland were *not* for the exclusive purpose of marketing goods and services to those customers. And even if they were, the exception requires Time to provide notice to the customers of their right to opt out of such disclosures, which was not provided here.

#### 1. Time disclosed class members' protected information to Wiland not for the purpose of marketing goods and services to them, but to gain access to valuable information about *other* consumers.

Time's disclosures do not fall within the exclusive purpose of marketing exception because Time disclosed class members' protected information to Wiland

---

[4] Time offhandedly refers to Wiland as its "agent and service provider," (Def. Mem. at 15), but doesn't provide any facts or argument in support of that statement. Nor could it, as the Time-Wiland contract focuses almost exclusively on *Wiland's* control over Time's usage of the Wiland cooperative database (i.e., as a "Member" of Wiland's product). (*See generally* Ex. F.)

in order to gain access to information in Wiland's cooperative database about *other* consumers. The exception permits the disclosure of customer records "[i]f the disclosure is for the exclusive purpose of marketing goods and services *directly to the consumer*." M.C.L. § 445.1713(d) (emphasis added). As the statutory text makes clear, this means that the marketing of goods and services must be made directly *to Time's customers—i.e.*, to the same persons whose magazine subscription records were disclosed. If the statute meant "any" consumer (*i.e.*, not just Time's customers), the phrase "directly to the consumer" would be superfluous, as there is no substantive difference between saying "marketing goods and services to *any* consumer" and "marketing goods and services" period.

Here, as this Court has recognized, "[Time] contributes to the Wiland database so that it can take advantage of the information contributed to the database by other companies." (Cert Order at 4.) (*See also* Breninger Dep. at 87:9-88:23; Ex. F at 000212 ("Only Member companies which contribute to the Cooperative Database may use names from the Cooperative Database.").) And the reason why information contributed by other companies is valuable to Time is because it allows Time to prospect for potential *new* subscribers to Time publications. (Ex. F at 000215 ███████████████████████

███████ ); Wiland Database Materials (Ex. K) at 0008093 ███████████

████████████████████████████████████████████████████████

14

██████████████████████████████); *id.* at 0008097 (█████████████████

████████████████████████)]. But, by definition, marketing Time magazines

to potential *new* subscribers is not marketing goods and services to *existing*

subscribers, *i.e.*, the subscribers whose names were disclosed to Wiland, which is

what the statutory exception requires. Because Time disclosed class members'

protected information to Wiland as the key to unlocking access to *other*

consumers' information, the disclosure does not fall within the exclusive purpose

of marketing exception.



(Def.'s Mem. Supp. Mot. Summ. at 16 ("Def. Mem.") (quoting

TIME_RCO_000212)), there is no evidence that such mailings must be or are for

the exclusive purpose of marketing goods and services. And, indeed, to the

contrary, class members' information disclosed by Time to Wiland has been used

for nonprofit and political fundraising by organizations such as the ████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████(Time emails RE:

"Wiland Participants" (Ex. L).) (*See also* Cert. Order at 4 ("Defendant's third-party

rental customers use the subscription information to send mailers, fundraising and

nonprofit offers to the subscriber, among other things.").) The fact that at least some members of the Wiland cooperative are using the information disclosed by Time for fundraising purposes shows the disclosures weren't made "for the *exclusive* purpose of marketing goods and services" as required by the VRPA. M.C.L. § 445.1713(d) (emphasis added).

### 2.   Time did not provide sufficient notice to class members of their right to opt out of any such disclosures.

Regardless, even if Time's disclosures of class members' protected information were for the exclusive purpose of marketing goods and services to them, Time *still* cannot claim the protection of the exception. The exception states that "[t]he person disclosing the information shall inform the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information." M.C.L. § 445.1713(d). Here, while Time cites to language on its website, in bill and renewal notices, and in its magazines, nothing it points to establishes that it provided the required notice when class members first subscribed to a magazine or at any other time prior to disclosing their protected information to Wiland.

