# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ROSE COULTER-OWENS, individually and on behalf of all others similarly situated, | Case No. 2:12-cv-14390-GCS-MKM |
| | Hon. George C. Steeh |
| Plaintiff, | |
| v. | |
| TIME INC., a Delaware Corporation, | |
| Defendant. | |

## TIME'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Marc Zwillinger
Jacob Sommer
Jeffrey Landis
ZWILLGEN PLLC
1900 M St. NW, Ste. 250
Washington, DC 20036
(202) 706-5205
marc@zwillgen.com
jake@zwillgen.com
jeff@zwillgen.com

Robert M. Jackson (P40723)
Arthur T. O'Reilly (P70406)
HONIGMAN MILLER SCHWARTZ
AND COHN LLP
660 Woodward Avenue
2290 First National Building
Detroit, MI  48226
(313) 465-7430
rjackson@honigman.com
aoreilly@honigman.com

## ISSUES PRESENTED

1.     Whether Plaintiff is entitled to summary judgment based on disclosures to Acxiom where Acxiom acted as an agent of Time with regard to the data Acxiom was hosting for Time, and the VRPA does not apply to disclosures between a company and its own employees and agents?

**Defendant's Answer:  No.**

2.     Whether Plaintiff is entitled to summary judgment based on disclosures to Wiland where such disclosures were for the purpose of marketing goods and services directly to the consumer and Time informed consumers by written notice that they may remove their names from such disclosures at any time?

**Defendant's Answer:  No.**

3.     Whether Plaintiff is entitled to summary judgment where the class members, by definition, were not "customers" of Time that purchased their subscriptions directly from Time "at retail" as required by the VRPA?

**Defendant's Answer:  No.**

## **CONTROLLING OR MOST IMPORTANT AUTHORITY**

Federal Rule of Civil Procedure 56

M.C.L.  §§ 445.1711-15

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,  501 U.S. 104 (1991)

*Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553 (6th Cir. 1999)

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades* Council, 485 U.S. 568 (1988)

*Fed. Commc'ns Comm'n v. Am. Broad*. Co., 347 U.S. 284 (1954)

*Sorrell v. IMS Health Inc*., 131 S. Ct. 2653 (2011)

*Speet v. Schuette*, 726 F.3d 867 (6th Cir. 2013)

*SPX Corp. v. Shop Equip. Specialists, Inc*., 4:00 CV 49, 2001 WL 36512993 (W.D. Mich. Mar. 28, 2001)

# TABLE OF CONTENTS

**ISSUES PRESENTED** ........................................................................................ i

**CONTROLLING OR MOST IMPORTANT AUTHORITY** .......................... ii

**PRELIMINARY STATEMENT** ........................................................... 1

**ADDITIONAL RELEVANT UNDISPUTED FACTS** ....................................... 3

    A.    Time's Use of Acxiom as Database Host ............................................ 3

    B.    Time's Participation in the Wiland Cooperative.................................. 4

    C.    Time as Fulfillment Agent ................................................................. 5

    D.    Time Inc.'s Notice of its Practices and Ability to Opt Out ................ 7

**ARGUMENT** ................................................................................. 7

    I.    The Class Did Not Purchase From Time "At Retail" .......................... 7

    II.    There was No Improper Disclosure to Acxiom Because the VRPA Permits Time to Disclose Information to its Agents ............. 10

    III.    Time's Participation in the Wiland Co-op Does Not Violate the VRPA ................................................................................ 11

        A.    Wiland's rental of names to charity and political organizations does not render the direct marketing exception inapplicable ........................................................ 12

            1.    *Solicitations from charity and political organizations are "goods and services" under the VRPA.* .......................................................... 12

            2.    *Charitable and political organizations offer what constitute "goods and services" even under Plaintiff's definition.* ............................................ 14

3.     *Construing the direct marketing exception as
Plaintiff suggests would violate the Constitution.* ........16

B.     Time's written notices satisfy the VRPA  ...............................23

**CONCLUSION**......................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Astoria Fed. Sav. & Loan Ass'n v. Solimino,*
    501 U.S. 104 (1991) ...................................................................21

*Belle Maer Harbor v. Charter Twp. of Harrison,*
    170 F.3d 553 (6th Cir. 1999) ....................................................22

*Broderick v. 119TCbay, LLC,*
    670 F. Supp. 2d 612 (W.D. Mich. 2009).....................................8

*Carter v. Welles-Bowen Realty, Inc.,*
    719 F. Supp. 2d 846 (N.D. Ohio 2010) .....................................22

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010) ...................................................................18

*Dolan v. U.S. Postal Serv.,*
    546 U.S. 481 (2006)......................................................................8

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades
    Council,* 485 U.S. 568 (1988).....................................................19

*Fed. Commc'ns Comm'n v. Am. Broad. Co.,*
    347 U.S. 284 (1954).....................................................................22

*Green Party of Tennessee v. Hargett,*
    700 F.3d 816 (6th Cir. 2012) .....................................................19

*H.J. Inc. v. Nw. Bell Tel. Co.,*
    492 U.S. 229 (1989).....................................................................22

*In re Brucher,*
    243 F.3d 242 (6th Cir. 2001) .....................................................21

*Kinder v. Meredith Corp.,*
    No. 14-CV-11284, 2014 WL 4209575 (E.D. Mich. Aug. 26, 2014) ..........10