First, any purported notice on Time's website is irrelevant, as the class is specifically defined to include only consumers who purchased a subscription on a website *other* than a Time website, (Cert. Order at 2), and it is undisputed that those third-party websites did not contain Time's opt-out notice (Breininger Dep.

at 154:23-156:6.)[5] And bills and renewal notices purportedly containing the

required notice would not appear until well after the disclosures had been made.

(*See* Ex. F at 000212 (quarterly Wiland disclosures).)

Finally, even if Time had presented evidence to demonstrate that customers

received their first magazine issues before Time disclosure their information to

Wiland, the in-magazine notices are completely insufficient. In fact, the notice in

two of the magazines, *Fortune* and *Real Simple*, does not even inform customers—

as the statutory exception requires—that they can remove their name from the

disclosed lists at any time. M.C.L. § 445.1713(d). Instead, they state simply state in

full: "Mailing List: We make a portion of our mailing list available to reputable

firms." (*Real Simple* Notice (Ex. M) at 47518, *Fortune* Notice (Ex. N) at 47407.)

Further, one look at the pages on which the in-magazine notices appear make clear

the insufficiency of the notice. *See* Ex. M at 47518; Ex. N at 47407; *TIME* Notice

(Ex. O) at 47163.) The notice is buried at the bottom of the pages, in tiny font,

within a paragraph of other fine print. The size and placement of these notices

alone render them deficient. *High v. Capital Senior Living Props. 2-Heatherwood,*

---

[5] Time asserts that judicial estoppel bars Plaintiff from arguing that the contents of
Time's website are irrelevant based on the position she took in her Reply in
Support of Class Certification. (Def. Mem. at 20 (citing Pl.'s Reply Mem. Supp.
Class Cert. at 6).) But Plaintiff's prior position is entirely consistent with—indeed,
identical to—her current position. In her prior brief, on the exact page cited by
Time here, Plaintiff argued that "[b]ecause the class is defined to be only those
who purchased subscriptions from third-party websites, any terms or policies on
Time's websites are irrelevant." (Pl.'s Reply Mem. Supp. Class Cert. at 6 n.5.)

17

*Inc.*, 594 F. Supp. 2d 789, 799 (E.D. Mich. 2008) ("Procedural unconscionability is present where the challenged provision is buried in the text of a document, appears in small font, or is not otherwise conspicuous.").

In sum, Time's disclosures to Wiland were not made for the exclusive purpose of marketing goods and services directly to the disclosed subscribers, and, even if they were, Time failed to provide them with the required "opt out" notice, Time is therefore not entitled to summary judgment on this statutory exception.

### C.   Time is engaged in the business of selling written materials at retail.

Time next argues that it is entitled to summary judgment because class members did not purchase the magazines "at retail." As an initial matter, Time appears to misunderstand the statute. The statute does not require class members to have purchased their magazines at retail; the statute simply applies to companies "engaged in the business of selling at retail … written materials." M.C.L. § 445.1712. Here, as explained below, Time clearly is. And even if Time's reading of the statute were correct, the class members' magazine purchases were at retail.

### 1.   Time sells magazines at retail.

The VRPA does not define "at retail." To determine the meaning of undefined terms in a Michigan statute, this Court may look to dictionary definitions, as well as how the term is used elsewhere by the Michigan Legislature. *See People v. Hughes*, 855 N.W.2d 209, 218-19 (Mich. Ct. App. 2014) ("In

addition to using the dictionary to give meaning to undefined statutory terms, we also look to the use by the Legislature of the same or similar terms in other statutes to divine Legislative intent."). Here, as Time points out, dictionary definitions establish that sales "at retail" are sales to an ultimate consumer for their own consumption, rather than to someone for resale. (Def. Mem. at 21.) *See also Retail*, Black's Law Dictionary (9th ed. 2009) (defining "retail" as "the sale of goods or commodities to ultimate consumers, as opposed to the sale for further distribution or processing."); *Retail*, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/retail (last accessed October 1, 2015) (defining "retail" as "to sell (something) to customers for their own use."). Likewise, the Michigan Legislature has ascribed the same meaning to the term "retail" in another statute. *See* M.C.L. § 205.51(b) (tax statute defining "[s]ale at retail" and "retail sale" as "a sale, lease, or rental of tangible personal property for any purpose other than for resale, sublease, or subrent").