*Sorrell v. IMS Health Inc.,*
    131 S. Ct. 2653 (2011)............................................................................ 16-18

*Speet v. Schuette,*
    726 F.3d 867 (6th Cir. 2013) ....................................................................18

*SPX Corp. v. Shop Equip. Specialists, Inc.,*
    4:00 CV 49, 2001 WL 36512993 (W.D. Mich. Mar. 28, 2001)...................16

*People v. Hall,*
    215 N.W.2d 166 (1974) ............................................................................22

*Tankersley v. Lynch,*
    11-12847, 2012 WL 683384 (E.D. Mich. Mar. 2, 2012) ...................... 15-16

*United States v. Erpenbeck,*
    682 F.3d 472 (6th Cir. 2012) ....................................................................19

*United States v. Thompson/Ctr. Arms Co.,*
    504 U.S. 505 (1992).................................................................................23

*World Book, Inc. v. Dept. of Treas.,*
    590 N.W.2d 293 (Mich. 1999) ...................................................................9

## Statutes and Regulations

M.C.L. § 445.1712 ..................................................................... *passim*

M.C.L. § 445.1713 ............................................................................12

M.C.L. § 500.529 ..............................................................................24

M.C.L. § 550.1406 ....................................................................... 24-25

11 U.S.C. 522 ...................................................................................21

## Other Authorities

Black's Law Dictionary (8th ed. 2005) ...............................................13

Choose Your Business Structure: Cooperative, U.S. SMALL BUSINESS
    ADMIN., https://www.sba.gov/content/cooperative (last accessed Sept.
    29, 2015) ............................................................................................20

Internal Revenue Serv., U.S. Dep't of Treas., Pub. No. 1771, Charitable
    Contributions: Substantiation and Disclosure Requirements (Rev.
    7-2013), available at http://www.irs.gov/pub/irs-pdf/p1771.pdf (last
    accessed Sept. 29, 2015) ...................................................... 13-14

Merriam-Webster, http://www.merriam-webster.com/dictionary/,
    (last visited Sept. 29, 2015) .........................................................13

NAT'L WILDLIFE FEDERATION SHOP, http://www.shopnwf.org/home.jsp
    (last accessed Sept. 28, 2015)................................................ 14-15

THE OFFICIAL NRA STORE, http://www.nrastore.com/,
    (last accessed Sept. 28, 2015) .....................................................14

## **PRELIMINARY STATEMENT**

Defendant Time Inc. ("Time") moved for summary judgment explaining that its use of service provider Acxiom to host Time's consumer marketing database did not violate the Michigan Video Rental Privacy Act ("VRPA") because Acxiom was Time's agent in its role as database host.  Time also explained that its participation in the Wiland Co-op did not violate the VRPA because disclosures to Wiland were for the purpose of marketing goods and services directly to consumers, and Time provided written notice of the ability to opt out of such disclosures in its magazines, on its websites, and in its bills and renewal notices.

Plaintiff has cross-moved for summary judgment arguing that Time's proper conduct (that Plaintiff admits caused no harm) violates the VRPA.  In doing so, Plaintiff miscasts facts and offers an interpretation of the VRPA inconsistent with the statute's text, the Constitution, and common sense.  For example, to try to get Time's conduct to fall under the VRPA, Plaintiff reads out the statute's requirement that a "customer" purchase written materials from Time "at retail" and falsely contends that Time directly sold subscriptions to the class.  Similarly, to shoehorn Time's disclosures to Acxiom into a VRPA violation, Plaintiff reads out the VRPA's language authorizing disclosure of information to agents like Acxiom.

Plaintiff's arguments why Time's disclosures to Wiland are not covered by the direct marketing exception are similarly outlandish.  She argues that because

1

charitable and political organizations rented names from Wiland, and because such organizations may have sent mailings seeking donations, the direct marketing exception does not apply to *any* disclosures to Wiland because requests for donations are not "goods and services." But the ability to donate to a charitable or political organization someone supports is itself a "service," if not a good. And charitable and political organizations routinely raise money by selling merchandise or "experiences," which constitute "goods and services" even under Plaintiff's inappropriately narrow definition. Plaintiff's construction of "goods and services" would also place heightened burdens on disclosures to charitable and political organizations as compared to for-profit entities, turning the VRPA into a content- and speaker-based restriction on speech that would violate the First Amendment.

In addition, even though she does not dispute that information disclosed to Wiland was used solely to market to consumers, Plaintiff argues that the direct marketing exception should not apply because Time was motivated to participate in the Co-op by a desire to access Co-op data, and thus marketing goods and services was not the "exclusive purpose" for Time's disclosures. But "purpose" in the direct marketing exception means the ultimate use of the disclosed information, not the disclosing person's motivation. Plaintiff's contrary interpretation would render the direct marketing exception superfluous because all actions can have multiple motivations, not to mention void for vagueness because it would provide

no clear standard for when the statute applies. Finally, Plaintiff argues that Time cannot avail itself of the direct marketing exception because its in-magazine notices were in a small font. But Plaintiff ignores that Time also provided notice on its website and in its bills and renewal notices, and that the VRPA provides no specifications for font size and timing.