There can thus be no dispute that "at retail" simply means to sell a product to consumers for their own use, as opposed to "at wholesale," which means selling a product in large amounts to other businesses for resale.[6] And because Time sells magazines to customers for their own use, (Breininger Dep. at 124:3-126:7; Ex. B

---

[6] *See Wholesale*, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/wholesale (last accessed October 1, 2015) (defining "wholesale" as "the business of selling things in large amounts to other businesses rather than to individual customers").

19

at No. 17), it indisputably falls within the statutory meaning of a company engaged in the business of selling magazines "at retail." *See Halaburda v. Bauer Publishing Co., LP*, No. 12-cv-12831, 2013 WL 4012827 at *7 (E.D. Mich. Aug. 6, 2013) ("As to 'selling at retail,' the court is persuaded by plaintiffs' argument that the defendants to these actions are in the business of publishing magazines, and sell them to the ultimate consumer of the products.").

### 2.    Class members' magazine purchases through Time subscription agents were at retail.

That class members here purchased their magazines through subscription agents in no way undercuts the fact that Time is not engaged in the business of selling magazines "at retail." First, not all of Time's magazine sales are conducted using subscription agents. Consumers can purchase magazine subscriptions directly from Time through Time's website, by calling a Time customer service representative, or by mailing a postcard to Time, all without the assistance of any subscription agent. (Breininger Dep. at 124:3-126:7.) Consequently, because at least some of Time's magazine subscription sales did not involve subscription agents, Time is indisputably "engaged in the business of selling at retail . . . written materials" and thus subject to the VRPA's prohibition against disclosing its readers' protected information. M.C.L. § 445.1712.

And in any event, even when it utilizes subscription agents, it is undisputed that Time is still the actual entity that sells magazine subscriptions directly to

customers "at retail." Indeed, Time is not selling magazines at wholesale to its subscription agents, who then turn around and resell those magazines to consumers. Rather, Time is simply using its subscription agents to help funnel new or existing customer subscription orders to it. (*See, e.g.,* Breininger Dep. at 153:8-154:2 (when Plaintiff ordered magazines through a subscription agent's website "the order was submitted to [the subscription agent], and then submitted to [Time]"); *id.* at 130:20-131:5 (when an order is placed with a subscription agent "they will receive payment for the subscription . . . and the order then will be submitted to Time Inc., to . . . our customer service facility, and they will process the order and put the order on file.").) Indeed, Scott Breininger—Time's Vice President of Marketing—testified that even when a subscription agent is used, Time is still the entity that sells the magazine subscriptions to the customers:



(Breininger Dep. at 138:19-139:16.)

Simply put, Time sells its magazine subscriptions directly to customers for their personal use, *i.e.* "at retail." The fact that it uses subscription agents to

21

originate or facilitate some of those subscription sales—including the sales to Plaintiff and other Class members—in no way changes that fact, either generally or with respect to those transactions involving subscription agents. *See World Book, Inc. v. Dep't of Treasury*, 590 N.W.2d 293, 298 (Mich. 1999) (treating encyclopedia company as having engaged in sales "at retail" under Michigan law, even though "its independent contractors solicited orders from customers and entered into tentative agreements with them").

Thus, contrary to Time's assertion, the undisputed facts establish that Time is engaged in the business of selling magazines at retail. Time is not entitled to summary judgment on this ground.

### D.     Plaintiff has Article III standing, and this Court has subject matter jurisdiction.

Finally, Time argues that Plaintiff lacks Article III standing and that this Court lacks subject matter jurisdiction. But this Court has already decided that Plaintiff has standing, and Time's subject matter jurisdiction argument is simply a disguised attack on this Court's class certification order. Time presents absolutely no basis for reexamining either of those decisions, and is not entitled to summary judgment on these already-decided issues.