**ADDITIONAL RELEVANT UNDISPUTED FACTS[1]**

**A.  Time's Use of Acxiom as Database Host**

Like most companies, Time uses service providers to conduct its business. One such provider was Acxiom, which hosted Time's consumer marketing database.  Time's Summary Judgment Motion ("Time Mem.") (ECF No. 119), which is incorporated herein, explains the services that Acxiom performed for Time as database host.  Most important here is that Acxiom was strictly limited in what it could do with Time's data.  ███████████████████████████████

██████████████ [2]  Acxiom could not use Time subscriber data for any other purpose, such as Acxiom's own commercial purposes or to provide services to Acxiom customers other than Time. *See* Declaration of Linda Moore in Support of Time's Motion for Summary Judgment, attached hereto as Exhibit B ("Ex. B") ¶

---

[1] To avoid some duplication, Time incorporates its statement of facts from its Summary Judgment Motion and repeats only those facts most pertinent to specific points addressed in this Opposition.

[2] Unless otherwise noted, all references to Exhibits refer to exhibits attached to the Declaration of Jacob Sommer ("Sommer Decl.") submitted herewith.

16. ███████████████████████████████████████████████

█████████████████████████████████████ (*Id*.)[3] Acxiom hosted

Time's data and did with it only what Time requested and only for Time's benefit.[4]

**B.    Time's Participation in the Wiland Cooperative**

Time also rented names to marketers through a cooperative database, or

"Co-op," administered by Wiland Direct ("Wiland").   Time's summary judgment

motion explains how the Co-op operated, including how members renting names

from the Co-op could not use magazine title—or any criteria unique to Time—as

selection criteria. *See* Time Mem. at 5. Members ***never*** received information

---

[3] Plaintiff's brief repeats the false claim that █████████████████████

██████████████████   *See* Pl.'s Brief in Supp. of Mot. for Summ. J. ("Pl. Mem.") (ECF
No. 126) at 20 n.12 (emphasis in original).  As Time pointed out previously, the
documents Plaintiff cites as support for these assertions say no such thing.█████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████   To the extent the agreement was unclear, Acxiom's declaration is
unequivocal: "[F]or all of the services Acxiom provided to Time . . . Acxiom was
only allowed to use Time's subscriber data as required to perform its obligations to
Time under the parties' Agreement.  Acxiom could not, and did not, use Time
subscriber data for any other purpose, such as Acxiom's own commercial purposes
or to provide services to Acxiom customers other than Time." (Ex. B ¶ 16.)

[4] Also inaccurate is Plaintiff's assertion that Time "discloses its customers' names,
addresses, ***and magazine choices***" to Acxiom as part of the data appends process.
*See* Pl. Mem. at 3 (emphasis added).███████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████████████

showing that a person subscribed to a specific magazine. (*Id.*) ██████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ (*See* Ex. C at

3449; Ex. D at 29648.)   Plaintiff has submitted no evidence that any Michigan

subscriber had their information rented from Wiland.

## C.   Time as Fulfillment Agent

Time publishes magazines including those at issue here. Sometimes

consumers purchase subscriptions to those magazines from Time. (Ex. E, No. 3.)

In other instances (and as is the case with the entire class), consumers purchase

subscriptions to Time-published magazines from third parties. (*Id.*)  For example, a

person can purchase a subscription to a Time magazine on www.magazines.com.

(*See* Ex. F.) ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

5

When a person purchases a subscription from a third-party seller, the third-party seller will provide Time with the subscriber's name and address and the titles of the magazines the person subscribed to so Time can have the magazines delivered. (Simoneau Decl. ¶ 6.)  The third-party seller does not provide Time with credit card or other payment information. *Id.* The third party remits a percentage of its sales to Time.  ███████████████████████████

███████████████████████████████████████████

For Plaintiff's purchase, no portion of the $2 per magazine price she paid was remitted to Time.  (*See Id.* at Row 1125.)

If a purchaser has a billing issue they would call the third-party seller to address the issue.  (Simoneau Decl. ¶ 6.)  If the purchaser calls Time to raise such an issue, Time would direct them to the third-party seller. *Id.*  To the extent the purchaser does not receive a magazine they ordered, they would call the third-party seller, not Time. *Id.* ¶ 7.  An individual that purchased their subscription from a third-party seller cannot make transactions related to that subscription on Time's website or collect any refund from Time.  *Id.* ¶ 7.   The third-party seller will often solicit the subscriber to continue their subscription or purchase a new subscription from the third-party seller. *Id.* ¶ 7. When a person purchases a subscription from a third-party seller, they are transacting with the third-party seller, not Time.  *Id.*  ¶ 4.

**D.      Time Inc.'s Notice of its Practices and Ability to Opt Out**

As set forth in detail in Time's summary judgment motion, Time notified subscribers of its disclosure practices, and the ability to opt out of disclosures in numerous places, not just in its magazines.  *See* Time Mem. at 5-8. This included Time's website notice which specifically disclosed Time's participation in co-ops like Wiland: "We may disclose personally identifiable information to third parties whose practices are not covered by this privacy statement (e.g., other marketers, magazine    publishers,    retailers,    ***participatory    databases***    and    non-profit organizations) that want to market products or services to you." (Ex. H at 4217) (emphasis added).   Class members who opted out would not have their name contributed to Wiland; and if their name had been contributed to Wiland, it would have been purged once they opted out. (Ex. I at 216:7-15.)