#### 1.     This Court has already decided that Plaintiff has Article III standing to sue.

This Court—along with every other to consider the issue—has already

rejected Time's challenge to Plaintiff's Article III standing, holding that Plaintiff's alleged invasion of her statutory rights was an injury sufficient to establish standing. (Dkt. 43 at 6-11.) In denying Time's motion to dismiss on Article III standing grounds, this Court expressly followed—and quoted at length—binding Sixth Circuit precedent. (*Id.* at 6-11 (quoting *Beaudry v. TeleCheck Servs., Inc.*, 579 F.3d 702, 707 (6th Cir. 2009)). In addition, this Court declined to certify the issue for interlocutory appeal, reiterating that the Sixth Circuit's decision in *Beaudry* controlled. (Dkt. 55.)

"Issues decided at an early stage of the litigation, either explicitly or by necessary inference from the disposition, constitute the law of the case." *In re Kenneth Allen Knight Trust*, 303 F.3d 671, 676 (6th Cir. 2002) (internal quotations omitted). And under the law of the case doctrine, a court's power to reach a result inconsistent with a prior decision reached in the same case "is to be exercised very sparingly, and only under extraordinary conditions." *Id.* (internal quotations omitted). If this Court is to reverse course, it "must find some cogent reason to show the prior ruling is no longer applicable, such as if [its] prior opinion was a clearly erroneous decision which would work a manifest injustice." *Id.* (internal quotations omitted).

Here, other than "respectfully disagree[ing]" and pointing to an irrelevant Supreme Court amicus brief joined by, among others, the Michigan Attorney

General, Time presents absolutely no reason—let alone a cogent one—why this Court's prior ruling that Plaintiff has Article III standing is no longer applicable. (Def. Mem. at 23.) To the contrary, that ruling is pretty much the opposite of clearly erroneous—and certainly does not work a manifest injustice—given the Sixth Circuit's opinion in *Beaudry*. Simply put, this Court's prior ruling on Article III standing was correct before, and is correct now.

> ## 2.   Time's subject matter jurisdiction argument is a confused— and borderline frivolous—attack on this Court's certification ruling.

Time's subject matter jurisdiction argument likewise—though in a convoluted manner—attacks a prior ruling of this Court. While couched in terms of jurisdiction, Time's invocation of M.C.R. § 3.501(A)(5), a Michigan procedural rule governing certification of class actions in state court, is nothing more than an attempt to have this Court revisit its decision to certify this case as a class action. In addition to Time not having raised it at the class certification stage, the argument is without merit.

Time asserts that Michigan Rule 3.501(A)(5) "specifically prohibits class actions under statutory damages statutes such as the VRPA unless expressly authorized by the statute itself." (Def. Mem. at 24.) But Time's invocation of Michigan Rule 3.501(A)(5)—which only applies in state courts—borders on the frivolous. "[A]fter *Shady Grove* [*Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559

24

U.S. 393 (2010)], state laws that categorically prohibit the maintenance of class action lawsuits no longer will be an effective bar to such suits [in federal court] if the state law that prohibits them is procedural in nature and is not 'so intertwined' with the right or remedy that it defines the scope of the right." *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 661 (E.D. Mich. 2011). Michigan Rule 3.501(A)(5) is in no way intertwined with the substantive rights and remedies provided for in the VRPA and is clearly a procedural rule. Indeed, it is found in the "Michigan Court Rules of 1985," which expressly "govern the practice and procedure in all courts established by the constitution and laws of the State of Michigan." M.C.R. §§ 1.101, 1.103.

Time's Article III and subject matter jurisdiction arguments both seek to overturn matters this Court has already decided. Time presents no justification for doing so, and thus, is not entitled to summary judgment on either of these issues.

## IV.   CONCLUSION

For these reasons, Time's motion for summary judgment should be denied.

Respectfully submitted,

Date: October 1, 2015

**Rose Coulter-Owens**, individually and on behalf of all others similarly situated,

By:   /s/ Ari J. Scharg

EDELSON PC
350 N. LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378
*Class Counsel*

25

## <u>CERTIFICATE OF SERVICE</u>

I, Ari J. Scharg, an attorney, certify that on October 1, 2015, I served the above and foregoing ***Plaintiff's Response to Defendant's Motion for Summary Judgment*** by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

<u>     /s/ Ari J. Scharg            </u>