<u>**ARGUMENT**</u>

**I.      The Class Did Not Purchase From Time "At Retail"**

As discussed in Time's summary judgment motion, the class purchased their subscriptions from third parties, and thus does not meet the VRPA's requirement that they purchased their subscriptions from Time "at retail."   *See* Time Mem. at 20-22.  Plaintiff's two arguments to get around this deficiency fail.

First, Plaintiff argues that because Time sells "at least some" magazines directly to subscribers, Time is "engaged in the business of selling at retail . . .

7

written materials" Pl. Mem. at 11. And that the VRPA therefore still applies although Time did not sell *these* class members their subscriptions. *Id.* Plaintiff's argument, however, ignores the remaining language of the relevant statutory provision. Section 445.1712 limits the ability of an entity engaged in the business of selling at retail to disclose "to any person, other than the *customer*" a record concerning the purchase "of those materials by a *customer* that indicates the identity of the *customer*." M.C.L. § 445.1712 (emphasis added).

"Customer" requires a retailer-customer relationship. That relationship does not exist where class members were customers of, and purchased at retail from, third-party sellers, not Time. Plaintiff cannot just cast this language aside. *See Broderick v. 119TCbay, LLC*, 670 F. Supp. 2d 612, 615 (W.D. Mich. 2009) ("[I]n analyzing the words of a statute, the Court does not look at each word, each sentence, or even each subsection of the statute in total isolation."); *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.").

Second, Plaintiff argues that even where third-party sellers are utilized, "Time is still the actual entity that sells magazine subscriptions directly to customers 'at retail.'" Pl. Mem. at 11. The uncontroverted evidence reveals that

8

this is wrong. The third-party sells subscriptions to customers. Time delivers the
subscriptions. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████[5] If a purchaser has a billing issue or does not receive their magazine, they
would contact the third-party seller, not Time.  (Simoneau Decl. ¶¶ 6-7.)

Plaintiff places dispositive weight on the fact that Time does not first sell "a
packet of subscriptions" to third-party sellers for them to re-sell to subscribers. *See*
Pl. Mem. at 11.  But this is a distinction without a difference.  That third-party
sellers sell the subscriptions first, and then (sometimes) remit payment to Time, as
opposed to "buying" subscriptions from Time up-front and re-selling them to
subscribers, does not change that the third-party seller is transacting with the
"customer" "at retail."

As Judge Ludington stated in another VRPA action against publisher

---

[5] The *World Book Inc. v. Dep't of Treas.,* 590 N.W.2d 293 (Mich. 1999) case cited
by Plaintiff is distinguishable.  In that case (which involved determining the state a
sales transaction occurred for tax purposes), although an encyclopedia seller's
independent contractors solicited orders in one state, the actual purchase
transactions were made with the seller itself in another state.  *Id.* at 298 ("Two
parties can form a present contract for the sale of an item to take place in the future
in a different location.").  Here, class members purchased their subscriptions from,
and paid, the third-party sellers who then sent address information to Time so that
Time could have the magazines delivered to the third-party seller's customers.

Meredith, "if [plaintiff] had purchased her magazine subscription through a third party, rather than directly from Meredith she would not have bought them at retail" under the VRPA. *See Kinder v. Meredith Corp.*, No. 14–cv–11284, 2014 WL 4209575, at *6 (E.D. Mich. Aug. 26, 2014). Tellingly, in that case, these same attorneys defined their proposed class as individuals who purchased subscriptions "directly from Meredith."  *See* Pl.'s Mot. to Certify Class at 2, 11, *Kinder v. Meredith Corp.,* No. 14–cv–11284 (E.D. Mich. Sept. 11 2015) (ECF No. 55). Here, the class transacted with the third-party sellers, and did not purchase their subscriptions from Time at retail.

## II.    There was No Improper Disclosure to Acxiom Because the VRPA Permits Time to Disclose Information to its Agents

As set forth in in Time's summary judgment motion, Time's use of Acxiom as its database host does not violate the VRPA because the statute authorizes disclosures to agents—which Acxiom was for Time.  *See* Time Mem. at 11-15. Plaintiff incorrectly argues that by using Acxiom to host Time's consumer marketing database, Time "disclosed records and information to third parties" in violation of the VRPA.  Pl. Mem. at 13.  To do so, Plaintiff excises from the statute-—both figuratively and literally (using ellipses)[6]—language authorizing disclosures to agents.  Specifically, the VRPA contemplate that agents can receive

---

[6] *See* Pl. Mem. at 8 ("The VRPA provides that 'a person . . . engaged in the business of selling at retail'…")

information by providing that "a person, or an employee or agent of the person" may not disclose the materials a person purchased at retail. M.C.L. § 445.1712.

Acxiom was Time's agent because Time exercised complete control over Acxiom's use of Time's data. Acxiom could only use Time's subscriber data as required to perform its obligations to Time under the parties' Agreement, and for no other purpose. (Ex. B. ¶16.)[7]   All data belonged to Time even when housed on Acxiom's servers or run through Acxiom's computer programs. (*Id*.) Plaintiff has offered no evidence to the contrary.

## III.   Time's Participation in the Wiland Co-op Does not Violate the VRPA

As explained in Time's summary judgment motion, Plaintiff's claim based on Time's participation in the Wiland Co-op cannot survive summary judgment. *See* Time Mem. at 15-20. That is because Time's disclosures to Wiland fall within the VRPA's direct marketing exception.[8]  That exception authorizes disclosures for

---

[7] Plaintiff's characterization of Acxiom as "the quiet giant" of the database marketing industry, supposedly integrating what it knows about consumers' "offline, online, and mobile behavior" is entirely irrelevant.  *See* Pl. Mem. at 3. Plaintiff's characterization does not change the undisputed evidence *in this case* that Acxiom could only use Time's data to perform its obligations to Time, and that Acxiom could not and did not "integrate" anything.

[8] Plaintiff spends much time arguing that the direct marketing exception does not apply to Acxiom.  *See* Pl. Mem. at 19-20, 22-23.  This argument is a straw man. There is no need to get to the direct marketing exception with respect to Acxiom because it was Time's agent, and thus there was no VRPA "disclosure" at all.  The fact that subscribers could not opt out of having their information put in Time's consumer marketing database, and may have received notice of Time's disclosure practices after their names were already in that database, is irrelevant.  The same

11

the exclusive purpose of marketing goods and services directly to the consumer if the customer is provided with written notice that he or she may remove his or her name from such disclosures. *See* M.C.L. § 445.1713(d). Those requirements are met here. The information Time provided to Wiland was used solely to market goods and services to consumers, and for no other purpose. And Time provided written notice of the ability to opt out of such disclosures in its magazines, on its website, and in its bills and renewal notices.

Plaintiff offers no evidence that Wiland used the information it received from Time for any purpose other than sending marketing materials to consumers. Nor does she offer evidence that Time failed to honor subscribers' opt out wishes. Instead, Plaintiff puts forward several legal arguments for why the direct marketing exception should not apply notwithstanding these undisputed facts. None withstands scrutiny.

### A. Wiland's rental of names to charity and political organizations does not render the direct marketing exception inapplicable

#### 1. Solicitations from charity and political organizations are "goods and services" under the VRPA.

Plaintiff first argues that disclosures to Wiland do not satisfy the direct marketing exception because members of the Wiland Co-op "include nonprofit and

---

could be said about Time's "disclosures" to the USPS and printers that put addresses on the magazines: subscribers could not opt out of having their information shared with such entities and "disclosures" to such entities occurred before subscribers received their first magazine.

political fundraising organizations." Pl. Mem. at 21. Plaintiff has not introduced evidence that any Michigan subscriber had their name rented by any nonprofit or political organization. Rather, Plaintiff's theory seems to be that as long as *one* rental from the Wiland Co-op was by a non-profit or political organization, *all* disclosures to Wiland were not for the exclusive purpose of marketing goods and services to consumers. This reading of the statute is untenable.

Offering the ability to contribute to a charitable or political cause is itself a service. (*See* Ex. I at 123:24-124:2 ("Q. So, in your view, soliciting for a donation would be a service? A. Yes.")) This follows dictionary definitions of "service," which include "[c]ontribution to the welfare of others" and "[t]he act of serving: (a) a helpful act." [9] The ability to donate to a charitable or political cause can also be a good, which Black's Law Dictionary defines as "[t]hings that have value, whether tangible or not <the importance of social goods varies from society to society."[10] The IRS definition of goods and services also includes the opportunity to donate to charitable or political causes. The IRS's manual for charitable contributions defines "goods or services" as including "cash, property, services,

---

[9] *Service*, Merriam-Webster, http://www.merriam-webster.com/dictionary/service (last visited Sept. 29, 2015).

[10] *Goods*, Black's Law Dictionary 575 (8th ed. 2005).

benefits or privileges."[11]   The opportunity to donate to a cause someone supports (whether charitable or political) is itself a "benefit" and "privilege," not even considering the tax deductions that would go along with such a donation.

### 2. Charitable and political organizations offer what constitute "goods and services" even under Plaintiff's definition.

Plaintiff's argument that the direct marketing exception should not apply to disclosures in aid of marketing by charitable and political organizations also ignores that such organizations sell merchandise, or provide experiences (i.e., lunch with the candidate) in return for contributions, which are "goods and services" even under Plaintiff's too narrow definition.   The IRS confirms this in its manual on charitable contributions which requires donors to provide a "description and good faith estimate of the value of goods or services, if any, that an organization provided in return for the contribution."[12]   It is also evident from the websites of the organizations Plaintiff references in her brief.   The NRA has an entire section on its website devoted to the "NRA Store," where individuals can buy bumper stickers, holsters, and jewelry.[13]   The National Wildlife Foundation

---

[11] INTERNAL REVENUE SERV., U.S. DEP'T OF TREAS., PUB. NO. 1771, CHARITABLE CONTRIBUTIONS: SUBSTANTIATION AND DISCLOSURE REQUIREMENTS (REV. 7-2013), available at http://www.irs.gov/pub/irs-pdf/p1771.pdf (last accessed Sept. 29, 2015).

[12] *Id.*

[13] THE OFFICIAL NRA STORE, http://www.nrastore.com/ (last accessed Sept. 28, 2015).

likewise has a "shop" where individuals can buy home décor items, apparel, and greeting cards.[14]

If Plaintiff's theory is that Time cannot avail itself of the direct marketing exception because Time disclosed Michigan subscriber names to Wiland and Wiland rented names to charitable or political organizations that sent materials to subscribers seeking donations (but not offering "goods or services" as Plaintiff defines those terms), Plaintiff must put forward evidence these events occurred. She has not done so, instead pointing only to the fact that charitable and political organizations were members of Wiland and that there were several instances where such organizations rented names of subscribers to one of the magazines from Wiland. *See* Pl. Mem. at 21.[15]   This is insufficient. That the direct marketing exception is an exception to liability under the VRPA does not make it Time's burden to affirmatively ***disprove*** that such events ever occurred. *See Tankersly v.*

---

[14] NAT'L WILDLIFE FEDERATION SHOP, http://www.shopnwf.org/home.jsp (last accessed Sept. 28, 2015).

[15] Here, Plaintiff once again plays fast and loose with the facts. Plaintiff asserts that "other members of the Wiland cooperative ***that have utilized Time's subscriber lists—and for which Time has received payment***—include nonprofit and political fundraising organization such as the ███████████████████████████████████████████████████████████████████

*Lynch*, No. 11-12847, 2012 WL 683384 at *11 (E.D. Mich. Mar. 2, 2012) (noting that the Court was required "to identify the facts which established [defendant's'] liability" before evaluating whether defendant satisfied the affirmative defense). *See also SPX Corp. v. Shop Equip. Specialists, Inc.*, No. 4:00CV 49, 2001 WL 36512993, at *5 (W.D. Mich. Mar. 28, 2001) (noting that party with burden of proof not responsible for "'negating' the opponent's claim" and instead must show only that "there is an absence of evidence to support the nonmoving party's case.")

### 3. Construing the direct marketing exception as Plaintiff suggests would violate the Constitution.

Construing the VRPA's direct marketing exception as Plaintiff suggests also renders the statute unconstitutional. If the VRPA limits disclosures in aid of marketing by charitable and political organizations as compared to for-profit enterprises, the statute becomes an improper content-and speaker-based restriction on speech in violation of the First Amendment. *See Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653 (2011). *Sorrell* involved a First Amendment challenge to a Vermont statute stating that pharmacy records revealing doctors' prescribing practices could not be sold, disclosed by pharmacies for marketing purposes, or used for marketing purposes by pharmaceutical manufacturers. *Id.* at 2659. After the Second Circuit held that the statute improperly "burden[ed] the speech of pharmaceutical marketers and data miners" the case went to the Supreme Court. *Id.*

The Court first found that the statute was subject to heightened scrutiny

because it enacted "content-and speaker-based restrictions on the sale, disclosure, and use of prescriber-identifying information." *Id.* at 2663. The statute was a content-based restriction because it "forbids sale subject to exceptions based in large part on the content of a purchaser's speech." *Id.* at 2656. "[T]hose who wish to engage in certain 'educational communications' may purchase the information" but those who wish to use the information for marketing may not. *Id.* at 2663. The statute was a speaker-based restriction because it "disfavore[d] specific speakers, namely pharmaceutical manufacturers" because their detailers could not "obtain prescriber-identifying information, even though the information may be purchased or acquired by other speakers with diverse purposes and viewpoints." *Id.*[16]

After finding that heightened scrutiny applied, the Court evaluated whether the statute was appropriately drawn to achieve an important governmental interest.

---

[16] The Court rejected multiple arguments for why heightened scrutiny should not apply. This included that it should not apply because the law was "a mere commercial regulation." *Id.* at 2664. The Court reasoned that "[b]oth on its face and in its practical operation, Vermont's law imposes a burden based on the content of speech and the identity of the speaker. While the burdened speech results from an economic motive, so too does a great deal of vital expression." *Id.* at 2665. The Court next rejected the argument that heighted scrutiny should not apply because the statute "regulates not speech but simply access to information." *Id.* There, the Court pointed out that "[a]n individual's right to speak is implicated when information he or she possesses is subject to restraints on the way in which the information might be used or disseminated." *Id.* at 2665-6. The Court also rejected the argument that heighted scrutiny was not warranted "because sales, transfer, and use of prescriber-identifying information are conduct, not speech," finding instead that the "creation and dissemination of information are speech within the meaning of the First Amendment." *Id.* at 2666-7.

*Id.* at 2667-8.  The Court concluded it was not.  The Court rejected the argument that the statute was necessary to protect medical privacy, finding that "[g]iven the information's widespread availability and many permissible uses, the State's asserted interest in physician confidentiality does not justify the burden that [the statute] places on protected expression."  *Id.* at 2668.   The Court also disagreed that the statute was necessary to protect doctors from attempts to influence their treatment decisions because the state did not explain why pharmaceutical manufacturers' use of the information was "more likely to prompt these objections than many other uses permitted by [the statute]."  *Id.* at 2657.

Here, if Plaintiff's construction were adopted, it would render the VRPA unconstitutional under *Sorrell*.[17]  The statute would be a content-based restriction on speech because it would limit the disclosure of information based on content— magazine titles.  It would be a speaker-based restriction because it would burden to a  much  greater  degree  a  small  group  of  speakers—charities  and  political organizations—seeking to obtain information that is available to for-profit entities. The VRPA as Plaintiff seeks to construe it is also not narrowly drawn to achieve

---

[17] Plaintiff's  interpretation  of  the  VRPA  is  even  more  problematic  than  the limitations the statute in *Sorrell* imposed because it would have the VRPA limit charitable and political speech.  *See Speet v. Schuette*, 726 F.3d 867, 874 (6th Cir. 2013) (noting that the Supreme Court has repeatedly reaffirmed that "charitable solicitations are so intertwined with speech that they are entitled to the protection of the First Amendment."); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) (finding that political speech is a core First Amendment activity that "must prevail against laws that would suppress it, whether by design or inadvertence.").

the interests the statute seeks to advance. Plaintiff argues that the purpose of the VRPA is to provide "Michigan consumers with a statutory right to privacy in their reading choices and habits." Pl. Mem. at 1. But a statute that allows publishers to disclose such reading choices and habits to an unlimited number of for-profit entities, but places much greater restrictions on disclosures to charitable and political organizations, does not advance such an interest.

Construing the VRPA as Plaintiff suggests renders the statute unconstitutional. Such a construction therefore should be avoided. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"); *Green Party of Tennessee v. Hargett*, 700 F.3d 816, 825 (6th Cir. 2012) ("federal courts must construe challenged state statutes, whenever possible, so as 'to avoid constitutional difficulty'"); *U.S. v. Erpenbeck*, 682 F.3d 472, 476 (6th Cir. 2012) ("If a statute is susceptible of 'two plausible ... constructions,' one of which 'would raise a multitude of constitutional problems, the other should prevail'").

## B. That Time Received Names from the Co-Op is Irrelevant to Whether the Direct Marketing Exception Applies

The facts are undisputed that every entity that rented names from the Wiland

Co-op did so solely to market goods and services (including charitable and political solicitations) to consumers.  *See* Time Mem. at 16.  This should end the inquiry regarding whether Time's disclosures were for the exclusive purpose of marketing.   Plaintiff argues that marketing goods and services was not the exclusive purpose of disclosures to Wiland because such disclosures were "the 'price' Time must pay" to "unlock access to the subscriber information supplied by *other* magazine publishers."  *See* Pl. Mem. at 6 (emphasis in original).[18]

Plaintiff's argument is that "purpose" as used in the direct marketing exception means the disclosing person's motivation, not the ultimate use of the information disclosed.   But Plaintiff provides no basis for this construction, and that cannot be what "purpose" means.  Asking "why" Time joined the Co-op is like asking "why" Time rented a list to Coke but not Pepsi.  It is irrelevant.   In traditional list rental, publishers receive monetary compensation for renting subscriber names to direct marketers.  *See* Time Mem. at 3-5.   According to

---

[18] The deposition testimony Plaintiff points to as support for this proposition says no such thing. Mr. Breininger testified that as a member of the Co-op Time could access names from the Co-op and that all members of the Co-op contributed names to the Co-op. This should not be surprising given that the definition a Co-op is an organization "operated for the benefit of those using its services." *See* Choose Your Business Structure: Cooperative, U.S. SMALL BUSINESS ADMIN, https://www.sba.gov/content/cooperative (last accessed Sept. 29, 2015). It would thus be strange if members did not both provide and receive some benefit from participation.  But Mr. Breininger never testified that this was "a reason," let alone "the reason," for Time's participation in the Co-op, or that contributing the names was a "price" to "unlock" anything.

Plaintiff, the direct marketing exception would not apply to such disclosures, even if (like here) the disclosed information was used solely to market to those subscribers.  Under Plaintiff's theory, the exception would likewise not apply if the publisher's disclosure to the direct marketer was motivated by generosity, friendship, advocacy for a particular cause, or anything else other than a pure heart and mind devoted to consumer marketing.

Construing the statute in such a way is inconsistent with the principle that statutes must be construed "to avoid rendering superfluous any parts thereof." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991).  This is because no disclosure could ever clearly satisfy the direct marketing exception, at least not until the disclosure's motivations were fully explored. The exception should not be read in such a way. *See In re Brucher*, 243 F.3d 242, 244 (6th Cir. 2001) ("In the second place, the trustee's reading turns part of § 522(d)(10)(E)(iii) into surplusage…. If IRAs were never to be exempted under § 522(d)(10)(E), the inclusion in subsection (iii) of the reference to section 408 would have been utterly pointless.")

Plaintiff's construction also renders the VRPA unconstitutionally vague.  A law must define prohibited conduct "with sufficient definiteness that ordinary people can understand what is prohibited" and establish standards permitting authorities "to enforce the law in a non-arbitrary, non-discriminatory manner."

*Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999).[19]  Construing the direct marketing exception as Plaintiff suggests runs afoul of both requirements. An ordinary person disclosing information to marketers would have no way of understanding what motivations (if any) are proper or improper, or how significant a motivation must be before a company could no longer avail itself of the direct marketing exception.  Likewise, there would be no identifiable standards under which authorities (or private parties) could enforce the statute's provisions in a criminal or civil context.  *See, e.g., Carter*, 719 F. Supp. at 853 (determining whether an entity had "'sufficient' operating capital and net worth," "performs substantial services" or "actively competes in the marketplace," all "invite a highly subjective evaluation," and accordingly "the regulation does not contain sufficient exactness to prevent arbitrary enforcement and give notice of

---

[19] Where an ordinance or statute imposes criminal penalties, although "impossible clarity in standards governing conduct" is not required, "the court must apply a relative strict standard of scrutiny." *Belle Maer*, 170 F.3d at 557. *See also People v. Hall*, 215 N.W.2d 166, 174 (1974) ("We begin our review of these statutes by affirming our previous holdings that penal statutes are to be strictly construed"). The fact that this particular case is a civil case and not a criminal case does not obviate this requirement. *See Carter v. Welles-Bowen Realty, Inc*., 719 F. Supp. 2d 846, 852 (N.D. Ohio 2010) ("Moreover, a statute must be given the same construction in its civil and criminal applications"); *Fed. Commc'ns Comm'n v. Am. Broad. Corp*., 347 U.S. 284, 296, (1954) ("[T]hese are not criminal cases, but it is a criminal statute that we must interpret. There cannot be one construction for the Federal Communications Commission and another for the Department of Justice."); *H.J. Inc. v. Nw. Bell Tel. Co*., 492 U.S. 229, 255 (1989) (Scalia, J., concurring) ("RICO, since it has criminal applications as well, must, even in its civil applications, possess the degree of certainty required for criminal laws[.]")

what an individual must do to comply with the enactment.")[20]

### C.    Time's written notices satisfy the VRPA.

Finally, Plaintiff argues that the direct marketing exception does not apply because Time's written notices "just don't comply" with the direct marketing exception.  Pl. Mem. at 24.  Plaintiff says this is because the in-magazine notices "appear at the bottom of a single page" and are "in minuscule font," and because the notices in Fortune and Real Simple don't include the language in Time's in-magazine notices stating that, "If you would prefer that we not include your name, please call or write us at P.O. Box 60001, Tampa, Fla. 33630, or send us an email at ***privacy@time.customerservc.com***." (*See, e.g.*, Ex. J.) But as explained more fully in Time's summary judgment Plaintiff's argument ignores key facts:

- ***First***, Time provided notices of its practices, and the ability to opt out of those practices, not just in its magazines, but also on its website and in bills and renewal notices.  Since Plaintiff concedes that "the VRPA only requires that written notice be made, and not received" these notices are just as effective under the VRPA as the in-magazine notices, regardless of how the class subscribed. *See* Time Mem. at 16-17, 19-20.

- ***Second***, Time's notices were effective, ████████████████████████████████████████████████████

- ***Third,*** although much of the VRPA is modeled after the federal Video

[20] Plaintiff's interpretation is also properly rejected under the rule of lenity which counsels courts to choose the interpretation of an ambiguous statute that is most "lenient" or favorable to the defendant.  *See, e.g.*, *U.S. v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518, n.10 (1992) (noting that in civil action, rule of lenity applies when construing statute that, like the VRPA, "has criminal applications").

Privacy Protection Act, the Michigan legislature chose ***not*** to include the VPPA's language requiring that notice be made in a "clear and conspicuous manner," although other Michigan statutes have mandated specific forms of consumer notices. *See id.* at 18-19.

- ***Fourth,*** notwithstanding Plaintiff's claim that the in-magazine notices are in "miniscule font" the notices are in the exact same font as Time's USPS-compliant "Identification Statements" which the USPS requires be "in an easily read type" and "shown conspicuously." *See id.* at 19.

Finally, Plaintiff suggests that Time's opt-out notices were insufficient because they were provided after Time had already disclosed subscribers' names and because consumers were not notified "at the time they purchased their magazine subscriptions." Pl. Mem. at 23-24. But the VRPA does not require notice at purchase or before any disclosure. Plaintiff invents a timing requirement that does not exist. The statute states that "[t]he person disclosing the information shall inform the customer by written notice that the customer may remove his or her name." M.C.L. § 445.1713. It includes no temporal requirement. Moreover, the provision's use of the word "remove" presupposes that their information may already be disclosed.

Several Michigan consumer protection laws include timing requirements for notice. Section 500.529, enacted in 1980, requires insurers to provide "the consumer a reasonable opportunity, before it discloses the information to the nonaffiliated third party, to opt out of the disclosure." M.C.L. § 529(1)(c). Similarly, M.C.L. 550.1406, enacted in 2001, prevents health care corporations

from disclosing personal information "without the prior and specific informed consent of the member." *Id*. These statutes show that the Michigan legislature knew how to impart timing requirements, but did not do so in the VRPA's direct marketing exception.

## **CONCLUSION**

For the reasons stated here and in Time's Motion for Summary Judgment, which is incorporated by reference, Time respectfully requests that the Court deny Plaintiff's Motion for Summary Judgment, grant Time's Motion for Summary Judgment, and enter judgment for Time.[21]


Dated:  October 1, 2015        /s/ Jeffrey Landis
                               Marc Zwillinger
                               Jeffrey Landis
                               Jacob Sommer
                               ZwillGen PLLC
                               1900 M St. NW, Ste. 250
                               Washington, DC 20036
                               (202) 706-5203

                               Robert M. Jackson (P40723)
                               Arthur T. O'Reilly  (P70406)
                               HONIGMAN MILLER SCHWARTZ
                               AND COHN LLP

---

[21] Plaintiff requests in her brief that the Court allow sufficient time for Class members to exercise their right to opt out of the class before ruling on her motion for summary judgment.  *See* Pl. Mem. at 1 n.2.  Time agrees that this is a sensible approach both with respect to Plaintiff's motion and Time's affirmative motion for summary judgment.

660 Woodward Avenue
2290 First National Building
Detroit, MI  48226
(313) 465-7430
rjackson@honigman.com
aoreilly@honigman.com

*Counsel for Defendant Time, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 1, 2015, I electronically filed the foregoing Time's Opposition to Motion for Summary Judgment and Exhibits with the Clerk of the Court via the ECF system, which shall send a notification of such filing to all counsel of record.

/s/ Jeffrey Landis

Jeffrey Landis
